# EXHIBIT A

# Prescription Requirement Under Section 503A of the Federal Food, Drug, and Cosmetic Act

## Guidance for Industry

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Office of Compliance/OUDLC**

**December 2016**
**Compounding and Related Documents**

# Prescription Requirement Under Section 503A of the Federal Food, Drug, and Cosmetic Act

## Guidance for Industry

*Additional copies are available from:*
*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353*
*Email: druginfo@fda.hhs.gov*
*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Office of Compliance/OUDLC**

**December 2016**
**Compounding and Related Documents**

# TABLE OF CONTENTS

**I.    INTRODUCTION AND SCOPE**..................................................................................... **1**

**II.   BACKGROUND** ............................................................................................................. **2**

   **A.   Overview** ................................................................................................................. **2**

   **B.   The Prescription Requirement in Section 503A(a) of the FD&C Act** ...................... **5**

**III.  POLICY** ........................................................................................................................ **7**

   **A.   Receipt of a Valid Prescription Order or a Notation Approved by the Prescriber Under Section 503A** ............................................................................................................ **7**

   **B.   When a Drug Can Be Compounded Under Section 503A** ......................................... **8**

   **C.   When a Compounded Drug Product Can Be Distributed Under Section 503A**..................... **10**

   **D.   Compounding Office Stock/ Compounding for Office Use** ......................................... **10**

# Prescription Requirement Under Section 503A of the Federal Food, Drug, and Cosmetic Act

## Guidance for Industry[1]

> This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page.

## I.  INTRODUCTION AND SCOPE

This guidance sets forth the FDA's policy concerning certain prescription requirements for compounding human drug products[2] for identified individual patients under section 503A of the Federal Food, Drug, and Cosmetic Act (FD&C Act or Act). It addresses compounding after the receipt of a prescription for an identified individual patient, compounding before the receipt of a prescription for an identified individual patient (anticipatory compounding), and compounding for office use (or office stock).

In general, FDA's guidance documents do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

---

[1] This guidance has been prepared by multiple offices in the Center for Drug Evaluation and Research (CDER), in consultation with the Office of Regulatory Affairs at the Food and Drug Administration.

[2] This guidance does not apply to drugs compounded for use in animals, to biological products subject to licensure in a biologics license application, or to repackaged drug products. For proposed policies pertaining to compounding drug products from bulk drug substances for use in animals, see FDA's draft guidance, *Compounding Animal Drugs from Bulk Drug Substances.* For proposed policies pertaining to mixing, diluting, and repackaging biological products, see FDA's draft guidance, *Mixing, Diluting, and Repackaging Biological Products Outside the Scope of an Approved Biologics License Application.* For proposed policies pertaining to repackaged drug products, see FDA's draft guidance, *Repackaging of Certain Human Drug Products by Pharmacies and Outsourcing Facilities.* FDA guidances are available on the FDA website at http://www.fda.gov/RegulatoryInformation/Guidances/default.htm.

## II.  BACKGROUND

### A.  Overview

1.  Compounding Under the FD&C Act

Sections 503A and 503B of the FD&C Act address human drug compounding.

Section 503A, added to the FD&C Act by the Food and Drug Administration Modernization Act in 1997, describes the conditions that must be satisfied for human drug products compounded by a licensed pharmacist in a State licensed pharmacy or Federal facility, or by a licensed physician, to be exempt from the following three sections of the FD&C Act:

- section 501(a)(2)(B) (concerning current good manufacturing practice (CGMP) requirements);
- section 502(f)(1) (concerning the labeling of drugs with adequate directions for use); and
- section 505 (concerning the approval of drugs under new drug applications (NDAs) or abbreviated new drug applications (ANDAs)).

A list of the conditions that must be met for a compounded drug product to qualify for the exemptions in section 503A of the FD&C Act appears in the guidance, *Pharmacy Compounding of Human Drug Products Under Section 503A of the Federal Food, Drug, and Cosmetic Act.*

New section 503B, added to the FD&C Act by the Drug Quality and Security Act in 2013, created a new category of compounders called *outsourcing facilities.* Section 503B of the FD&C Act describes the conditions that must be satisfied for human drug products compounded by or under the direct supervision of a licensed pharmacist in an outsourcing facility to qualify for exemptions from three sections of the FD&C Act:

- section 502(f)(1);
- section 505; and
- section 582 (concerning drug supply chain security requirements).

In contrast to drug products compounded under section 503A of the FD&C Act, drug products compounded by outsourcing facilities under section 503B are not exempt from CGMP requirements in section 501(a)(2)(B). Outsourcing facilities are also subject to FDA inspections according to a risk-based schedule, specific adverse event reporting requirements, and other conditions that help to mitigate the risks of the drug products they compound.

The guidance, *For Entities Considering Whether to Register As Outsourcing Facilities Under Section 503B of the Federal Food, Drug, and Cosmetic Act,* lists the conditions that are set forth in section 503B of the FD&C Act.

2.  Compounding, Generally

Compounded drug products can serve an important role for patients whose clinical needs cannot be met by an FDA-approved drug product, such as a patient who has an allergy and needs a medication to be made without a certain dye, or an elderly patient or a child who cannot swallow a tablet or capsule and needs a medicine in a liquid dosage form that is not otherwise available, or for appropriate pediatric or weight-based dosing. Drug products for identified individual patients can be compounded consistent with section 503A by licensed pharmacists in State licensed pharmacies and Federal facilities, or by licensed physicians. Drug products can also be compounded by outsourcing facilities under section 503B of the FD&C Act.

In general, when a compounded drug product is clinically necessary for a patient, a prescriber writes a prescription for a compounded drug product, and the patient brings the prescription to a pharmacy, where a licensed pharmacist fills the prescription. In an inpatient setting, such as in a hospital, a prescriber may write an order for a compounded drug product on a patient's health record (e.g., chart). In an office setting, a physician may make an entry or order in a patient's health record that the physician compounded a drug in the office for administration to his or her patient after the patient presents at the physician's office with a clinical need for the compounded drug.

In other cases, based on a history of receiving prescriptions for identified individual patients, in the context of an established relationship with the patient or the practitioner who writes the prescription, a pharmacist may compound a drug product before receipt of a prescription for an identified individual patient in anticipation of receiving such a prescription. The pharmacist then provides the drug product to a patient or a prescriber upon receipt of a prescription. Similarly, based on the amount of the compounded drug that the physician has historically administered or dispensed to his or her patients, a physician may compound a drug product to hold in his or her office in anticipation of patients in his or her practice presenting with a need for the compounded drug,. The physician then administers or dispenses the compounded drug to his or her patients after making an entry in the patients' health records.

Sometimes, it is necessary for health care practitioners in hospitals, clinics, offices, or other settings to have certain compounded drug products on hand that they can administer to a patient who presents with an immediate need for the compounded drug product. For example, if a patient presents at an ophthalmologist's office with a fungal eye infection, timely administration of a compounded antifungal medication may be critical to preventing vision loss. In such a case, the ophthalmologist may need to inject the patient with a compounded drug product immediately, rather than writing a prescription and waiting for the drug product to be compounded and shipped to the prescriber.[3]

In other cases, compounded drug products may need to be administered by a health care practitioner in his or her office because it would not be safe for the patient to take the drug home for self-administration, and it would be more convenient for the physician to have the drug in his

---

[3] Such compounding would be subject to all of the conditions of section 503A or 503B, including provisions concerning compounding drug products that are essentially copies of commercially available drug products (section 503A(b)(1)(D)) or drug products that are essentially copies of approved drugs (section 503B(a)(5)).

or her office to administer immediately upon diagnosis, rather than asking the physician to order the drug and have the patient return to the health care practitioner for administration.

3. Risks Associated with Compounded Drug Products

Although compounded drugs can serve an important need, they pose a higher risk to patients than FDA-approved drugs. Compounded drug products are not FDA-approved, which means they have not undergone FDA premarket review for safety, effectiveness, and quality. In addition, licensed pharmacists and licensed physicians who compound drug products in accordance with section 503A are not subject to CGMP requirements. Furthermore, FDA does not interact with the vast majority of licensed pharmacists and licensed physicians who compound drug products and seek to qualify for the exemptions under section 503A of the FD&C Act for the drug products they compound (see section 3, below) because these compounders are not licensed by FDA and generally do not register their compounding facilities with FDA. Therefore, FDA is often not aware of potential problems with their compounded drug products or compounding practices unless it receives a complaint such as a report of a serious adverse event or visible contamination.

In 2012, contaminated injectable drug products that a compounding pharmacy shipped to patients and health care practitioners across the country caused a fungal meningitis outbreak that resulted in more than 60 deaths and 750 cases of infection.[4] This was the most serious of a long history of outbreaks associated with contaminated compounded drugs. Since the 2012 fungal meningitis outbreak, FDA has investigated numerous other outbreaks and other serious adverse events, including deaths, associated with compounded drugs that were contaminated or otherwise compounded improperly. For example, patients have been hospitalized after receiving compounded non-sterile drugs that were hundreds or even thousands of times their labeled strength.[5]

FDA has also identified many pharmacies that compounded drug products under insanitary conditions whereby the drug products may have been contaminated with filth or rendered injurious to health, and that shipped, sometimes in large amounts, the compounded drug products made under these conditions to patients and health care providers across the country.[6] The longer a compounded sterile drug product that has been contaminated is held by a pharmacist or physician before distribution, [7] or held in inventory in a health care facility before administration, the greater the likelihood of microbial proliferation and increased patient harm. Because of these and other risks, the FD&C Act places conditions on compounding that must be met for compounded drugs to qualify for the exemptions in section 503A. These conditions include:

---

[4] See http://www.cdc.gov/HAI/outbreaks/meningitis.html.

[5] See, for example, http://www.fda.gov/Drugs/DrugSafety/ucm474552.htm

[6] See FDA actions, including warning letters and injunctions, related to insanitary conditions at compounding facilities, on FDA's website at
http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/PharmacyCompounding/ucm339771.htm

[7] *Distribution* means that the compounded drug has left the facility in which it was compounded. As used in this guidance, *distribution* includes dispensing a drug directly to a patient.

- compounding is for an identified individual patient,
- drugs compounded in advance of receiving prescriptions are compounded only in limited quantities, and
- drugs are distributed pursuant to a valid patient-specific prescription.

These conditions are meant to help ensure that compounding under section 503A is based on individual patient needs, and that entities purportedly operating under section 503A are not actually operating as conventional manufacturers.

### B. The Prescription Requirement in Section 503A(a) of the FD&C Act

A compounded drug product may be eligible for the exemptions under section 503A of the FD&C Act only if it is, among other things, "compounded for an identified individual patient based on the receipt of a valid prescription order or a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is necessary for the identified patient." To qualify for the exemptions under section 503A, the drug product must also be compounded by a licensed pharmacist in a State licensed pharmacy or a Federal facility, or by a licensed physician (section 503A(a)).

Section 503A(a) describes two situations in which a drug product can be compounded: (1) based on the receipt of a valid prescription order for an identified individual patient (section 503A(a)(1)); or (2) in limited quantities before the receipt of a valid prescription order for an identified individual patient (section 503A(a)(2)). As discussed further in section III.C of this guidance document, section 503A does not provide for distributing a compounded drug product before receiving a valid prescription order for an identified individual patient.

The *prescription requirement* under section 503A is a critical mechanism to distinguish compounding by a licensed pharmacist or licensed physician from conventional manufacturing, and to ensure that drug products compounded under section 503A, which are not FDA-approved, are not subject to the requirement that labeling bear adequate directions for use, and are not subject to CGMP requirements, are provided to a patient only based on individual patient need.

The prescription requirement is also an important factor that distinguishes compounding by a licensed pharmacist in a State licensed pharmacy or a Federal facility, or by a licensed physician under section 503A from compounding by an outsourcing facility under section 503B of the FD&C Act. Section 503B states that an outsourcing facility may or may not obtain prescriptions for identified individual patients (section 503B(d)(4)(C)). Outsourcing facilities, which are subject to CGMP requirements and other important conditions, can compound drug products to fulfill the needs described in section II.A.2 for health care practitioners to have drug products on hand that are not compounded for identified individual patients.

1. Compounding After Receipt of a Valid Prescription Order

As described in section II.A.2, a prescriber may write a prescription for an identified individual patient who needs a compounded drug product. In most cases, either the prescriber or the patient

will then bring or send the prescription to the pharmacy, where the pharmacist will compound the drug product for the patient and provide it to the prescriber or patient according to the prescription. For a patient in an inpatient setting, a prescriber may place an order in the patient's health record (e.g., chart) for a compounded drug product, which will likely be provided by the health care facility pharmacy. In an office setting, a physician may compound a drug after making a notation in the health record of a patient in his practice who presents with a need for the compounded medication. These types of compounding are covered under section 503A(a)(1) of the FD&C Act,[8] which provides for compounding by a licensed pharmacist in a State licensed pharmacy or a Federal facility, or a licensed physician, on the prescription order for an individual patient made by a licensed physician or other licensed practitioner authorized by state law to prescribe drugs.

    2.   Compounding Before Receipt of a Valid Prescription Order

Sometimes, based on a history of receiving prescriptions for a particular drug product to be compounded for an identified individual patient, and in the context of an established relationship with a particular prescriber or patient, a pharmacist or physician will compound a batch of drugs in anticipation of receiving another patient-specific prescription. The compounder then provides the drugs to a patient or health care provider when a prescription for an identified individual patient is received. This is known as *anticipatory compounding*. Section 503A(a)(2) of the FD&C Act provides for compounding by a licensed pharmacist or licensed physician in "limited quantities before the receipt of a valid prescription order for such individual patient" if:

- The compounding is based on a history of the licensed pharmacist or licensed physician receiving valid prescription orders for the compounding of the human drug product;

and

- The orders have been generated solely within an established relationship between the licensed pharmacist or licensed physician and either such patient for whom the prescription order will be provided or the physician or other licensed practitioner who will write such prescription order.

Anticipatory compounding can be beneficial because larger batch sizes can increase efficiency and reduce the likelihood of human error that is associated with compounding many small batches of a drug product after the receipt of individual prescriptions for the same drug. However, anticipatory compounding also has risks. For example, if a problem occurs during compounding, such as contaminating a drug product that is supposed to be sterile, or producing subpotent or superpotent sterile or non-sterile drugs, it could affect numerous patients, and not just one. Because drug products compounded in accordance with section 503A are exempt from CGMP requirements, there is an inherently greater chance of a production mistake or

---

[8] If applicable state and federal requirements are met, outsourcing facilities can also compound drug products pursuant to prescriptions for identified individual patients under section 503B of the FD&C Act. However, that is not the subject of this guidance document.

contamination. Restricting anticipatory compounding to limited quantities serves to limit the number of patients likely to be affected if there are drug product mix-ups or contamination.

The limitations on anticipatory compounding in section 503A (i.e., compounding must be in "limited quantities" and based on an "established relationship") help to protect patients from product quality issues.

These limitations on anticipatory compounding also help to distinguish licensed pharmacists or licensed physicians compounding drug products under section 503A for individual patients from conventional manufacturers, who generally produce larger quantities of drugs that are distributed without a prescription.

The anticipatory compounding limitations also differentiate licensed pharmacists and licensed physicians compounding under section 503A from compounders registered as outsourcing facilities under section 503B of the FD&C Act. As explained above, outsourcing facilities are subject to increased Federal oversight and quality standards, including CGMP requirements, which reduce the risks of quality problems such as production mistakes or contamination. Under section 503B, an outsourcing facility can distribute compounded drug products to health care facilities and health care practitioners without first receiving prescriptions for identified individual patients.

With these principles in mind, FDA sets forth its policy with regard to the prescription requirement in section 503A.

## III.   POLICY

### A.   Receipt of a Valid Prescription Order or a Notation Approved by the Prescriber Under Section 503A

For purposes of section 503A(a), a *valid prescription order* for a compounded drug product means a valid prescription order from a licensed physician or other licensed practitioner authorized by state law to prescribe drugs (prescriber). It also includes a valid order or notation made by a prescriber in a patient's health record (e.g., chart) in an inpatient setting, and a valid order or notation by a physician who compounds a drug for his or her own patient documented in that patient's health record.[9]

To meet the prescription requirement, a prescription must identify the patient for whom the drug has been prescribed. If the identity of the patient is not given or is not clear, it will not satisfy

---

[9] Prescription orders that are not valid would not satisfy the prescription requirement in section 503A and cannot serve as the basis for anticipatory compounding. See, in addition, section 301(ccc)(2), which states that, with respect to a drug to be compounded pursuant to section 503A or 503B, the intentional falsification of a prescription, as applicable, is a prohibited act.

this requirement.  For example, a prescription would not satisfy the requirement if it is written for the prescriber, when the prescriber is not also the patient.[10]

### B.  When a Drug Can Be Compounded Under Section 503A

1.  Compounding After Receipt of a Valid Prescription Order

Unless a drug product is compounded in limited quantities before the receipt of a valid prescription order under the conditions described in section 503A(a)(2) of the FD&C Act, which are also described in section III.B.2 of this guidance, to qualify for the exemptions under section 503A, the drug product must be compounded *after* the licensed pharmacist or licensed physician receives a valid prescription order for an individual patient.  We understand this to be compounding "on" the receipt of a valid prescription order, as provided in section 503A(a)(1).[11]

2.  Compounding Before Receipt of a Valid Prescription Order

If a drug product is not compounded after the receipt of a valid prescription order for an identified individual patient as described in section 503A(a)(1) of the FD&C Act and section III.B.1 of this guidance, the drug product can be compounded under section 503A of the Act by a licensed pharmacist or licensed physician in limited quantities before the receipt of a valid prescription order for such individual patient (section 503A(a)(2)(A)), if all of the conditions of section 503A are met, including the following conditions:

- The compounding is based on a history of the licensed pharmacist or licensed physician receiving valid prescription orders for the compounding of the human drug product; and

- The orders have been generated solely within an established relationship between the licensed pharmacist or licensed physician and either such patient for whom the prescription order will be provided or the prescriber who will write such prescription order[12] (see section 503A(a)(2)(B)).

This means that anticipatory compounding under section 503A is done in limited quantities, based on an expectation that the licensed pharmacist or licensed physician will receive a patient-specific prescription for the particular drug product, written for a patient or by a prescriber with whom the compounder has a relationship.

---

[10] In addition, for a notation to serve as a basis for compounding under section 503A, the notation must document the prescriber's determination that a compounded drug is necessary for the identified patient (section 503A(a)). FDA intends to describe its policies regarding this provision in a future policy document.

[11] This includes a physician compounding a drug for his or her own patient after writing a prescription order (e.g., an order written in the patient's chart) for the compounded drug.

[12] When a physician compounds drugs for his or her own patients, FDA considers the "established relationship" provision of section 503A(a)(2) to have been satisfied because the licensed physician and the "prescriber who will write such prescription order" are the same individual.

At this time, as an interim compliance policy, we do not intend to consider whether a compounder has exceeded the limited quantity[13] condition in section 503A(a)(2) if:

- The compounder holds for distribution[14] no more than a 30-day supply of a particular compounded drug product (i.e., units of a compounded drug product that the compounder believes it will distribute over a 30-day period) to fill valid prescriptions it has not yet received; and

- The amount of the supply of a particular compounded product is based on the number of valid prescriptions that the compounder has received for identified individual patients in a 30-day period over the past year that the compounder selected.

Under this policy, if a compounder does not exceed the quantities described above, FDA does not intend to determine whether anticipatory compounding was based on the expectation that the compounder would receive another prescription for the drug product for the same patient or from the same prescriber with whom the compounder has a history. FDA also contemplates that a compounded drug product might be distributed to any patient or prescriber who presents a valid prescription for an identified individual patient for the compounded drug product.[15]

The following examples illustrate FDA's policy on anticipatory compounding under section 503A(a)(2):

- A compounder regularly receives valid prescription orders from a particular prescriber or prescribers, or for a particular patient or patients, for compounded drug X. The highest number of units of drug X for which the compounder has received valid patient-specific prescriptions in a 30-day period in the last year is 500 units. Compounding up to 500 units of drug X in advance of receiving prescriptions for the drug, and holding no more than that amount to fill new valid patient-specific prescriptions as the compounder receives them, would be consistent with this policy.[16]

- A compounder regularly receives valid prescription orders from a particular prescriber or prescribers, or for a particular patient or patients, for compounded drug

---

[13] The *limited quantities* policy, which relates to the amount of inventory held by the compounder, does not alter the product's BUD. For example, if the BUD for the product is 9 days, the compounder should not produce more units than can be distributed pursuant to valid prescriptions and used within 9 days.

[14] A drug product *for distribution* does not include drug product that is being held pending receipt of the results of release testing such as sterility testing.

[15] For example, in an inpatient setting, the "established relationship" may be between the prescriber who writes an order for a compounded drug product in a patient's health record, and the compounder who produces the drug product.

[16] In this example, it would be consistent with FDA's policy if, after distributing 200 units of drug X pursuant to valid patient-specific prescriptions, the compounder produces up to 200 additional units of drug X so that the total number of units that the compounder is holding for distribution returns to 500 units.

X. As of August 1, 2016, the highest number of units of drug X for which the compounder has received such valid patient-specific prescriptions in a 30-day period between August 1, 2015, and August 1, 2016, is 500 units, which were received between July 1, 2016, and July 30, 2016. Based on this 30-day reference period, the compounder produces 500 units of drug X in advance of receiving prescriptions for the drug, and holds no more than that amount to fill new patient-specific prescriptions as the compounder receives them. However, between July 15, 2016, and August 15, 2016, the compounder receives valid patient-specific prescriptions for 750 units of compounded drug X. Therefore, based on this new reference period, on August 16, 2016, the compounder produces up to 750 units of drug X in advance of receiving prescriptions for the drug, and holds no more than that amount to fill new valid patient-specific prescriptions as the compounder receives them. This would be consistent with FDA's policy on anticipatory compounding.

- A physician who compounds drugs for his or her own patients routinely sees patients who need compounded drug X. The highest number of units of drug X that the physician has dispensed or administered to patients after making a notation in the patients' charts in a 30-day period in the last year is 500 units. Compounding up to 500 units of drug X in advance of making such notations in patients' charts (i.e., before patients present at the physician's office with a need for the compounded drug), and holding no more than that amount to dispense or administer to patients, would be consistent with this policy.

### C. When a Compounded Drug Product Can Be Distributed Under Section 503A

Compounding under section 503A(a) must be "for an identified patient based on the receipt of a valid prescription order" – either "on the receipt of a prescription order for such individual patient" or, under certain conditions, "before the receipt of a valid prescription order for such individual patient." This means that for each drug compounded under section 503A, the compounder must obtain a valid patient-specific prescription order. We therefore understand that the compounder can distribute compounded drugs under section 503A only pursuant to such a valid patient-specific prescription (i.e., the compounder receives a valid patient-specific prescription before the compounded drug product leaves the compounding facility). We recognize that some state boards of pharmacy may authorize the writing of prescriptions that do not include individual patient names. Such prescriptions, however, do not meet the requirement of a patient-specific prescription in section 503A. Under section 503B, outsourcing facilities can fill such prescriptions if they meet the requirements of applicable state and Federal laws.

### D. Compounding Office Stock/ Compounding for Office Use

As discussed in section II.A.2 of this guidance, some compounded drug products are kept as office stock/ for office use by hospitals, clinics, or health care practitioners to administer to patients who present with an immediate need for a compounded drug product. Hospitals, clinics, and health care practitioners can obtain non-patient-specific compounded drug products from

outsourcing facilities registered under section 503B.[17]  Outsourcing facilities, which are subject to CGMP requirements, FDA inspections according to a risk-based schedule, specific adverse event reporting requirements, and other conditions that provide greater assurance of the quality of their compounded drug products, may, but need not, obtain prescriptions for identified individual patients prior to distribution of compounded drug products (section 503B(d)(4)(C)).[18] Therefore, outsourcing facilities can compound and distribute sterile and non-sterile[19] non-patient-specific drug products to hospitals, clinics, and health care practitioners for office use.[20]

Section 503A(a)(2) provides a pathway for anticipatory compounding in limited quantities.  A licensed pharmacist or licensed physician can compound a drug product in advance of receiving a valid prescription order for an identified individual patient, in accordance with the conditions described in section 503A(a)(2) of the FD&C Act, to have a supply of the drug product ready to provide to a patient or prescriber (or, in the case of a physician, to administer to a patient) when a patient-specific prescription order is presented for the compounded drug product.  This can reduce the time it would take for a compounded drug product to be made available to a patient upon receipt of a valid prescription order for that patient.

---

[17] See also FDA's draft guidance, *Hospital and Health System Compounding Under the Federal Food, Drug, and Cosmetic Act*, which, when final, will describe FDA's policies regarding the application of section 503A of the FD&C Act to drug products compounded for use within a hospital or health system.

[18] Although an outsourcing facility may send prescription drugs to health care facilities without obtaining prescriptions for identified individual patients, drugs produced by outsourcing facilities remain subject to the requirements in section 503(b) of the FD&C Act.  Therefore, an outsourcing facility cannot dispense a prescription drug to a patient without a prescription.

[19] Section 503B defines *outsourcing facility*, in part, as a facility that is engaged in the compounding of sterile drugs (section 503B(d)(4)(A)(i)).  Therefore, an entity that only compounds non-sterile drugs does not meet the definition of *outsourcing facility*.  An outsourcing facility may engage in non-sterile compounding provided that it also engages in the compounding of sterile drugs, and provided that it compounds all of its drugs (both sterile and non-sterile) in accordance with the conditions of section 503B.

[20] Distribution of compounded drug products by outsourcing facilities is subject to the limitations described in section 503B(a)(8), among other conditions.

# EXHIBIT B

# Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act

## Guidance for Industry

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Office of Compliance/OUDLC**

**January 2018**
**Compounding**

# Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act

## Guidance for Industry

*Additional copies are available from:*
*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353*
*Email: druginfo@fda.hhs.gov*
*https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Office of Compliance/OUDLC**

**January 2018**
**Compounding**

# TABLE OF CONTENTS

I.     INTRODUCTION AND SCOPE ............................................................................................ 1

II.    BACKGROUND ................................................................................................................. 2

   A.   Section 503A of the FD&C Act ..................................................................................... 2

   B.   Compounding, Generally ............................................................................................. 2

   C.   Risks Associated with Compounded Drug Products ..................................................... 3

   D.   Compounded Drugs That Are Essentially Copies of Commercially Available Drug Products . 3

III.     POLICY ............................................................................................................................. 4

   A.   Commercially Available Drug Product .......................................................................... 5

   B.   Essentially a Copy of a Commercially Available Drug Product .................................... 5

IV. PAPERWORK REDUCTION ACT .................................................................................... 11

APPENDIX A. ................................................................................................................................ 12

# Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act
# Guidance for Industry[1]

This guidance represents the current thinking of the Food and Drug Administration (FDA or the Agency) on this topic.  It does not create any rights for any person and is not binding on FDA or the public.  You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations.  To discuss an alternative approach, contact the FDA office responsible for this guidance as listed in the title page.

## I.      INTRODUCTION AND SCOPE

To qualify for exemptions under section 503A of the Federal Food, Drug, and Cosmetic Act (FD&C Act), a drug product must be compounded by a licensed pharmacist or physician who does not compound regularly or in inordinate amounts any drug products that are essentially copies of a commercially available drug product, among other conditions.  This guidance sets forth FDA's policies regarding this provision of section 503A, including the terms *commercially available*, *essentially a copy of a commercially available drug product*, and *regularly or in inordinate amounts*.[2]

In general, FDA's guidance documents do not establish legally enforceable responsibilities.  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.  The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

---

[1] This guidance has been prepared by multiple offices in the Center for Drug Evaluation and Research, in consultation with the Office of Regulatory Affairs at the Food and Drug Administration.

[2] This guidance does not apply to drugs compounded for use in animals, to biological products subject to licensure in a biologics license application, or to repackaged drug products.  For policies pertaining to mixing, diluting, and repackaging biological products, see FDA's guidance, *Mixing, Diluting, and Repackaging Biological Products Outside the Scope of an Approved Biologics License Application.*  For policies pertaining to repackaged drug products, see FDA's guidance, *Repackaging of Certain Human Drug Products by Pharmacies and Outsourcing Facilities*.

All FDA guidances are available on the FDA guidance web page.  FDA updates guidances regularly.  To make sure you have the most recent version of a guidance, always consult the guidance web page at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.

## II.    BACKGROUND

### A.  Section 503A of the FD&C Act

Section 503A, added to the FD&C Act by the Food and Drug Administration Modernization Act of 1997 and amended by the Drug Quality and Security Act in 2013, describes the conditions that must be satisfied for human drug products compounded by a licensed pharmacist in a State-licensed pharmacy or Federal facility, or by a licensed physician, to qualify for exemptions from the following three sections of the FD&C Act:[3]

- Section 501(a)(2)(B) (concerning current good manufacturing practice (CGMP) requirements)
- Section 502(f)(1) (concerning the labeling of drugs with adequate directions for use)
- Section 505 (concerning the approval of drugs under new drug applications (NDAs) or abbreviated new drug applications (ANDAs))

One of the conditions that must be met for a compounded drug product to qualify for the exemptions under section 503A of the FD&C Act is that it must be compounded by a licensed pharmacist or a licensed physician that "does not compound regularly or in inordinate amounts (as defined by the Secretary) any drug products that are essentially copies of a commercially available drug product."[4]

The statute further states that "the term 'essentially a copy of a commercially available drug product' does not include a drug product in which there is a change, made for an identified individual patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug."[5]

A complete list of the conditions that must be met for a compounded drug product to qualify for the exemptions in section 503A appears in the FDA guidance, *Pharmacy Compounding of Human Drug Products Under Section 503A of the Federal Food, Drug, and Cosmetic Act.*

### B.  Compounding, Generally

Compounded drug products serve an important role for patients whose clinical needs cannot be met by an FDA-approved drug product, such as a patient who has an allergy and needs a medication to be made without a certain dye, an elderly patient who cannot swallow a pill and needs a medicine in a liquid form that is not otherwise available, or a child who needs a drug in a strength that is lower than that of the commercially available product.  Drug products for identified individual patients can be compounded by licensed pharmacists in state-licensed

---

[3] In addition, under section 581(13) of the FD&C Act, the term "product," for purposes of pharmaceutical supply chain security requirements, does not include a drug compounded in compliance with section 503A.

[4] See section 503A(b)(1)(D).

[5] See section 503A(b)(2).

pharmacies and Federal facilities and by licensed physicians operating under section 503A of the FD&C Act. Drug products can also be compounded by outsourcing facilities under section 503B of the FD&C Act for identified individual patients pursuant to prescriptions or for distribution to health care practitioners without first receiving a prescription.[6] Both sections 503A and 503B restrict compounding drug products that are essentially a copy of a commercially available drug product (section 503A) or an approved drug product (section 503B).

### C. Risks Associated with Compounded Drug Products

Although compounded drugs can serve an important need, they can also pose a higher risk to patients than FDA-approved drugs. Compounded drug products are not FDA-approved, which means they have not undergone FDA premarket review for safety, effectiveness, and quality. In addition, licensed pharmacists and licensed physicians who compound drug products in accordance with section 503A are not required to comply with CGMP requirements. Furthermore, FDA does not interact with the vast majority of licensed pharmacists and licensed physicians who compound drug products and seek to qualify for the exemptions under section 503A of the FD&C Act for the drug products that they compound because these compounders are not licensed by FDA and generally do not register their compounding facilities with FDA. Therefore, FDA is often not aware of potential problems with their compounded drug products or compounding practices unless it receives a complaint, such as a report of a serious adverse event or visible contamination.

FDA has investigated numerous serious adverse events associated with compounded drug products that were contaminated or otherwise compounded improperly, including the adverse events associated with the 2012 fungal meningitis outbreak in which contaminated injectable drug products resulted in more than 60 deaths and 750 cases of infection. FDA has also identified many pharmacies that compounded drug products under insanitary conditions such that the drug products may have been contaminated with filth or rendered injurious to health and that shipped the compounded drug products made under these conditions to patients and health care practitioners across the country, sometimes in large amounts.

### D. Compounded Drugs That Are Essentially Copies of Commercially Available Drug Products

Section 503A provides exemptions from new drug approval, labeling with adequate directions for use, and CGMP requirements of the FD&C Act, so that drug products can be compounded as customized therapies for identified individual patients whose medical needs cannot be met by commercially available drug products. The restrictions on making drugs that are essentially copies ensure that pharmacists and physicians do not compound drug products under the exemptions for patients who could use a commercially available drug product. Such a practice would create significant public health risks because patients would be unnecessarily exposed to drug products that have not been shown to be safe and effective and that may have been prepared

---

[6] Section 503B of the FD&C Act describes the conditions that must be met for a human drug product compounded by an outsourcing facility to qualify for exemptions from sections 505, 502(f)(1), and 582 (concerning drug supply chain security requirements) of the FD&C Act. The conditions applicable to outsourcing facilities are discussed in separate guidances applicable to those facilities.

under substandard manufacturing conditions. FDA has investigated serious adverse events in patients who received contaminated compounded drugs when a comparable approved drug, made in a facility subject to CGMP requirements, was available.

In addition to these immediate public health risks, section 503A's limitations on producing a drug product that is essentially a copy of a commercially available drug product protects the integrity and effectiveness of the new drug and abbreviated new drug approval processes that Congress put in place to protect patients from unsafe, ineffective, or poor quality drugs. Furthermore, sponsors may be less likely to invest in and seek approval of innovative, life-saving medications if a compounder could, after a drug is approved, compound "substitutes" that may be less expensive because they have not had to demonstrate safety and effectiveness and are not produced in accordance with CGMP requirements or labeled with adequate directions for use.

Sponsors might also be less likely to seek approval of an ANDA for a generic drug if compounders were permitted to compound drugs that are essentially copies of commercially available drugs without going through the ANDA process. An ANDA must include data to demonstrate that the drug has the same active ingredient and is bioequivalent to an approved drug. FDA also conducts premarketing inspections of proposed manufacturing facilities.

The copies restriction also protects FDA's drug monograph process. FDA has an ongoing process for evaluating the safety and effectiveness of certain over-the-counter (OTC) medications, and if the Agency determines that an OTC drug meets certain conditions and is generally recognized as safe and effective, it will publish a final monograph specifying those conditions. Products that comply with a final monograph may be marketed, but manufacturers are required to meet CGMP standards. Restrictions in section 503A prevent compounders from producing drugs without having to comply with monograph standards, or CGMP requirements.

## III.  POLICY

As stated above, to qualify for the exemptions under section 503A of the FD&C Act, a drug must be compounded by a licensed pharmacist or a licensed physician that does not compound regularly or in inordinate amounts (as defined by the Secretary) any drug products that are essentially copies of a commercially available drug product.[7] This means that a compounded drug product is not eligible for the exemptions in section 503A if it is (1) essentially a copy of a commercially available drug product, and (2) compounded regularly or in inordinate amounts. Accordingly, and as discussed below, when evaluating whether a drug product meets the condition in section 503A regarding essentially copies, FDA intends to determine whether a compounded drug product is *essentially a copy of a commercially available drug product:* if it is, FDA intends to determine whether the drug product was compounded regularly or in inordinate amounts.[8]

---

[7] See section 503A(b)(1)(D).

[8] FDA is considering the applicability of the policies described in this guidance to hospitals and health systems and intends to address these issues in separate guidance or rulemaking. FDA regards a health system as collection of hospitals that are owned and operated by the same entity and that share access to databases with drug order information for their patients. There is no definition of "health system" that applies to all sections of the FD&C Act.

FDA's policies with regard to the terms (1) *commercially available drug product*, (2) *essentially a copy of a commercially available drug product*, and (3) *regularly or in inordinate amounts*, are as follows:

### A. Commercially Available Drug Product

For purposes of this guidance, a drug product is commercially available if it is a marketed drug product.

We do not consider a drug product to be commercially available if

- the drug product has been discontinued and is no longer marketed[9] or

- the drug product appears on the FDA drug shortage list in effect under section 506E of the FD&C Act.[10]  A drug "appears on the drug shortage list in effect under section 506E" if the drug is in "currently in shortage" status (and not in "resolved" status) in FDA's drug shortage database.

Commercially available drugs are available on the market, and they are generally subject to FD&C Act requirements relating to approval, labeling, and CGMP requirements, and the copies restriction applies to all such drugs because section 503A is not intended to provide a means for compounders to produce compounded drugs exempt from the Act's requirements that are essentially copies of commercially available drug products.

### B. Essentially a Copy of a Commercially Available Drug Product

*1. What is Essentially a Copy?*

FDA intends to consider a compounded drug product to be essentially a copy of a commercially available drug product if:

- the compounded drug product has the same active pharmaceutical ingredient(s) (API) as the commercially available drug product;
- the API(s) have the same, similar, or an easily substitutable dosage strength; and

---

However, this is the definition of a "health system" used in section 506F of the Act concerning hospital repackaging of drugs in shortage.

[9] FDA maintains a list of approved drug products that sponsors have indicated are not marketed in the discontinued section of the list of Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book). See http://www.accessdata.fda.gov/scripts/cder/ob/default.cfm.  Specifically, the list includes approved drug products that have never been marketed, are for exportation, are for military use, have been discontinued from marketing and we have not determined were withdrawn for safety or effectiveness reasons, or have had their approvals withdrawn for reasons other than safety or effectiveness subsequent to being discontinued from marketing.

[10] See http://www.accessdata.fda.gov/scripts/drugshortages/default.cfm.

- the commercially available drug product can be used by the same route of administration as prescribed for the compounded drug,

unless, as provided by section 503A(b)(2), a prescriber determines that there is a change, made for an identified individual patient, which produces, for that patient, a significant difference from the commercially available drug product.

The limitations in section 503A(b)(1)(D) apply to the compounding of drug products that are *essentially* copies of a commercially available drug product – not only to drugs that are exact copies or even to drugs that are nearly identical. This is to ensure that compounders do not evade the limits in this section by making relatively small changes to a compounded drug product and then offering the drug to the general public without regard to whether a prescribing practitioner has determined that the change produces for the patient a significant difference. For example, Congress contemplated that a compounded drug may be essentially a copy of a commercially available drug if "minor changes in strength (such as from .08% to .09%) are made that are not known to be significant . . ." for the patient for whom the drug was prescribed.[11]

   a.  Same API

With regard to the characteristics listed above, an API is the substance in a drug product that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease or to affect the structure or function of the body.[12] When a compounded drug product offers the same API as a commercially available drug product, in the same, similar, or easily substitutable dosage strength and for use through the same route of administration, we generally intend to consider such a drug product *essentially a copy,* unless a prescriber determines that there is a change, made for an identified individual patient, that will produce a significant difference for that patient.

We recognize that, for some patients, a drug product that has the same API, strength, and route of administration may include a change that produces a significant difference for a particular patient. For example, a drug product compounded without a particular inactive ingredient may produce a significant difference for a patient who has an allergy to the inactive ingredient in the commercially available drug product. However, for other patients, this change may produce no difference at all. Congress did not intend for compounders to use, for example, the fact that some patients may have allergies as a basis to compound a drug without the inactive ingredient for other patients who do not have the allergy under the exemptions in section 503A (i.e., without meeting requirements for premarket approval, labeling with adequate directions for use, or

---

[11] U.S. House. Food and Drug Administration Modernization Act of 1997, *Conference Report* (to Accompany S. 830). (105 H. Rpt. 399).

[12] Section 503A refers to bulk drug substances. A *bulk drug substance* is defined as any substance that is intended for incorporation into a finished drug product and is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body. It does not include intermediates used in the synthesis of the substance. This definition is the same as the definition of active pharmaceutical ingredient. See 21 CFR 207.1, 207.3.

CGMP requirements).[13]  In the context of compounding and consistent with the statute, we generally intend to consider such a drug essentially a copy unless a prescriber determines that there is a change that will produce a significant difference for the patient for whom it is prescribed.

      b.  Same, Similar or Easily Substitutable Strength

FDA generally intends to consider two drugs to have a similar dosage strength if the dosage strength of the compounded drug is within 10% of the dosage strength of the commercially available drug product.

With regard to the concept of easily substitutable strength, in some cases, the same or similar dosage strength can be achieved by administration of fractional or multiple doses of a drug product.  For example, if FDA-approved Drug X tablets have a dosage strength of 25 mg and a patient needs 50 mg of Drug X, FDA would generally consider a compounded Drug X 50 mg tablet to have an easily substitutable strength because the patient could take two Drug X 25 mg tablets to achieve the required dose.[14]

      c.  Same Route of Administration

Route of administration is a way of administering a drug to a site in a patient (e.g., topical, intravenous, oral).[15]  In general, FDA does not intend to consider a compounded drug product with the same API and similar or easily substitutable strength to be essentially a copy of a commercially available drug product if the compounded drug product and the commercially available drug product have different routes of administration (e.g., if the commercially available drug product is oral and the compounded drug product is topical).  However, if the compounded drug product has the same API and similar or easily substitutable strength as the commercially available drug product and the commercially available drug product can be used (regardless of how it is labeled) by the route of administration prescribed for the compounded drug, FDA generally intends to consider the compounded drug to be essentially a copy of the commercially available drug.  In this case, the compounded drug product generally would not produce a significant difference for an identified individual patient relative to the commercially available drug product.

For example, if the commercially available drug is an injectable drug sold in a vial that is labeled for intra-muscular use, but the drug also can be drawn from the vial by a smaller needle for subcutaneous administration, a compounded drug product with the same API and similar or

---

[13] *See* note 11.

[14] If a commercially available tablet must be split to achieve the prescribed dosage strength, and such tablet is not suitable for splitting, FDA would not consider the compounded drug made to the prescribed dosage strength to have an easily substitutable strength. For example, some tablets may be too small or crumble too easily when split, making splitting an inappropriate option. Information regarding tablet splitting may be printed in the "HOW SUPPLIED" section of the professional label insert and in the patient package insert of an approved drug product.

[15] See http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071667.htm.

easily substitutable strength prescribed for sub-cutaneous administration would generally be considered to be essentially a copy, unless the prescriber documents on the prescription that the compounded drug product produces a significant difference for the identified individual patient.

### d. Same Characteristics as Two or More Commercially Available Drug Products

FDA intends to consider a compounded drug product to be essentially a copy of a commercially available drug product if the compounded drug product contains the same APIs as two or more commercially available drug products in the same, similar, or easily substitutable strength and if the commercially available drug products can be used (regardless of how they are labeled) by the same route of administration prescribed for the compounded drug, unless there is documentation as described in section III.B.2. Such drug products present the same kinds of concerns as drug products that have a single API and in some respects may be more dangerous because of the potential for unintended drug interactions or formulation issues. For example, if drug X and drug Y are commercially available oral drug products, FDA generally intends to consider a compounded oral drug product that combines drug X and drug Y in strengths that are within 10% of the strengths of the respective commercially available products to be essentially a copy of the commercially available drug product, unless a prescriber determination of a significant difference has been documented.

### 2. Statement of Significant Difference

Pursuant to section 503A(b)(2) of the FD&C Act, a compounded drug product is not essentially a copy of a commercially available drug product if a change is made for an identified individual patient, and the prescribing practitioner has determined that the change will produce a significant difference for that patient. If a compounder intends to rely on such a determination to establish that a compounded drug is not essentially a copy of a commercially available drug product, the compounder should ensure that the determination is documented on the prescription.

FDA does not believe that a particular format is needed to document the determination, provided that the prescription makes clear that the prescriber identified the relevant change and the significant difference that the change will produce for the patient. For example, the following would be sufficient:

- "No Dye X, patient allergy" (if the comparable drug contains the dye)
- "Liquid form, patient can't swallow tablet" (if the comparable drug is a tablet)
- "6 mg, patient needs higher dose" (if the comparable drug is only available in 5 mg dose)

However, if a prescription identifies only a patient name and drug product formulation, this would not be sufficient to establish that the prescriber made the determination described by section 503A(b)(2). Note also that the significant benefit that the prescriber identifies must be produced by the change the compounder will make to a commercially available drug product (i.e., a change in drug product formulation). Other factors, such as a lower price, are not

sufficient to establish that the compounded drug product is not essentially a copy of the commercially available drug product.[16]

If a prescription does not make clear that the prescriber made the determination required by section 503A(b)(2), or a compounded drug is substituted for the commercially available drug product, the compounder can contact the prescriber and if the prescriber confirms it, make a notation on the prescription that the compounded drug product contains a change that makes a significant difference for the patient. The notations should be as specific as those described above, and the date of the conversation with the prescriber should be included on the prescription.[17]

It is not possible to offer exhaustive guidance about when a difference will be "significant" to an identified individual patient. At this time, FDA generally does not intend to question prescriber determinations that are documented in a prescription or notation. However, we do intend to consider whether a prescription or notation relied upon by a compounder to establish that a drug is not essentially a copy documents that the determination was made.

If the compounder produces drugs in anticipation of receiving valid prescriptions for identified individual patients, and the compounder obtains the statement of significant difference from the prescriber when it receives the prescription for the compounded drug, prior to distribution, FDA does not intend to consider the compounded drug that is then distributed to be essentially a copy.

### 3. Documentation of Shortage

If the drug was compounded because the approved drug product was not commercially available because it was on the FDA drug shortage list, the prescriber or compounder should include a notation on the prescription that it was on the drug shortage list and the date the list was checked.[18]

### 4. Regularly or in Inordinate Amounts

A drug product is not eligible for the exemptions in section 503A if it is prepared by a pharmacist or physician who compounds "regularly or in inordinate amounts (as defined by the Secretary)" any drug products that are essentially copies of a commercially available drug

---

[16] Congress noted that "where it is readily apparent, based on the circumstances, that the 'significant difference' is a mere pretext to allow compounding of products that are essentially copies of commercially available products, such compounding would be considered copying of commercially available products and would not qualify for the compounding exemptions if it is done regularly or in inordinate amounts. Such circumstances may include, for example, instances in which minor changes in strength (such as from .08% to .09%) are made that are not known to be significant or instances in which the prescribing physician is receiving financial remuneration or other financial incentives to write prescriptions for compounded products." *See* the U.S. House. Food and Drug Administration Modernization Act of 1997, *Conference Report* (to Accompany S. 830). (105 H. Rpt. 399).

[17] See section IV of this guidance.

[18] See section IV of this guidance.

product.[19]  FDA interprets this to mean that, in order to be compounded in accordance with section 503A, a drug product that is essentially a copy of a commercially available drug product cannot be compounded regularly – i.e., it cannot be compounded at regular times or intervals, usually, or very often.  Nor can the amounts compounded be inordinate, in light of the purpose of section 503A.

Section 503A is intended to protect patients from the public health risks of providing compounded drugs to patients whose medical needs could be met by commercially available drug products and to protect the integrity and efficiency of the drug approval process.  Under the statutory scheme, only very rarely should a compounded drug product that is essentially a copy of a commercially available drug product be offered to a patient.  We conclude, therefore, that a drug product that is essentially a copy of a commercially available drug product is compounded regularly or in inordinate amounts if it is compounded more frequently than needed to address unanticipated, emergency circumstances, or in more than the small quantities needed to address unanticipated, emergency circumstances.

It is important to note that the regularly or in inordinate amounts provision is not implicated if the compounded drug is not essentially a copy of a commercially available drug product.  For example, a compounded drug product that has the same API, dosage strength, and route of administration as a drug product on FDA's shortage list would not be considered essentially a copy of a commercially available drug because a drug product is not considered *commercially available* if it is on FDA's drug shortage list.  In addition, a compounded drug product is not essentially a copy of a commercially available drug product if a prescriber has determined that the compounded drug has a change that produces a significant difference for a patient. Once it has been determined that a compounded drug is essentially a copy of a commercially available drug product as described above, the following are examples of factors that may be the basis for concluding that it has been compounded regularly or in inordinate amounts:

- The compounded drug product amounts to more than a small number of prescriptions or a small percentage of the compounded drug products that a compounder prepares.
- The compounder routinely substitutes compounded drugs that are essentially copies of commercially available drugs upon receiving prescriptions for patients.
- The compounder offers pre-printed prescription pads that a prescriber can use to write a prescription for the drug product that is essentially a copy without making a determination that there is a change that will produce a significant difference for a patient.
- The compounded drug product is not compounded on an as-needed basis, but on a routine or pre-set schedule.

The foregoing list is not intended to be exhaustive. Other factors may be appropriate for consideration in a particular case.

To focus enforcement on the most significant cases, as a matter of policy, at this time FDA does not intend to take action against a compounder for compounding a drug product that is

---

[19]  See section 503A(b)(1)(D).

essentially a copy of a commercially available drug product regularly or in inordinate amounts if the compounder fills four or fewer prescriptions for the relevant compounded drug product in a calendar month.[20]  As noted above, a compounded drug product is not essentially a copy of a commercially available drug product if a prescriber has determined that the compounded drug has a change that produces a significant difference for a patient; thus, a prescription that documents such a prescriber determination would not be counted towards the four prescriptions.

Compounders may produce a limited amount of drugs in anticipation of receiving valid prescriptions for identified individual patients. See section 503A(a)(2). FDA generally intends to consider whether such drugs are essentially a copy at the time the drug is distributed rather than the time it is produced.

>    5.  *Recordkeeping*

A licensed pharmacist or physician seeking to compound a drug product under section 503A should maintain records to demonstrate compliance with section 503A(b)(1)(D).  For example, records should be kept of notations on prescriptions for identified individual patients that a prescriber has determined that the compounded drug has a change that produces a significant difference for the identified patient.

Compounders under section 503A should also maintain records of the frequency in which they have compounded drug products that are essentially copies of commercially available drug products and the number of prescriptions that they have filled for compounded drug products that are essentially copies of commercially available drug products to document that such compounding has not been done regularly or in inordinate amounts.[21]

FDA recommends that compounders maintain the records described above for a period of at least three years.

## IV.  PAPERWORK REDUCTION ACT

This guidance contains information collection provisions that are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520).  See footnotes 17, 18, and 21.  These provisions require review and are not in effect until they display a currently valid OMB control number.  The information collection provisions in this guidance have been submitted to OMB for review as required by section 3507(d) of the Paperwork Reduction Act of 1995. FDA will publish a notice in the *Federal Register* announcing OMB's decision regarding the information collection provisions in this guidance.

---

[20] For purposes of this policy, FDA intends to consider each refill of a prescription as an additional prescription.

[21] See section IV of this guidance.

## APPENDIX A.



# EXHIBIT C


 A

**Alejandro**
San Diego, CA

★★★★★

| Tech | Punctuality & Speed | Online & App | Staff |

Reviewed Oct. 15, 2025

I was hesitant about starting compounded tirzepatide. I began on the pill for the first 2 months, stepping up dosage every month until the injection was the only next step. The slow transition in dosage prevented any side effects for me, even though they ship medication for the side effects, I didn't have to use any and stopped asking for refills. I definitely felt the effect of the appetite suppression once I switched to the injection and I have experienced more consistent weight loss since.

If you want faster results, just go straight for the injection, as the tablet is slower and less effective. I've been on for about 4 months now and have dropped from a size 38 to size 34. I've started running again, and everyone around me have all noticed my improved physique and I have gone down in one shirt size. When you first start, you get an appointment with a care provider and they determine if you're eligible and check your background, afterwards you don't usually need to meet with your care provider to refill unless you want a stronger dose. Medication arrived promptly and you get often reminders about re-ordering.

Less

 👍 Report

M **Response from MEDVi**
Nov. 11, 2025

Good morning Alenjandro,

Thank you for the amazing feedback! We're thrilled MEDVi's medical weight loss program helped you on your journey. We pride ourselves on delivering safe, effective, and personalized weight loss solutions. MEDVi.org reviews like yours help others discover that yes — MEDVi is legit!

-MEDVi Team

# EXHIBIT D

# Terms and Conditions

**Last updated: January 1, 2024**

MEDVi is contemplated for specific non-emergency medical conditions and concerns. If you believe you are experiencing a medical emergency, please dial 911 or your local medical provider.

This User Agreement (collectively with MEDVi's Privacy Policy) applies to your use of all sites (collectively, the "Sites") to which this User Agreement is linked, and the services, features, content or applications (together with the Sites, the "Services") offered by MEDVi and our affiliated brands and products. The terms "we", "us", "our" and "MEDVi" refer to MEDVi, LLC, a Delaware corporation located at 131 Continental Dr, Ste 305, Newark, DE 19713.

Please read this User Agreement carefully as it sets forth the legally binding terms and conditions for your use of our Services.

THIS USER AGREEMENT CONTAINS A MANDATORY ARBITRATION PROVISION IN SECTION XXI WHICH INCLUDES A CLASS ACTION, CLASS ARBITRATION, AND JURY TRIAL WAIVER. THESE PROVISIONS REQUIRE THE USE OF ARBITRATION TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS. BY ACCEPTING THESE TERMS, YOU EXPRESSLY AGREE TO BE BOUND BY AND ABIDE BY THIS AGREEMENT, INCLUDING THE MANDATORY ARBITRATION PROVISION AND THE CLASS ACTION WAIVER PROVISION.

PLEASE READ THESE TERMS OF USE CAREFULLY BEFORE USING OUR SERVICES OR WEBSITE.

# I. Introduction

These Terms of Use (the "Terms") describe your rights and responsibilities regarding the MEDVi website ("website" or the "Platform") owned and operated by MEDVi.

In these Terms, "we", "our", "us", and "MEDVi" collectively refer to MEDVi and any products, subsidiaries, and affiliations. The terms "you" and "yours" refer to the person using the Platform. Use of the Platform is governed by these Terms and our Privacy Policy. By accessing or using the Platform, you acknowledge that you have read, understood, and agreed to be legally bound by and comply with these Terms and our Privacy Policy.

Even though you may have arrived at the Platform through a website operated or controlled by a third party, including by an affiliate of MEDVi, you understand and agree that these Terms are entered into between you and MEDVi. You also understand and agree that the Platform and any services provided through these Terms, except the Healthcare Services described herein, are provided by MEDVi.

You agree that when you use or enter the Platform, you affirmatively consent to conduct business electronically with MEDVi and engage in health-oriented activities with health professionals and professional entities affiliated with MEDVi, and such processes have the same force and effect as your written signature. You agree and consent to MEDVi and certain affiliated professional entities sending you disclosures, messages, notices, and other communications to your designated mobile phone and email account. If you do not agree with any of these Terms or our Privacy Policy, you may not use the Platform.

This Agreement establishes the important terms which you need to know and understand as well as the Services which you are requesting.

# II. Modification of Terms

This agreement is subject to changes as explained below.

We reserve the right, in our sole discretion, to amend these Terms, in whole or in part, at any time and for any reason, without penalty or liability to you or any third-party. You

should check the Terms from time to time when you use the Platform to determine if any changes have been made. You can determine when the Terms were last revised by referring to the "Last Modified" notation above. If you use the Platform after the amended Terms have been posted, you will be deemed to have agreed to the amended Terms. If any of the provisions of these Terms are not acceptable to you, your sole and exclusive remedy is to discontinue your use of the Platform.

# III. Description of MEDVi

You understand and agree that the Platform is intended to facilitate the following services (the "Services"): (a) the development and gathering of healthcare records and information with retention of the same for use in medical provider encounters and communications; (b) administrative support in connection with scheduling and payment for Healthcare Services; (c) administrative support in connection with coordinating optional fulfillment and payment for prescription medications ordered or prescribed by medical providers performing Healthcare Services; and (d) telecommunications and technology support for using the Platform as a means of direct access to medical providers provided by affiliated professional entities for communication, consultations, assessments, and treatment by such medical providers.

You understand that the Platform gathers unique information from you to enable an affiliated medical provider through the Healthcare Services to determine whether a prescription or a diagnostic test is indicated and appropriate for you, including applicable health information (such as your past and present health conditions, medications, and blood pressure), diagnostic tests, as applicable, and personal information (such as your name, location and demographic information) (collectively, "Your Information"). You further understand and agree that after reviewing Your Information, the medical provider, in his or her independent professional judgment, will determine whether to prescribe you medication, other treatment, or, alternatively, recommend that you consult with alternative clinical resources (the "Healthcare Services").

You give us consent to send and disclose to the affiliated professional entities and their medical providers all of Your Information so that you may be assessed and possibly receive Healthcare Services.

Further, you consent to our delivery of Your Information to MEDVi affiliated and unaffiliated pharmacies, laboratories, and other diagnostic testing companies as part of coordinating desired fulfillment and payment for diagnostic testing, prescription medications, and medical devices recommended as part of the Healthcare Services.

All medical providers who deliver Healthcare Services through the Platform are: (i) independent professionals contracted or employed with affiliated professional entities that coordinate with MEDVi and (ii) solely responsible for such Healthcare Services provided to you.

MEDVi does not provide any Healthcare Services through the Platform and is not licensed to practice medicine. MEDVi does not control or interfere with the provision of Healthcare Services by the medical providers and affiliated professional entities, each of whom is independent and solely responsible for the Healthcare Services provided to you. You, therefore, understand and agree that MEDVi is not responsible for Healthcare Services, or your use of any Healthcare Services provided by a medical provider or affiliated professional entity, including any personal injury or property damage.

By accepting this Agreement, you additionally understand and agree that MEDVi is not acting as a pharmacy, nor do we control or interfere with any such services. By accepting this Agreement, you understand and agree that you may be entering into a relationship with a pharmacy, pharmacist, and/or pharmacy group or other such relationship with any one or more such third-party entities.

# IV. Eligibility

In order to use the Services through the Platform, the following must be true:

1. You are at least 18 years of age or older.
2. You live in the United States and in a state or territory where the Services are available.
3. You agree to be legally bound by and comply with these Terms of Use.

4. You must have compatible computing and/or mobile devices, access to the Internet, and certain necessary software to use the Platform. Fees and charges may apply to your use of the mobile services and to the Internet.

You understand and agree that satisfying the above requirements does not guarantee that you will receive the Services through the Platform. In addition to the above requirements, MEDVi and its affiliated professional entities reserve the right to change or include new requirements as deemed appropriate in their sole discretion without providing prior notice to you. Further, medical providers and affiliated professional entities delivering the Healthcare Services may, on a case-by-case basis, determine that certain criteria apply to utilizing the Platform for the Healthcare Services or that Healthcare Services are not appropriate in any instance for a particular user. You can obtain more information on the criteria for the Healthcare Services by contacting help@medvi.org.

# V. Availability

The Services are currently available to individuals located in certain states. To see the list of current states, please contact customer service at help@medvi.org.

# VI. Registration, User Accounts, and User Data

Although certain parts of the Platform are accessible by any individual, you are obligated to register with MEDVi in order to access the Services. The Services are available only to users who have registered with MEDVi and to other persons affiliated with MEDVi who have been granted accounts with usernames and passwords. The Platform may not be accessible at any time, for any period, or for any reason, and MEDVi will not be liable if, for any reason, all or any part of the Platform is unavailable at any time or for any period.

Upon registration of an account, the Platform may contain forms or fields that allow you to enter, submit, or transmit to MEDVi user information or data ("User Data") on or through the Platform. You understand and agree that any User Data provided by you on

or through the Platform may be used, copied, or displayed by MEDVi. MEDVi may create derivative works of any such data, and MEDVi may provide such data to our service providers, our successors and assigns, and medical providers and their affiliated professional entities, in performance of the Services.

You grant MEDVi, our service providers, our successors and assigns, and medical providers and their affiliated professional entities, the fully transferable and sublicensable right and license to use, reproduce, modify, analyze, perform, display, distribute, and otherwise disclose to third-parties any User Data you submit on or through the Platform for the purposes of providing the Services to you; conducting research or analyses of such data; and designing, developing, implementing, modifying and/or improving new, current or future features, products and services of MEDVi using such data.

# VII. Your Responsibilities and Acknowledgment

As a condition of your use of the Services through the Platform, you agree to the following:

1. All Your Information provided through the Platform is accurate, complete, and correct, and you will accurately maintain and update any of Your Information that you have provided to MEDVi.
2. Your permission to use the Platform is personal (the Platform will be used only by you), and your identification information is accurate and truthful. You agree to keep confidential your username and password and that you will exit from your account at the end of each session. You are responsible for all activities that occur under your account and for maintaining the confidentiality of your password. You are responsible for changing your password promptly if you think it has been compromised. You may not transfer or share your password with anyone or create more than one account. You may not use anyone else's account at any time.
3. You agree to immediately notify MEDVi of any unauthorized use of your username, password, or any other breach of security that you become aware of involving or relating to the Services by emailing MEDVi at help@medvi.org.
4. You may be asked to provide additional information to MEDVi, its affiliated professional entities, or applicable medical provider(s) for the purpose of providing Healthcare Services or fulfilling a prescription. You may elect to

withhold requested information; however, if you do so, you may not use the Platform or any other related services.
5. You understand and agree that provision of Healthcare Services through the Platform depends on the completeness and accuracy of Your Information. MEDVi is unable to verify all of Your Information, therefore, MEDVi is not responsible for any consequences if Your Information is inaccurate or incomplete. If Your Information is inaccurate, incomplete, or not maintained; or MEDVi has reasonable grounds to suspect as much, MEDVi has the right to suspend or terminate your account and your use of the Services. In addition, MEDVi may take any and all actions it deems necessary or reasonable to maintain the security of the Platform, Services, and your Secure User account.

# VIII. Restrictions on Use

You will not use, or encourage, or permit others to use, our Platform except as expressly permitted in these Terms. You will not:

1. Use or attempt to use the Platform or the Services for any other person than yourself.
2. Access or use the Platform in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any third party, or that violates any applicable local, state, or federal law or regulation, or is prohibited by these Terms.
3. "Jailbreak" your mobile operating system. The Platform is intended for use only on a mobile phone that runs an unmodified manufacturer-approved operating system. Using the Platform on a mobile phone with a modified operating system may undermine security features that are intended to protect your protected health information (PHI) from unauthorized or unintended disclosure. You may compromise your PHI if you use the Platform on a mobile phone that has been modified. Use of the Platform on a mobile phone with a modified operating system is a material breach of these Terms.
4. License, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit or make available to any third-party the Platform or related materials in any way.
5. Use or access the Platform to create or develop competing products or services or for any other purpose that is detrimental to MEDVi or puts MEDVi at a commercial disadvantage.
6. Take any action or use the Platform in any manner which could damage, destroy, disrupt, disable, impair, overburden, interfere with, or otherwise impede or harm in any manner our Platform or any content, in whole or in part.
7. Disrupt, interfere with, violate the security of, or attempt to gain unauthorized access to our Platform or any computer network.
8. Bypass, breach, avoid, remove, deactivate, impair, descramble, or otherwise circumvent any security device, protection, or technological measure implemented by MEDVi or any of our service providers to protect our Platform.

9. Input, upload, transmit, distribute, or otherwise run or propagate any virus, application, Trojan horse, or any other harmful computer code that could damage or alter a computer, portable device, computer network, communication network, data, or our Platform, or any other system, device, or property.
10. Remove, delete, alter, or obscure any trademarks, specifications, warranties, or disclaimers, or any copyright, trademark, patent, or other intellectual property or proprietary rights notices from our Platform or any content made available to you on or through our Platform.
11. Use any manual process or automated device to monitor or copy any content made available on or through our Platform for any unauthorized purpose except as permitted in Section XIII (Privacy) below.
12. Copy, duplicate, download, store in a retrieval system, publish, transmit or otherwise reproduce, transfer, distribute, store, disseminate, aggregate, use as a component of or as the basis for a database or otherwise use in any form or by any means any data, text, reports, or other materials related to MEDVi or third-party content from the Platform; or
13. Encourage or enable any other individual to do any of the foregoing.

# IX. Licensing

Subject to your compliance with these Terms, MEDVi grants you a personal, limited, revocable, nonexclusive, and non-transferable license to view, download, access, and use the Platform and its content, solely for your personal and non-commercial use. No other right, title, or interest in or to the Platform is transferred to you, and all rights not expressly granted are reserved by MEDVi and its licensors. You are not permitted to reproduce, publish, transmit, distribute, display, modify, create derivative works from, sell or participate in any sale of, or exploit in any way, in whole or in part, any such content for commercial use.

# X. Disclaimer of Limited Healthcare Services

The Platform is structured for use specific to certain health care services and is not, and should not, be considered, or used as comprehensive medical advice, care, diagnosis, or treatment.

Always seek the advice of your physician or other qualified healthcare provider with any questions you may have regarding general personal health, medical conditions, or

drugs or medications, and before commencing or discontinuing any course of treatment, drug, or medication.

# XI. Telehealth Consent

Telehealth uses electronic communications, information technology, and other means to connect patients in one location and licensed, certified, or registered healthcare professionals in another location regarding a clinical matter. Though Telehealth carries potential benefits, like any medical procedure, it also carries potential risks. Please review the full Telehealth Informed Consent which informs you about the treatment methods, risks, and limitations of utilizing Telehealth to meet your health and wellness needs. In order to receive Health Care Services, you will be required to agree to the Telehealth Informed Consent regarding the use of Telehealth.

By using the Services, you agree and acknowledge that MEDVi is a beneficiary of the Medical Consent and has the right to enforcement.

# XII. Payment

When you submit Your Information for Health Care Services, you agree to pay all fees due. By entering your payment information and submitting your request, you authorize us, our affiliates, or our third-party payment processors to charge the amount due. If you receive a medical consultation, medical consult fees are not subject to or eligible for a refund. We cannot accept returns of prescription products for reuse or resale, and all sales are final. If you believe we have made an error please message us through your MEDVi portal or email us.

Refund Policy: You understand and agree that you will be eligible for a refund of your payment (minus dr. consult fees of 25%) if you can demonstrate that you have not lost weight after following our weight loss program for a minimum of 5 months. Your body takes time to acclimate to GLP-1 medication, so it is important that you follow the dose instructions and timeline from your medical provider.

You understand and agree that you are responsible for all fees due to receive the Services, including any fees charged by medical providers and affiliated medical professional entities. Kindly be advised that the final charge to your credit card may fluctuate contingent upon the prescribed medication and the chosen pharmacy for order fulfillment. Should any variance arise in the charge, a dedicated member of our support team will expeditiously communicate the details to you. Please be informed that we gather essential payment data, encompassing your payment instrument particulars (such as credit card number) and associated security code, solely for the purpose of facilitating payment processing. It is imperative to note that all payment information is meticulously safeguarded within the secure infrastructure provided by Stripe. For a comprehensive understanding of data privacy practices, we encourage you to peruse the privacy notice available at: https://stripe.com/privacy.

You understand that MEDVi-affiliated medical professional entities are not contracted healthcare providers with any health insurance plans (commercial, government, or otherwise, i.e., "out-of-network" providers), and therefore, you understand and agree that you are exclusively and solely responsible for paying all fees due to receive the Healthcare Services provided to you, including any fees charged by the medical providers and affiliated medical professional entities. Amounts collected by MEDVi will include fees charged by medical providers for Healthcare Services. In the event that your credit card expires or MEDVi, our affiliates, or our third-party payment processors are unable to process your payment, you may receive notice for you to provide an alternative payment method. MEDVi and/or the medical provider(s) have no obligation to provide any Healthcare Services unless and until full payment has been received and/or verified.

You also understand and agree that, because MEDVi medical providers are not contracted with any health insurance plan to provide the Healthcare Services, including federal or state government health care programs, like Medicaid and Medicare, any prescription medication or laboratory service ordered by a MEDVi medical provider may also not be covered.

# XIII. Privacy

MEDVi understands the importance of confidentiality and privacy regarding Your Information. Please see our Privacy Policy for a description of how we may collect, use, and disclose Your Information in connection with the Platform.

# XIV. Intellectual Property

As between MEDVi and you, MEDVi is the sole and exclusive owner of all right, title, and interest in and to the Platform and its content, features, and functionality (including, without limitation, all information, software, text, displays, images, video, audio, selection, arrangement, and look and feel), and all intellectual property rights therein, and any suggestions, ideas, or other feedback provided by you. Any copy, modification, revision, enhancement, adaptation, translation, or derivative work of the Platform shall be owned solely and exclusively by MEDVi or its licensors, including all intellectual property rights therein. You have permission to use the Platform solely for your personal and non-commercial use on the condition that you comply with these Terms. No other right, title, or interest in or to the Platform is transferred to you, and all rights not expressly granted are reserved by us or our affiliates.

Certain names, logos, and other materials displayed in and throughout the Platform may constitute trademarks, trade names, services marks, or logos ("Trademarks") of MEDVi or its affiliates. You are not authorized to use any such Trademarks without the express written permission of MEDVi or its affiliates. Ownership of all such Trademarks and the goodwill associated therewith remains with us or our affiliates.

# XV. Third-Party Links and Websites

The Platform may contain hyperlinks or references to other websites ("Linked Sites") operated by third parties. The Linked Sites may not be under our control; therefore, we are not responsible for the information, products, or services described therein, or for the content of any Linked Site, including, without limitation, any link contained in a Linked Site, or any changes or updates to a Linked Site. We are providing these Linked Sites to you only as a convenience, and the inclusion of any link does not necessarily

imply endorsement of the Linked Site or any association with its operators. Your use of these Linked Sites is at your own risk, and we are not liable to you in any way, either directly or indirectly, for any content, errors, damage, or loss caused by or in connection with use of or reliance on information contained in or provided to Linked Sites.

You may have arrived at the Platform through a Linked Site, including a Linked Site controlled by a parent, subsidiary, or affiliate of MEDVi. You understand and agree that we are not responsible for the information, products, or services described on those Linked Sites and only these Terms will apply to your use of or access to the Platform.

# XVI. Disclaimer of Warranties

YOU ACKNOWLEDGE AND AGREE THAT THE PLATFORM AND THE SERVICES ARE PROVIDED THROUGH THE PLATFORM ON AN "AS IS" AND "AS AVAILABLE" BASIS. YOUR USE OF THE PLATFORM IS AT YOUR SOLE RISK. MEDVi AND ITS AFFILIATES MAKE NO REPRESENTATIONS OR WARRANTIES AND SPECIFICALLY DISCLAIM ANY AND ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE PLATFORM AND THE SERVICES, INCLUDING ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AVAILABILITY, SECURITY, ACCURACY, FREEDOM FROM VIRUSES OR MALWARE, COMPLETENESS, TIMELINESS, FUNCTIONALITY, RELIABILITY, SEQUENCING OR SPEED OF DELIVERY. WE MAKE NO WARRANTIES OR REPRESENTATIONS THAT YOUR USE OF THE PLATFORM OR THE SERVICES WILL NOT INFRINGE THE RIGHTS OF THIRD PARTIES.

TO THE FULLEST EXTENT OF APPLICABLE LAW, NEITHER MEDVi NOR ITS RELATED PERSONS WILL BE LIABLE FOR ANY LOSS OR DAMAGE CAUSED BY YOUR RELIANCE ON INFORMATION OBTAINED THROUGH THE PLATFORM. IT IS YOUR RESPONSIBILITY TO EVALUATE THE ACCURACY, COMPLETENESS, TIMELINESS, RELIABILITY OR USEFULNESS OF THE PLATFORM. FURTHERMORE, MEDVi DOES NOT GUARANTEE THAT THE PLATFORM WILL BE UNINTERRUPTED, OR FREE FROM ERROR, DEFECT, LOSS, DELAY IN OPERATION, CORRUPTION, CYBER ATTACK, VIRUSES, INTERFERENCE,

HACKING, MALWARE, OR OTHER SECURITY INTRUSION, AND MEDVi DISCLAIMS ANY LIABILITY RELATING THERETO.

YOU UNDERSTAND AND AGREE THAT ANY CONTENT, MATERIAL AND/OR INFORMATION OBTAINED THROUGH THE USE OF THE PLATFORM ARE USED AT YOUR SOLE RISK AND THAT YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER OR MOBILE PHONE OR LOSS OF DATA THAT RESULTS FROM THE DOWNLOAD OF SUCH CONTENT, MATERIAL, AND/OR INFORMATION.

# XVII. Limitation of Liability

TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW AND EXCEPT AS SET FORTH IN THIS SECTION, NEITHER MEDVi NOR ITS RELATED PERSONS OR LICENSORS WILL BE LIABLE TO YOU OR TO ANY PARTY FOR ANY CLAIMS, LIABILITIES, LOSSES, COSTS OR DAMAGES UNDER ANY LEGAL OR EQUITABLE THEORY, WHETHER IN TORT (INCLUDING NEGLIGENCE), CONTRACT, STRICT LIABILITY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, ANY INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, LOSS OF DATA OR LOSS OF GOODWILL, SERVICE INTERRUPTION, COMPUTER OR MOBILE PHONE DAMAGE, OR SYSTEM FAILURE, OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES, OR FOR ANY DAMAGES FOR PERSONAL OR BODILY INJURY OR EMOTIONAL DISTRESS, INCLUDING DEATH, ARISING OUT OF OR IN CONNECTION WITH ANY ACCESS, USE OF (OR INABILITY TO USE) THE PLATFORM OR ANY SERVICES PROVIDED THROUGH THE PLATFORM. THIS IS TRUE EVEN IF MEDVi OR RELATED PERSONS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES.

TO THE EXTENT PERMITTED BY LAW AND SUBJECT TO THIS SECTION, THE TOTAL LIABILITY OF MEDVi FOR ANY CLAIMS UNDER THESE TERMS SHALL NOT EXCEED U.S. ONE HUNDRED DOLLARS ($100.00 USD). NOTE THAT SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS OF LIABILITY OR MAY PLACE

LIMITATIONS ON OUR ABILITY TO LIMIT OUR LIABILITY TO YOU, THUS THE FOREGOING LIMITATION MAY NOT APPLY TO YOU.

# XVIII. Indemnification

You agree to indemnify, defend, and hold MEDVi and any of its Related Persons, licensors, and suppliers harmless from and against any and all third-party claims, demands, liabilities, costs or expenses, including attorneys' fees and costs, arising from or related to: (i) any breach by you of these Terms, (ii) your use of material or features available on the Platform in an unauthorized manner, and/or (iii) a violation by you of any and all applicable laws, rules, or regulations.

# XIX. Modifications to the Platform

MEDVi reserves the right at any time and for any reason to modify, temporarily, or permanently discontinue, the Platform, or any portion thereof, with or without notice. You agree that MEDVi shall not be liable to you and to any third party for any modification, suspension, or discontinuance of the Platform.

# XX. Suspension and Termination of Rights

The Terms will remain in full force and effect as long as you continue to access or use the Platform. You may terminate the Terms at any time by discontinuing use of the Platform. Your permission to use the Platform automatically terminates if you violate these Terms.

We may terminate or suspend any of the rights granted by these Terms and your access to our Platform with or without prior notice, at any time, and for any reason. The following provisions survive the expiration or termination of these Terms for any reason whatsoever: Disclaimer of Warranties; Limitation of Liability; Indemnification; Governing Law, Dispute Resolution, Arbitration, Class Action Waiver; and Miscellaneous.

Subject to applicable law, MEDVi reserves the right to maintain, delete, or destroy all communications and materials posted or uploaded to the Platform pursuant to its

internal record retention and/or content destruction policies. After any termination, MEDVi will have no further obligation to provide the Services, except to the extent we are obligated to provide you access to your health records or required to provide you with continuing care under our applicable legal, ethical, and professional obligations to you.

## XXI. Governing Law; Dispute Resolution; Arbitration

YOU AND WE AGREE THAT ALL DISPUTES BETWEEN YOU AND US (WHETHER OR NOT SUCH DISPUTE INVOLVES A THIRD PARTY) WITH REGARD TO YOUR RELATIONSHIP WITH US (INCLUDING DISPUTES RELATED TO THIS USER AGREEMENT, YOUR USE OF THE SERVICES, AND/OR RIGHTS OF PRIVACY AND/OR PUBLICITY), WILL BE RESOLVED EXCLUSIVELY BY BINDING ARBITRATION, EXCEPT THAT YOU MAY ASSERT CLAIMS IN SMALL CLAIMS COURT IF YOUR CLAIMS QUALIFY. YOU AND WE EACH AGREE THAT CLASS OR REPRESENTATIVE ARBITRATIONS, AS WELL AS CLASS OR REPRESENTATIVE ACTIONS, ARE NOT PERMITTED UNDER ANY CIRCUMSTANCES, AND THAT YOU AND WE ARE EACH WAIVING THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR CLASS ARBITRATION.

You and we each agree that you and we are further waiving our respective rights to sue or go to court to assert or defend our rights under this User Agreement. You and we each agree that the Federal Arbitration Act and federal arbitration governs the interpretation and enforcement of this provision.

Except as provided below, you and we agree that any cause of action, legal claim, or dispute between you and us arising out of or related to these Terms must be resolved by arbitration on an individual basis. Class actions and class arbitrations are not permitted; you and we may bring a claim only on your own behalf and cannot seek relief that would affect other MEDVi users. If there is a final judicial determination that any particular claim (or a request for particular relief) cannot be arbitrated in accordance with this provision's limitations, then only that claim (or only that request for relief) may

be brought in court. All other claims (or requests for relief) remain subject to this provision.

Instead of using arbitration, you or we can bring claims in your local "small claims" court, if the rules of that court will allow it. If you don't bring your claims in small claims court (or if you or we appeal a small claims court judgment to a court of general jurisdiction), then the claims must be resolved by binding, individual arbitration. The American Arbitration Association will administer all arbitrations under its Consumer Arbitration Rules. You and we expressly waive a trial by jury.

You can opt out of this provision within 30 days of the date that you agreed to these Terms. To opt out, you must send your name, residence address, username, email address or phone number you use for your MEDVi account, and a clear statement that you want to opt out of this arbitration agreement, and you must send them to:

MEDVi, LLC
131 Continental Dr, Ste 305
Newark, DE 19713
help@medvi.org

Before you commence arbitration of a claim, you must provide us with a written Notice of Dispute that includes your name, residence address, username, email address or phone number you use for your MEDVi account, a detailed description of the dispute, and the relief you seek.

Any Notice of Dispute you send to us should be mailed to:

MEDVi, LLC
131 Continental Dr, Ste 305
Newark, DE 19713
help@medvi.org

Before arbitration commences, we will send you a Notice of Dispute to the email address you use with your MEDVi account, or other appropriate means. If we are unable to resolve a dispute within thirty (30) days after the Notice of Dispute is received, you or we may commence arbitration.

The costs and fees of arbitration shall be allocated in accordance with the arbitration provider's rules, including rules regarding frivolous or improper claims.

For any claim that is not arbitrated or resolved in small claims court, you agree that it will be resolved exclusively in the U.S. District Court for Delaware, or a state court located in New Castle County, Delaware. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim.

The laws of the State of Delaware, to the extent not preempted by or inconsistent with federal law, will govern these Terms and any claim, without regard to conflict of law provisions.

# XXII. Copyright Infringement

MEDVi reserves the right to remove any content or any other material or information available on or through our Platform, at any time, for any reason. MEDVi complies with the provisions of the Digital Millennium Copyright Act ("DMCA") applicable to Internet service providers (17 U.S.C. § 512, as amended), and responds to clear notices of alleged copyright infringement. This Section XXII describes the procedure that should be followed to file a notification of alleged copyright infringement with MEDVi.

# Notification of Claimed Copyright Infringement

If you have objections to copyrighted content or material made available on or through our Platform, you may submit a notification to our Designated Agent at the following address: help@medvi.org.

Any notification to MEDVi regarding copyright infringement must include the following information:

1. An electronic or physical signature of the person authorized to act on behalf of the owner of the exclusive right being infringed.
2. An identification of the copyrighted work or other intellectual property that you claim has been infringed or, if multiple copyrighted works are covered by a single notification, a representative list of such works.

3. An identification of the content or material that you claim is infringing and where it is located on our Platform.
4. Information sufficient for MEDVi to contact you, such as your address, telephone number, and/or email address.
5. A statement by you that you have a good-faith belief that the use of the content or material of which you are complaining is not authorized by the copyright owner, its agent, or the law; and
6. A signed statement by you that the above information in your notice is accurate and that, under penalty of perjury, you are the copyright owner or authorized to act on the copyright owner's behalf.

# XXIII. Miscellaneous

The Terms set forth the entire understanding and agreement between you and us with respect to the subject matter herein. If any provision of the Terms is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision, and the other provisions of the Terms shall remain in full force and effect. Headings are for reference only and in no way define, limit, construe, or describe the scope or extent of such section. Our failure to act with respect to any failure by you or others to comply with these Terms does not waive our right to act with respect to subsequent or similar failures. You may not assign or transfer your rights or obligations under these Terms without our prior written consent, and any assignment or transfer in violation of this provision shall be null and void.

# XXIV. Contact Information

If you have any questions or concerns, please contact help@medvi.org.

MEDVi is a patient management platform that works with independent physicians and practitioners who provide services utilizing the MEDVi Platform. MEDVi does not directly provide medical or pharmacy services and payment does not guarantee the writing or dispensing of a prescription. Medical Services are provided via independent providers. The information provided on this website is for informational purposes and not a substitute for professional medical advice, diagnosis, or treatment. If you have

questions or concerns about your health, please talk to your doctor. This site is an advertisement for services and not any specific medication.