# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DARBY DAY, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 1:25-cv-01418-GBW |
| OPENLOOP HEALTH INC., TRIAD RX BUYER LLC and TRIAD RX, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT, OR, IN THE ALTERNATIVE, TO <u>COMPEL ARBITRATION AND ENFORCE CLASS ACTION WAIVER</u>

Dated: March 26, 2026

Robert J. Kriner, Jr. (Del. Bar No. 2546)
Scott M. Tucker (Del. Bar No. 4925)
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
2711 Centerville Rd., Suite 201
Wilmington, DE 19808
Phone: 302-656-2500
Fax: 302-656-9053
smt@chimicles.com

Nicholas E. Chimicles (*pro hac vice*)
Kimberly M. Donaldson-Smith (*pro hac vice*)
Dylan Altland (*pro hac vice*)
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, PA 19041
Phone: 610-642-8500
Fax: 610-649-3633
*nec@chimicles.com*
*kds@chimicles.com*
*dda@chimicles.com*

*Attorneys for Plaintiff and Proposed Class*

**TABLE OF CONTENTS**

I.    NATURE AND STAGE OF PROCEEDINGS ....................................................................1

II.   SUMMARY OF ARGUMENT ......................................................................................1

III.  STATEMENT OF FACTS ...........................................................................................4

      A.  DEFENDANTS' NATIONWIDE SCHEME TO SELL ORAL TIRZEPATIDE.........4

      B.  ORAL TIRZEPATIDE IS SNAKE OIL........................................................7

      C.  PLAINTIFF'S EXPERIENCE........................................................................8

IV.   ARGUMENT ...............................................................................................................9

      A.  LEGAL STANDARDS  GOVERNING A RULE 12 MOTION .................................9

      B.  UNDEVELOPED ARGUMENTS ARE WAIVED ........................................................9

      C.  DEFENDANTS' FDCA AND § 337(A) PREEMPTION/PRECLUSION
          ARGUMENTS FAIL AT THE OUTSET ...................................................................11

          1.  Section 337(a) Does  Not Bar Plaintiff's State-Law and
              RICO Claims.............................................................................................12

          2.  RICO Claims Based on Deceptive Marketing and Telehealth
              Prescribing Are Not Precluded .................................................................16

      D.   PLAINTIFF PLEADS RICO STANDING, INCLUDING BOTH
           INJURY AND PROXIMATE CAUSE ...........................................................17

          1.   RICO  Has Long Applied to Fraudulent
               Pharmaceutical and "Snake Oil" Schemes .................................................17

          2.   Plaintiff Alleges a Concrete  Economical Injury .........................................18

          3.   Plaintiff's Injury Was The Proximately Caused by
               Defendants' Scheme ..................................................................................21

      E.   PLAINTIFF ADEQUATELY ALLEGES A RICO ENTERPRISE, PATTERN,
           AND CONSPIRACY ..........................................................................25

          1.   Defendants' Functioned as a Single Coordinated Enterprise ...................25

2.   The Complaint Alleges a Pattern of Racketeering Activity ......................................26

3.   Plaintiff Adequately Pleads RICO Conspiracy Under § 1962(d) .............................28

F.   PLAINTIFF ADEQUATELY PLEADS FRAUD AND RICO UNDER RULE 9(B)....29

1.   The Complaint Pleads a Unified Course of Fraudulent Conduct,
     Not Isolated Statements ....................................................................................................29

2.   The Complaint Adequately Pleads Falsity ...............................................................33

     (a)  Safety and Efficacy Claims Are Actionably False
          And Misleading ..................................................................................................33

     (b)  Defendants Made Utterly False Representations About Their
          Weight-Loss Product's Therapeutic Equivalence and Efficacy ..........................33

     (c)  Statements Concerning Oral Tirzepatide and the Telehealth
          Prescribing Process............................................................................................34

     (d)  Customer Satisfaction Is Not An Element Of Plaintiff's
          RICO or Consumer Protection Theory ...............................................................36

G.   PLAINTIFF'S STATE LAW CLAIMS ARE ADEQUATELY PLEADED..................36

1.   North Carolina Class ......................................................................................................36

     (a)  Plaintiff Has Adequately Alleged Unfair or Deceptive Conduct ........................36

     (b)  Plaintiff's Common Law Fraud Claim Is Properly Pleaded...............................38

     (c)  Plaintiff's Unjust Enrichment Claim Is Properly Pleaded..................................39

2.   Multistate Consumer Protection Subclass ................................................................39

     (a)  Every State Prohibits Defendants' Alleged Conduct ..........................................39

     (b)  Rule 23 Supersedes The South Carolina And Tennessee Statutes ......................39

     (c)  Defendants' Attacks On Specific State Statutes Are Premature
          Or Meritless......................................................................................................40

3.   Plaintiff Has Standing to Seek Injunctive Relief......................................................40

H.   PLAINTIFF'S CLAIMS ARE NOT SUBJECT TO ARBITRATION OR CLASS

WAIVER PROVISIONS.................................................................................42

1.  Defendants Fail To Establish That Plaintiff Is Subject To An
    Enforceable Arbitration Agreement Or Class Waiver Provision ............................42

2.  The Record Is conclusive That No Valid Arbitration Agreement
    Applies to Plaintiff's Claims ..................................................................44

3.  Defendants Cannot Rely On Equitable Estoppel.......................................47

I.  LEAVE TO AMEND ...............................................................................50

X.  CONCLUSION. ........................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agostino v. Quest Diagnostics*,
No. 04-4362 (JCL), 2005 U.S. Dist. LEXIS 64071 (D.N.J. Oct. 6, 2005) .............................31

*Altisource S.A.R.L. v. Szumanski*,
No. 21-03293, 2022 WL 909872 (D.N.J. Mar. 29, 2022) ......................................................22

*Altisource S.A.R.L. v. Szumanski*,
No. 21-03293 2024 U.S. Dist. LEXIS 96952 (D.N.J. May 31, 2024)....................................34

*Arnold v. X Corp.*,
No. 23-528, 2024 LX 58634 (D. Del. Dec. 5, 2024) ..............................................................32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................................9

*Atacs Corp. v. Trans World Communs.*,
155 F.3d 659 (3d Cir. 1998)...................................................................................................42

*Austin v. Experian Info. Sols., Inc.*,
148 F.4th 194 (4th Cir. 2025) ...........................................................................................45, 47

*In re Avandia Mktg.*,
804 F.3d 633 (3d Cir. 2015)....................................................18, 19, 20, 22, 23, 35

*Azurity Pharms., Inc. v. Edge Pharma, LLC*,
45 F.4th 479 (1st Cir. 2022)..............................................................................................12, 17

*Banaszak v. Progressive Direct Ins. Co.*,
3 A.3d 1089 (Del. 2010) .........................................................................................................43

*Barrera v. Pharmavite*,
No. CV11-4153-CAS(AGRx), 2016 U.S. Dist. LEXIS 204164 (C.D. Cal. June
2, 2016) ...................................................................................................................................35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................................9

*Bennett v. Teva Pharms. USA, Inc.*,
Nos. 21-1642, 21-2304, 2022 U.S. App. LEXIS 25168 (3d Cir. Sept. 7, 2022) ...................15

*Bennett v. Teva Pharms. USA, Inc.*,
No. 19-2126-CFC, 2021 U.S. Dist. LEXIS 38565 (D. Del. Mar. 2, 2021) ...........................15

*Bergenstock v. Legalzoom.com, Inc.*,
  2015 NCBC LEXIS 66 (N.C. Super. Ct. June 23, 2015)....................................................45, 46

*Berk v. Choy*,
  223 L.Ed.2d 463 (U.S. 2026) ...............................................................................3, 9, 40

*Bernstein v. IDT Corp.*,
  582 F. Supp. 1079 (D. Del. 1984)..............................................................................32

*Bhatti v. Buckland*,
  400 S.E.2d 440 (N.C. 1991).......................................................................................37

*Black v. Montgomery Cnty.*,
  835 F.3d 358 (3d Cir. 2016).........................................................................................9

*United States ex rel. Bledsoe v. Cmty. Health Sys.*,
  501 F.3d 493 (6th Cir. 2007) .......................................................................................9

*Booe v. Shadrick*,
  369 S.E.2d 554 (N.C. 1988)........................................................................................39

*Boyle v. United States*,
  556 U.S. 938 (2009).....................................................................................................25

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008).................................................................................21, 22, 23, 35

*In re Brokerage Antitrust*,
  618 F.3d 300 (3d Cir. 2010)............................................................................10, 22, 26

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)..............................................................................................14, 15

*Bumpers v. Cmty. Bank of N. Va.*,
  747 S.E.2d 220 (N.C. 2013)........................................................................................37

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997).......................................................................................9

*Caldiero v. Mo. Higher Educ. Loan Auth.*,
  No. 3:24cv315, 2025 LX 279453 (M.D. Pa. Mar. 31, 2025)....................................31

*Carson v. HP Inc.*,
  750 F. Supp. 3d 376 (D. Del. 2024)............................................................................30

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001)....................................................................................................25

*Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*,
No. 5140-CS, 2012 Del. Ch. LEXIS 171 (Del. Ch. Aug. 7, 2012)..........................................48

*Chaleplis v. Karloutsos*,
579 F. Supp. 3d 685 (E.D. Pa. 2022) .....................................................................................32

*Chevron Corp. v. Donziger*,
833 F.3d 74 (2d Cir. 2016)....................................................................................................41

*Clarity Sports Int'l LLC v. Redland Sports*,
400 F. Supp. 3d 161 (M.D. Pa. 2019) ....................................................................................50

*Cohen v. Quten Rsch. Inst., LLC*,
No. 23-01783, 2024 U.S. Dist. LEXIS 123854 (D.N.J. Jan. 29, 2024)..................................19

*Conroy v. Leone*,
316 F. App'x 140 (3d Cir. 2009)............................................................................................10

*Creekside Apartments v. Poteat*,
446 S.E.2d 826 (N.C. Ct. App. 1994) ...................................................................................37

*Davidson v. Sprout Foods, Inc.*,
106 F.4th 842 (9th Cir. 2024) ...............................................................................................14

*Davis & Taft Architecture, P.A. v. DDR-Shadowline, LLC*,
835 S.E.2d 473 (N.C. 2019)..................................................................................................44

*Diebler v. SanMedica Int'l, LLC*,
488 F. Supp. 3d 169 (D.N.J. 2020) ........................................................................................19

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
784 F. Supp. 2d 508 (D.N.J. 2011) ........................................................................................23

*Dockery v. Heretick*,
No. 17-4114, 2021 LX 60343 (E.D. Pa. Sep. 1, 2021)..........................................................23

*Dole v. Arco Chem. Co.*,
921 F.2d 484 (3d Cir. 1990)...................................................................................................50

*Douzinas v. Am. Bureau of Shipping, Inc.*,
888 A.2d 1146 (Del. Ch. 2006)..............................................................................................49

*Eli Lilly & Co. v. Adonis Health, Inc.*,
No. 25-cv-03536-JST, 2025 LX 465179 (N.D. Cal. Sep. 24, 2025) ......................................19

*Eli Lilly & Co. v. Willow Health Servs.*,
No. 25-cv-03570, D.I. 59 (C.D. Cal.) (Hearing Tr., Nov. 6, 2025) .........................................8

*Epes Logistics Servs. v. Marcuslund*,
 861 S.E.2d 924 (N.C. Ct. App. 2021) ......................................................................48

*Fennell v. E. Carolina Health*,
 828 S.E.2d 674 (N.C. Ct. App. 2019) ......................................................................38

*FinancialApps, LLC v. Envestnet, Inc.*,
 No. 19-1337, 2020 WL 4569466 (D. Del. July 30, 2020) .......................................10

*Flintkote Co. v. Aviva PLC*,
 769 F.3d 215 (3d Cir. 2014) ....................................................................................48

*Frompovicz v. Niagara Bottling, LLC*,
 337 F. Supp. 3d 498 (E.D. Pa. 2018) ......................................................................15

*FTC v. Pantron I Corp.*,
 33 F.3d 1088 (9th Cir. 1994) ...................................................................................36

*FTC v. QT, Inc.*,
 512 F.3d 858 (7th Cir. 2008) ...................................................................................36

*Garner v. Glob. Plasma Sols.*,
 590 F. Supp. 3d 738 (D. Del. 2022) .........................................................................40

*Gov't Employees Ins. Co. v. Wellmart RX, Inc.*,
 435 F. Supp. 3d 443 (E.D.N.Y. 2020) .........................................................18, 27, 28

*Gov't Emps. Ins. Co. v. Bhargav Patel*,
 166 F.4th 280 (2d Cir. 2026) ...................................................................................27

*Gov't Emps. Ins. Co. v. J Flexible Corp.*,
 No. 25-cv-6700, 2026 LX 192857 (E.D.N.Y. Mar. 17, 2026) ...............................27

*Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*,
 545 U.S. 308 (2005) ................................................................................................37

*Grant v. Turner*,
 505 F. App'x 107 (3d Cir. 2012) ..............................................................................34

*Gray v. Bayer Corp.*,
 No. 08-4716, 2009 U.S. Dist. LEXIS 48181 (D.N.J. June 8, 2009) .......................30

*Gray v. N.C. Ins. Underwriting Ass'n*,
 529 S.E.2d 676 (2000) .......................................................................................36, 37

*Grigson v. Creative Artists Agency, L.L.C.*,
 210 F.3d 524 (5th Cir. 2000) ...................................................................................48

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*,
716 F.3d 764 (3d Cir. 2013)..................................................................................42, 43, 45

*H. J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989)...................................................................................................4, 27

*Hause v. City of Sunbury*,
No. 20-1933, 2022 U.S. App. LEXIS 6330 (3d Cir. Mar. 11, 2022).......................................42

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992)...........................................................................................................21

*In re Horizon Healthcare Servs. Data Breach Litig.*,
846 F.3d 625 (3d Cir. 2017)...............................................................................................40

*Humana, Inc. v. Indivior, Inc.*,
Nos. 21-2573, 21-2574, 2022 U.S. App. LEXIS 34754 (3d Cir. Dec. 15, 2022)....................31

*In re Insulin Pricing Litig.*,
No. 2:23-md-03080, 2025 U.S. Dist. LEXIS 267766 (D.N.J. Dec. 30, 2025) .................24, 26

*Int'l ProcessPlants & Equip. Corp. v. First Standard Asurety, LLLP*,
No. 22-01630, 2025 LX 283562 (E.D. Pa. Mar. 6, 2025) .....................................10, 11, 12, 34

*Interstate Circuit v. United States*,
306 U.S. 208 (1939)...........................................................................................................31

*Irish v. Ferguson*,
970 F. Supp. 2d 317 (M.D. Pa. 2013) ................................................................................22

*ITCO Corp. v. Michelin Tire Corp.*,
722 F.2d 42 (4th Cir. 1983) ...............................................................................................37

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab.
Litig.*,
903 F.3d 278 (3d Cir. 2018)...............................................................................................41

*Jones v. CVS Health Corp.*,
No. 24-cv-1703, 2024 LX 177157 (E.D. Pa. Oct. 31, 2024) ..................................................34

*In re JUUL Labs, Inc.*,
533 F. Supp. 3d 858 (N.D. Cal. 2021) ................................................................................26

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
560 F.3d 156 (3d Cir. 2009)...............................................................................................42

*Klapper v. Commonwealth Realty Tr.*,
657 F. Supp. 948 (D. Del. 1987).........................................................................................32

*Kolar v. Preferred Real Estate Invs., Inc.*,
   361 F. App'x 354 (3d Cir. 2010)........................................................................................22

*Kseniya Godun v. JustAnswer LLC*,
   135 F.4th 699 (9th Cir. 2025) ....................................................................................43, 46

*Laborers Int'l Union of N. America, AFL-CIO v. Foster Wheeler Corp.*,
   26 F.3d 375 (3d Cir. 1994)..........................................................................................10, 44

*Lisk v. Lumber One Wood Preserving, LLC*,
   792 F.3d 1331 (11th Cir. 2015) .......................................................................................40

*Livingston v. Shore Slurry Seal, Inc.*,
   98 F. Supp. 2d 594 (D.N.J. 2000) ...................................................................................23

*Lum v. Bank of Am.*,
   361 F.3d 217 (3d Cir. 2004)..........................................................................................9, 21

*Lynch v. Gonzalez*,
   2020 Del. Ch. LEXIS 254 (Ch. July 31, 2020).............................................................43

*Markoff v. Athena Cosmetics, Inc.*,
   764 F. Supp. 3d 733 (N.D. Ill. 2025) ..............................................................................12

*Marshall v. Georgetown Mem'l Hosp.*,
   112 F.4th 211 (4th Cir. 2024) ..........................................................................................43

*McNair v. Synapse Grp. Inc.*,
   672 F.3d 213 (3d Cir. 2012)............................................................................................41

*MDNet, Inc. v. Pharmacia Corp.*,
   147 F. App'x 239 (3d Cir. 2005) ....................................................................................32

*Med. Ctr. Pharm. v. Mukasey*,
   536 F.3d 383 (5th Cir. 2008) ...........................................................................................11

*Med. Marijuana, Inc. v. Horn*,
   604 U.S. 593 (2025)..........................................................................................................18

*Merrell Dow Pharms. Inc. v. Thompson*,
   478 U.S. 804 (1986)..........................................................................................................12

*NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*,
   922 A.2d 417 (Del. Ch. 2007)..........................................................................................48

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   338 F.R.D. 527 (S.D.N.Y. 2021) .....................................................................................39

*Naranjo v. Nick's Mgmt.*,
652 F. Supp. 3d 737 (N.D. Tex. 2023) ...................................................................48

*In re Neurontin Mktg. & Sales Practices Litig.*,
No. 04-cv-10739, 2011 U.S. Dist. LEXIS 99593 (D. Mass. Aug. 31, 2011) ...................14, 17

*In re Neurontin Mktg. & Sales Practices Litig.*,
712 F.3d 21 (1st Cir. 2013)...............................................................................17, 22, 24

*Optimum Constr., Inc. v. Harbor Bus. Compliance Corp.*,
No. MHM-21-2432, 2022 U.S. Dist. LEXIS 179629 (D. Md. Sep. 30, 2022).......................43

*In re Orthopedic Bone Screws Prods. Liab. Litig.*,
193 F.3d 781 (3d Cir. 1999)...............................................................................15

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Forest Pharms.,
Inc.*,
915 F.3d 1 (1st Cir. 2019).................................................................................14

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms
Co.*, 943 F.3d 1243 (9th Cir. 2019)....................................................................18, 22, 24

*Pereira v. United States*,
347 U.S. 1 (1954).............................................................................................22

*Philadelphia Reserve Supply Co. v. Norwalk & Assocs.*,
864 F.Supp. 1456 (E.D. Pa. 1994) .....................................................................22

*Phillips v. Cty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008).............................................................................9, 50

*Pineda v. Lake Consumer Prods., Inc.*,
2025 U.S. Dist. LEXIS 185142 (E.D. Pa. Sep. 22, 2025) ...........................................40

*In re PMTS Liquidating Corp.*,
490 B.R. 174 (D. Del. 2013).............................................................................50

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014).......................................................................................12, 16

*In re Presson*,
No. 24-cv-170, 2025 LX 290154 (S.D.N.Y. Mar. 4, 2025)............................................43, 47

*In re Processed Egg Prods. Antitrust Litig.*,
851 F. Supp. 2d 867 (E.D. Pa. 2012) ...................................................................37

*Prudential Ins. Co. of Am. v. Credit Suisse Secs. LLC*,
No. 12-7242, 2013 WL 5467093 (D.N.J. Sept. 30, 2013).............................................32

*Quamina v. JustAnswer LLC*,
    721 F. Supp. 3d 1026 (N.D. Cal. 2024) ...................................................................43

*Ramirez v. Trusper, Inc.*,
    No. 5:24-cv-02012, 2024 LX 272675 (N.D. Cal. Oct. 11, 2024) ...........................43

*Reorganized Hon Hai Precision Indus. Co., Ltd. v. NU Ride Inc.*,
    2025 LX 309921 (D. Del. Sep. 12, 2025).............................................................47

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993).............................................................................................10, 21

*Rikos v. P&G*,
    No. 1:11-cv-226, 2014 U.S. Dist. LEXIS 109302 (S.D. Ohio June 19, 2014).......................13

*Rikos v. P&G*,
    799 F.3d 497 (6th Cir. 2015) ................................................................................14, 20

*Roche Diagnostics Corp. v. Smith*,
    No. 2:19-CV-08761, 2022 U.S. Dist. LEXIS 178662 (D.N.J. Sep. 30, 2022) .......................34

*Rojas v. Gosmith, Inc.*,
    No. 2:17-CV-281, 2020 U.S. Dist. LEXIS 28922 (N.D. Ind. Feb. 20, 2020) ...................43, 47

*Rowe v. Metabolife Int'l, Inc.*,
    No. 03-4346, 2004 U.S. Dist. LEXIS 245 (E.D. Pa. Jan. 21, 2004)......................................32

*Salinas v. United States*,
    522 U.S. 52 (1997).................................................................................................28

*Scanlon v. Medtronic Sofamor Danek USA Inc.*,
    61 F. Supp. 3d 403 (D. Del. 2014)........................................................................15

*Schwarz v. St. Jude Med., Inc.*,
    802 S.E.2d 783 (N.C. Ct. App. 2017) ...................................................................43

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479 (1985)...............................................................................................21

*Silfee v. Auto. Data Processing, Inc.*,
    696 F. App'x 576 (3d Cir. 2017) ...........................................................................42

*Smith v. Berg*,
    247 F.3d 532 (3d Cir. 2001)...............................................................................26, 28

*Snowdy v. Mercedes-Benz USA, LLC*,
    No. 23-1681, 2024 LX 192181 (D.N.J. Apr. 1, 2024)..........................................30

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)................................................................................................40

*Stanley v. Moore*,
    454 S.E.2d 225 (N.C. 1995)....................................................................................37

*State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*,
    2010 U.S. Dist. LEXIS 147405 (M.D. Fla. May 24, 2010)......................................27

*Subacz v. Sellars*,
    No. 96-CV-6411, 1998 WL 720822 (E.D. Pa. Sept. 21, 1998) ...............................41

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002)................................................................................................13

*In re Triad Rx, Inc.*,
    No. 19-L-0137 (Ala. State Bd. Pharmacy July 19, 2022).......................................37

*United States v. Abrams*,
    165 F.4th 784 (3d Cir. 2026) .......................................................................21, 22, 35

*United States v. Bentz*,
    21 F.3d 37 (3d Cir. 1994)........................................................................................22

*United States v. Bergrin*,
    650 F.3d 257 (3d Cir. 2011)....................................................................................28

*United States v. Boria*,
    592 F.3d 476 (3d. Cir. 2010)...................................................................................28

*United States v. Cadden*,
    965 F.3d 1 (1st Cir. 2020)..................................................................................18, 28

*United States v. Fattah*,
    914 F.3d 112 (3d Cir. 2019)...............................................................................25, 26

*United States v. Gonzalez-Alvarez*,
    277 F.3d 73 (1st Cir. 2002)......................................................................................20

*United States v. Lane Labs-USA, Inc.*,
    427 F.3d 219 (3d Cir. 2005)....................................................................................28

*United States v. Quinones*,
    635 F.3d 590 (2d Cir. 2011)....................................................................................28

*United States v. Riccobene*,
    709 F.2d 214 (3d Cir. 1983)....................................................................................28

*United States v. Simon*,
 12 F.4th 1 (1st Cir. 2021)............................................................................................18

*In re Valsartan*,
 No. 19-2875, 2025 LX 180844 (D.N.J. Apr. 7, 2025)..........................................12

*Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*,
 891 S.E.2d 100 (N.C. 2023).........................................................................................38

*West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*,
 No. 2742-VCN, 2007 WL 3317551 (Del. Ch. Nov. 2, 2007)................................49

*Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*,
 No. 2037-N, 2006 Del. Ch. LEXIS 155 (Del. Ch. Aug. 22, 2006)..................48, 49

*Window Gang Ventures, Corp. v. Salinas*,
 2018 NCBC 18 (N.C. Super. Ct. Feb. 21, 2018) ....................................................41

*Wyeth v. Levine*,
 555 U.S. 555 (2009)....................................................................................14, 15, 39

*Young v. Experian Info. Sols., Inc.*,
 119 F.4th 314 (3d Cir. 2024) .....................................................................................45

**Federal Statutes and Regulations**

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§
 1961–1968.................................................................................................. *passim*

18 U.S.C. §§ 1341, 1343..............................................................................................16, 21

18 U.S.C. § 1961(5) .............................................................................................................27

18 U.S.C. § 1962(c) ...........................................................................................10, 16, 21, 28

18 U.S.C. § 1962(d) ...................................................................................................16, 28

18 U.S.C. § 1964(a) ...........................................................................................................41

18 U.S.C. § 1964(c) ......................................................................................................18, 41

The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq*. ................. *passim*

21 U.S.C. § 331....................................................................................................................11

21 U.S.C. § 337(a) ..........................................................................................11, 12, 15, 16, 17

21 U.S.C. § 343-1(a)(1) ................................................................................................15

21 U.S.C. § 353a ("§ 503A")................................................................................11, 13, 15

21 U.S.C. § 353b ("§ 503D")........................................................................................12

21 U.S.C. § 353a(a)......................................................................................................13

21 U.S.C. § 353b..........................................................................................................12

21 U.S.C. § 360k(a) ......................................................................................................15

21 CFR § 201.1(h)(2)....................................................................................................30

Lanham Act, 15 U.S.C. §§ 1051 *et seq.* ................................................................12, 19

HIPAA .........................................................................................................................46

**State Statutes and Regulations**

N.C. Gen. Stat. § 75-1.1.............................................................................................36, 37

N.C. Gen. Stat. § 106-135..............................................................................................37

Code of Alabama § 34-23-33(2) .....................................................................................37

**Federal Rules**

Fed. R. Civ. P. 8............................................................................................................15

Fed. R. Civ. P. 9(b) ................................................................................................. *passim*

Fed. R. Civ. P. 12(b)(1)..................................................................................................40

Fed. R. Civ. P. 12(b)(6)................................................................................................9, 50

Fed. R. Civ. P. 15..........................................................................................................50

Fed. R. Civ. P. 23......................................................................................................39, 40

Fed. R. Civ. P. 56..........................................................................................................45

## I.     NATURE AND STAGE OF PROCEEDINGS

Defendants OpenLoop Health Inc. ("OpenLoop"), Triad Rx Inc., and Triad Rx Buyer LLC (collectively "Triad") filed a Motion to Dismiss Plaintiff's Class Action Complaint, or in the Alternative, to Compel Arbitration and Enforce Class Action Waiver (D.I. 17), and a memorandum in support (D.I. 18, "Memo"). Plaintiff hereby opposes the Motion, demonstrating why it fails to present any grounds on which the Court could dismiss or compel arbitration of any of the claims in Plaintiff's Class Action Complaint (D.I. 1, 15, "Complaint" or "¶"). The Declaration of Dylan D. Altland in Support of Plaintiff's Opposition to the Motion ("Altland Decl.") is filed herewith.

## II.     SUMMARY OF ARGUMENT

It is common knowledge that prescription weight-loss drugs are all the rage and big business. ¶1. At the epicenter is Tirzepatide. It is the active ingredient in Eli Lilly's FDA-approved, once-weekly subcutaneous injectable treatment for weight-loss, branded as Zepbound. It is a weight-loss drug active ingredient that is markedly distinguished from others because it is a dual agonist that targets both GIP and GLP-1 receptors to effect weight-loss.[1] Zepbound, the only FDA-approved form of Tirzepatide for weight-loss, is only manufactured and sold as a subcutaneous injectable treatment because that is the only effective means of delivering Tirzepatide.[2]

Yet, Defendants are acquiring Tirzepatide and then marketing, advertising, packaging, selling, and distributing it as a weight-loss drug *in pill form*, "Oral Tirzepatide." As the Complaint details, it is a scientific certainty that Defendants' Oral Tirzepatide is not a pharmacologically effective weight-loss drug. ¶¶39, 42, 46-47, 55, 90. Oral Tirzepatide is not equivalent to any FDA-

---

[1] GLP-1 is the acronym for "Glucagon-like peptide-1" and GIP is the acronym for "glucose-dependent insulinotropic polypeptide". Mimicking the effects of two hormones, Tirzepatide is a GIP rector agonist (enhancing insulin secretion, improving fat metabolism) and a GLP-1 receptor agonist (slowing gastric emptying and increasing feelings of fullness). ¶38.

[2] *See* Altland Decl. ¶8 & Ex. D.

1

approved weight-loss drug. ¶¶3 n2, 39, 45-48, 46 n.94, 50-56, 90. Despite that, through the use of the internet, wires, and mail, at their direct and by their essential participation, Defendants are, *inter alia,* manufacturing, marketing, selling, and distributing Oral Tirzepatide to consumers, providing the operational and technical infrastructure for consumer-facing brands and telehealth websites to collect orders from those consumers, and supplying physicians who purportedly prescribe Oral Tirzepatide to unsuspecting consumers nationwide. As part of the scheme and deception, Defendants flood the internet, social media, and the brands' websites with messages, pictures, and advertising that tells people, just like the Plaintiff, that they can buy online from Defendants and their co-conspirators a needle-free, oral form of Tirzepatide that is equivalent to the FDA-approved injectable Tirzepatide. *See, e.g.*, ¶69 n.115 ("Tirzepatide Now Available as a Pill…No restrictive diets. No endless workouts. **Just real science that works**.") (emphasis added); *see* Section III.A., *infra*. This scheme causes each customer to pay hundreds of dollars to Defendants for snake oil branded as Oral Tirzepatide.

Defendants ignore these seminal factual allegations in the Complaint which amply plead federal RICO and multi-state consumer protection and common law claims. Instead, Defendants rely on obfuscation, inapposite case law, demonstrably wrong speculation argued as fact, and markedly undeveloped legal arguments (which cannot be rehabilitated in a reply brief, *see* Section IV.B). As detailed herein, Defendants' Motion must be denied for the following reasons:

1.    Defendants mount a futile attempt to invoke a regulatory thicket that has no legal bearing on Plaintiff's allegations and claims. The Complaint does not allege and therefore does not "rest on a single, erroneous premise: that compounded oral tirzepatide requires FDA approval…" D.I. 18 at 2. Plaintiff's claim is that Defendants are selling a product, Oral Tirzepatide, as the equivalent of an FDA-approved weight-loss drug (it is not) and as if it is effective for weight-

loss (it is not). The allegations and claims simply do not implicate compounding laws (D.I. 18 at 2, 9-13) or the FDCA (*id.* at 2-3, 7-9, 13-14), despite Defendants' desire to try to put them, and thus issues of preemption and preclusion, in play. *Id. See* Section IV.C., *infra.*

2.     Plaintiff alleges a pragmatic economic loss: he paid for a product that could not deliver the benefit for which it was sold. That is a concrete injury under RICO and the consumer protection statutes at issue. D.I. 18 at 14-16, 24-25. *See* Section IV.D.2., IV.G.1(a)-2(a), *infra*.

3.     The Complaint identifies the who, what, where, and why of the alleged misrepresentations and pleads the scheme with particularity. D.I. 18 at 17-24, 26-28. *See* Section IV.F., *infra*. Defendants' additional assertions—that Plaintiff fails to plead reliance, proximate cause, injury, or the elements of RICO—either misstate the law or ignore what is actually alleged. D.I. 18 at 28-34. *See* Section IV.D.3.-IV.E., *infra*.

4.     Defendants' attack on the class claims is premature and raises issues that are not appropriately resolved at the pleading stage. D.I. 18 at 34-35. *See* Section IV.G.2(c), *infra*. And Defendants' argument with respect to South Carolina and Tennessee is plainly foreclosed by *Berk v. Choy*, 223 L.Ed.2d 463, 470-75 (U.S. 2026). D.I. 18 at 36. *See* Section IV.G.2(b), *infra*.

5.     Plaintiff alleges ongoing conduct and a likelihood of continued harm that cannot be remedied by damages alone. D.I. 18 at 35-36. *See* Section IV.G.3., *infra*.

6.     Plaintiff alleges how Defendants have retained money obtained under circumstances rendering it inequitable for them to do so. D.I.18 at 37. *See* Section IV.G.1(c), *infra*.

7.     No user of MEDVi's website, including Plaintiff, "affirmatively check[ed] a box" to accept terms, contrary to the unsupported representations made in Defendants' filings. D.I. 18 at 37. There was no assent to arbitrate or waive class action treatment between Plaintiff and MEDVi, and even if there was, Defendants cannot invoke equitable estoppel here to compel

arbitration. *See* Section IV.H., *infra.*

### III.    STATEMENT OF FACTS

#### A.    Defendants' Nationwide Scheme to Sell Oral Tirzepatide

At the center of this scheme is Defendant OpenLoop Health Inc., a self-proclaimed backend "operating system" for "digital health" brands or websites. ¶10. Far from a peripheral vendor providing incidental services, the Complaint alleges how it controls: the prescribing entity, OpenLoop Healthcare Partners, P.C.; and, the clinicians it employs, who purport to prescribe and cause Oral Tirzepatide to be issued to consumers. ¶¶16-18. Jon Lensing owns OpenLoop Health Inc., and his father, Dale Lensing, is an officer of OpenLoop Healthcare Partners, P.C. ¶16. Then, in addition to the backend infrastructure and prescribing, is Defendant Triad Rx, Inc., a pharmacy, that is manufacturing and distributing the Oral Tirzepatide, whose facility is owned by OpenLoop Health Inc. (*see* ¶12 n.18), and which is alleged to be owned by or subsumed within Defendant Triad Rx Buyer LLC, which is, in turn, owned by Jon Lensing. ¶¶11-13.

As to the consumer-facing arm of the scheme, the website brands include MEDVi, Agile Telehealth, Diddly Health, Fridays, FuturHealth, Gala GLP-1, Remmy, 24HrDoc, Intimate Rose, Lovely Meds, MyStart Health, and Remedy Meds (¶¶20-32, 66-67), each of which presents itself to a consumer as an independent telehealth provider offering Oral Tirzepatide branded under its own name, contrary to the reality of Defendants' centralized OpenLoop–Triad operation to sell snake oil branded as Oral Tirzepatide. ¶¶103-111.[3] Taken together, these allegations describe a vertically integrated structure with OpenLoop controlling and actively participating in the

---

[3] Relegated to a footnote is Defendants' claim that these brands are irrelevant. D.I. 18 at 2 n.2. That argument is belied by the Complaint's allegations, which detail how the multiple brands are part of the scheme, and the extensive scope and uniformity of the scheme with Defendants at its helm. *See* ¶¶66-67, 78-81, 104. The brands and allegations support the existence and operation of the scheme alleged. *See H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989).

marketing, prescribing pipeline, sale, manufacturing, and distributing of Oral Terzepatide.[4]

As part of the scheme, Defendants and their cohorts flood the internet and social media with advertising that unequivocally tells people, just like the Plaintiff, that Defendants can sell them an "Oral Tirzepatide" that is a needle-free weight-loss drug equivalent to the FDA-approved injectable Tirzepatide. ¶¶66-72; Altland Decl. Ex. B. Indeed, Defendants, through the websites, which are where individuals make their purchase of and payment for the Oral Tirzepatide (¶88), displayed pictures of Oral Tirzepatide juxtaposed with pictures of injectable Tirzepatide (*see* ¶¶66, 72), and falsely and deceptively told customers:

- "Tirzepatide Now Available as a Pill…No restrictive diets. No endless workouts. **Just real science that works**." ¶69 n.115 (emphasis added);
- "Oral Tirzepatide…[a]s a dual receptor agonist … deliver[s] superior benefits in appetite control…and weight reduction." ¶66;
- "'You can now access cutting-edge diabetes and weight loss treatment in pill form-without leaving home'" *Id.*;
- "Highly effective and no needles" ¶71; and
- "You have a *very high* chance of success with MEDVi prescribed GLP-1 medication." *Id.*; *see also* Altland Decl. Ex. B.

Using equally misleading testimonial-style claims and numerical assurances, Defendants doubled-down on those false statements, *e.g.* "When nothing else worked, MEDVi did!"; "9/10 patients call it the most effective treatment to date"; "18% average weight-loss." ¶74.[5]

And, in furtherance of the scheme, customers were told there would be physician approval and supervision (¶¶67, 70(c), 76, 77), including a three-step process that was supposed to be

---

[4] *See* ¶61 ("'OpenLoop [trumpets that it] is focused on taking non-healthcare companies and turning them into … healthcare companies overnight.'").

[5] Since the filing of the Complaint, the FDA has characterized claims on MEDVi's website as implying "products have been FDA-approved or otherwise evaluated for safety and effectiveness when they have not" and, as, therefore, "false or misleading." 2/20/26 FDA Letter to MEDVi, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/medvi-llc-dba-medvi-721455-02202026

personalized, and culminate with a consultation with a provider before medication is prescribed. ¶¶67, 77. Yet, that was a ruse to create and further an erroneous public perception of legitimacy in the process and purchase of Oral Tirzepatide. As Plaintiff alleges, "[a]t no point before or after submitting payment did [he] speak with, video-conference, or otherwise consult a licensed medical professional," and that other consumers similarly reported, "'I didn't even talk to a doctor …'" ¶¶85, 98. In reality, consumers were instructed to "'choose whichever medication you prefer, regardless of our recommendation!'" ¶77. Further, Defendants' packaging of Oral Tirzepatide, which displayed Defendant Triad's name, reinforces the scheme at the point of fulfillment, as it is delivered in customary prescription packaging with conventional pharmacy labeling and dosing instructions printed directly on the bottle. ¶¶89, 96-97. There is no other statement or purported disclaimer on the delivered product that contradicts, qualifies, or tries to negate the deception.

Defendants are not innocuous participants nor estranged from the content on the websites, as Defendants argue without any support. D.I. 18 at 17-22. That conjecture is directly contradicted by the above, as well as OpenLoop's own, unvarnished words, as detailed in the Complaint. ¶¶58-65. OpenLoop made sure to disabuse the public of any such notion of being hands-off, instead declaring that the brands cannot offer Oral Tirzepatide without both OpenLoop and Triad. *Id.* Its so-named <u>marketing</u> guide touts that it supplies the full infrastructure necessary to launch the consumer-facing telehealth storefronts, including suggested landing-page layouts and step-by-step marketing strategies.[6] OpenLoop states it provides them with a prescribing pipeline (¶¶63, 82-88, 98), fulfillment (¶¶64, 89, 96-97), and payment routing.[7] Underscoring just how far afield

---

[6] ¶63 & n.100 (citing OpenLoop, *The Guide to Marketing Your Telehealth Business*); ¶62 ("OpenLoop's 'partners', … consist of the Consumer Facing Websites and Brands, like MEDVi and the numerous other GLP-1 marketing websites that offer '[O]ral [T]irzepatide'…").

[7] ¶63 ("'access to nationwide … payers with no additional operational lift.'"); *see also* ¶88.

Defendants' Memo strays from reality is OpenLoop's sales pitch to prospective partners which states that it will "maximize every marketing dollar" and **"You bring the patients, we handle everything else." ¶¶**63-64.[8]

### B.    Oral Tirzepatide is Snake Oil

It is a scientific certainty that Defendants' Oral Tirzepatide is not a pharmacologically effective weight-loss drug. ¶¶39, 42, 46-47, 55, 90. Oral Tirzepatide is not equivalent to any FDA-approved weight-loss drug. ¶¶3 n.2, 39, 45-48, 46 n.94, 50-56, 90.[9] Tirzepatide is a large, complex peptide; its molecular size, structure, and enzymatic vulnerability make effective oral delivery without a permeation enhancer pharmacologically impossible.[10] ¶¶39, 46-47. Nowhere does Defendants' Memo attempt to dispute this core fact or refute the Complaint's well-pled, extensive allegations supporting that fact.

The pharmaceutical industry reflects the same scientific reality. Far from being "bizarre" (as Defendants' Memo, D.I. 18 at 8, chides), the Complaint's allegations (¶¶50-57) about the fact that no FDA-approved oral version of Tirzepatide exists and the billions of dollars spent to develop oral weight-loss drugs are further supportive of Plaintiff's allegations and claims, including that Defendants' conduct and scheme were knowingly deceptive. Indeed, Eli Lilly has not simply

---

[8] OpenLoop continues to solicit telehealth brands with the same, clear message. *See* Decl. Ex. A, at Fig. 7.3. As Plaintiff alleged, ¶107, "The marketing companies themselves do not maintain any inventory, pharmacy licensure, or clinical infrastructure. Their ability to 'offer' [O]ral [T]irzepatide presupposes that the product already exists in quantity—manufactured, labeled, and ready for distribution—by the OpenLoop-Triad network."

[9] The oral tablets sold by Defendants consist of tirzepatide API blended with inert supplements (e.g., L-Carnitine and Vitamin B12) and pressed into pill form, which does not permit biologically meaningful absorption. ¶¶55, 90. *See also* Altland Decl. Ex. D. ("Tirzepatide is not available in pill form for oral administration … The molecular weight of tirzepatide is 4813.53 daltons. Generally, medicines with a molecular weight greater than 500 daltons are not absorbed orally.").

[10] FDA-approved tirzepatide products (Mounjaro and Zepbound) are delivered exclusively by **subcutaneous injection** due to known limitations of oral peptide delivery. ¶¶3 n.2, 39, 46 n. 94.

pressed Tirzepatide into a dissolvable pill and then marketed and sold it as an effective equivalent to their injectable Tirzepatide product Zepbound. Instead, Eli Lilly is pursuing **oral** GLP-1 therapies by developing an ***entirely new molecule***. ¶55. That course of conduct is consistent with the pharmacological reality of Defendants' Oral Tirzepatide alleged here.[11]

Unable to credibly respond to those seminal allegations, Defendants attempt to recast the Complaint as one alleging "lack of substantiation" (D.I. 18 at 14-17, 24-26), or as alleging ambiguous or missing data. *See* Section IV.D., *infra.* But the allegations, as detailed and cited above, belie those erroneous characterizations of Plaintiff's claims. Plaintiff is not alleging that Defendants failed to gather enough support for an uncertain medical claim or benefit. He alleges that the product Defendants chose to make and sell, in the form they sold it (¶90), is one that established scientific principles already tell us is ineffective.

### C.    Plaintiff's Experience

Plaintiff purchased Oral Tirzepatide through MEDVi, one of Defendants' consumer-facing brands. ¶87. MEDVi presented the product as a needle-free, clinically effective alternative to FDA-approved injectable GLP-1 medications, positioning it alongside injectable GLP-1 drugs and describing it as delivering substantial weight-loss benefits. ¶¶69-77. The website further represented that the medication would be prescribed pursuant to physician oversight and individualized clinical judgment. ¶¶67, 70, 76-78. After completing a standardized online intake process, selecting Oral Tirzepatide, and submitting payment, he received a bottle of Oral Tirzepatide having never spoken to or consulted with a licensed medical professional. ¶¶70-77, 82-88. The product came in a conventional prescription bottle, with a label displaying Triad's

---

[11] *See also Eli Lilly & Co. v. Willow Health Servs.*, No. 2:25-cv-03570, D.I. 59 at 15:20-22 (C.D. Cal.) (Hearing Tr., Nov. 6, 2025) ("[T]his is a complex molecule, Your Honor. There's a reason it's only sold in an injection because that's the only way it can get into the blood.")

name. ¶89; *see also* ¶¶96-97. Plaintiff paid $279.99 for the product. ¶83. Only afterward did

Plaintiff learn that Oral Tirzepatide is not capable of delivering the advertised weight-loss. ¶92.

As a result, Plaintiff paid for and consumed a worthless product. The Complaint details the scheme

to which Plaintiff and others nationwide have reported being subjected to, resulting in each paying

hundreds of dollars for, and unknowingly consuming, snake oil branded as Oral Tirzepatide.

## IV.    ARGUMENT

### A.    LEGAL STANDARDS GOVERNING A RULE 12 MOTION

When the particularized factual allegations of a complaint have put defendants on notice

of the misconduct with which they are charged,[12] and if, when accepted as true and viewed in the

light most favorable to the plaintiff,[13] the claims are held to be facially plausible, a Rule 12(b)(6)

motion must be denied. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008); *Berk*, 223

L.Ed.2d at 471; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007); *Ashcroft v. Iqbal*,

556 U.S. 662, 663 (2009). The Court's determination is based on whether Plaintiff is "entitled to

offer evidence to support the claims," not on whether Plaintiff "will ultimately prevail". *In re*

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (cleaned up).

### B.    UNDEVELOPED ARGUMENTS ARE WAIVED

As an initial matter, Defendants' Memo is replete with passing references to never

---

[12] Rule 9(b) governs allegations of mail and wire fraud statute violations, requiring that "a party must state with particularity the circumstances constituting fraud or mistake." *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004). That requirement is satisfied by "pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Id.* at 224. *See also United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 503 (6th Cir. 2007) ("[T]he purpose of Rule 9 is …to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct.").

[13] In considering a Rule 12(b)(6) Motion, the Court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Black v. Montgomery Cnty.*, 835 F.3d 358, 364 (3d Cir. 2016), *quoting Phillips,* 515. F.3d at 233.

developed and legally unsupported argument. The law is clear that arguments not properly raised in a motion are categorically waived and cannot be rehabilitated in a reply brief. *Laborers Int'l Union of N. America, AFL-CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("a passing reference to an issue...will not suffice to bring that issue before [the] court.").[14]

*First*, Defendants have waived any argument that the FDCA "preempts" RICO claims, citing no applicable statutory scheme or controlling authority (D.I. 18 at 13-14). *Second*, Defendants have waived any challenge to the sufficiency of Plaintiff's allegations about the: (i) RICO enterprise structure, *id*. at 21 (single unsupported sentence)[15]; (ii) pattern of racketeering activity, and the continuity, relatedness, or the repeated nature of the scheme, *id*. at 20, 32-33 (asserting failure without analysis or authority); (iii) RICO Conduct / Participation by Defendants, *id*. at 32-33; (iv) predicate acts, having not addressed the specific transactions alleged (which include the payment processing, invoicing, prescription fulfillment) or why they fail as predicate acts, *see id*. at 20 n.16; 32 (labeling predicate act allegations as "lumped together" without support); (v) conspiracy, agreement, or coordinated conduct, as Defendants' argument is focused entirely on § 1962(c) (*id*. at 33); and (vi) proximate cause, having proffered only the erroneous assertion, without supporting case law, that it must particularly pled under Rule 9(b) (*id*. at 31).

*Third*, Defendants waive their undeveloped and unsupported arguments that: (i) the Complaint's **testimonial allegations** fail under Rule 9(b), *see id*. at 24 (single citation, no

---

[14] *See also FinancialApps, LLC v. Envestnet, Inc*., 2020 WL 4569466, at *12 (D. Del. July 30, 2020) (refusing to dismiss counterclaim where "argument for dismissal is underdeveloped, having been raised only in a short paragraph"); *Conroy v. Leone*, 316 F. App'x 140, 144 n.5 (3d Cir. 2009) ("one conclusory sentence" constitutes an "undeveloped argument [that] has been waived").

[15] D.I. 18 at 33-34 cites to *Reves v. Ernst & Young,* 507 U.S. 170, 179 (1993), which is not an enterprise case, and to *In re Brokerage Antitrust*, 618 F.3d 300, 366-368 (3d Cir. 2010), for the proposition that the case involved "normal business relationships"—a characterization that does not appear in, and is not supported by, that decision.

analysis); (ii) there is some "regulatory disagreement", without defining the term or explaining its legal significance, *id*. at 31; and (iii) the unjust enrichment claim must fail having despite positing no separate legal analysis to the Complaint's benefit conferred/retained allegations (*id*. at 37).

## C.    DEFENDANTS' FDCA AND § 337(A) PREEMPTION/PRECLUSION ARGUMENTS FAIL AT THE OUTSET

Defendants' Memo at 5-14 leads with an irrelevant diatribe about compounded drugs and FDCA regulation.[16] That Oral Tirzepatide may be called a "compounded drug" or purportedly prepared at a pharmacy called a "compounding pharmacy" is irrelevant, and Plaintiff's Complaint does not allege otherwise, obviously to Defendants' ire. Plaintiff is not "seek[ing] to enforce § 503A of the FDCA." D.I. 18 at 10.[17] Plaintiff does not allege claims that are "derived entirely" from "federal drug approval and labeling requirements." *Id.* at 13. Defendants' entire argument rests on their repeatedly stated false narrative about the Plaintiff's claims and allegations.

Oral Tirzepatide is not an FDA-approved drug, and Plaintiff does not allege that it is or should be, nor base his claims on Defendants' failure to comply with any federal drug law or "compounding parameters" under 21 U.S.C. § 353a ("503A"). Instead, Plaintiff alleges that Defendants conducted a nationwide scheme to defraud consumers into buying a product, namely, Oral Tirzepatide that is ineffective for the purpose it was purchased, and provides detailed allegations as to why it is ineffective. And, like those allegations, others concerning Defendants' ruse about physician oversight invoke factual (mis)representations about how the service operates,

---

[16] The FDCA does not "govern" compounded drugs in the manner Defendants suggest; it establishes the outer boundaries of federal involvement while leaving substantive oversight of compounding practice to state law. *See* D.I. 19-1 Ex. A ("Prescription Guidance") at 4 ("FDA does not interact with the vast majority of licensed pharmacists and licensed physicians who compound drug products and seek to qualify for the exemptions under section 503A…").

[17] There is no such thing as a "violation" of Section 503A. *See* 21 U.S.C. § 331; *see also Med. Ctr. Pharm. v. Mukasey*, 536 F.3d 383, 405 (5th Cir. 2008) ("The [§ 503A] requirements themselves are thus not freestanding but instead serve to trigger an exemption from the adulteration, misbranding, and new drug approval provisions.").

none of which depend on, and are certainly not defined by, federal drug approval or labeling requirements. Defendants' attempt to reframe the claims as federal-labeling claims, so that they can argue that they "depend on an FDCA violation" just does not correspond to the Complaint's allegations. *See id*. at 2, 6, 8-10, and 11 (inaccurately quoting ¶223); *compare with* Section III, *supra*. On this basis alone, Defendants' arguments (D.I. 18 at 5-14) must be rejected outright.

1.     **Section 337(a) Does Not Bar Plaintiff's State-Law and RICO Claims**

Defendants' arguments also fail for the following additional reasons, as each argument is undermined by case law that permits the very claims Plaintiff asserts. *First*, as the Supreme Court has explained, 21 U.S.C. § 337(a) does not bar a claim brought pursuant to a statute other than the FDCA, even if the claim required litigating the issue of whether a defendant's conduct violated the FDCA, *an inquiry which is not required here*. *See POM Wonderful LLC v. Coca-Cola Co*., 573 U.S. 102, 117 (2014) (a suit "to enforce the Lanham Act" is not a suit to enforce "the FDCA or its regulations."); *Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 500-05 (1st Cir. 2022) (FDCA did not preclude a Lanham Act claim premised on allegations that the defendant falsely represented that its drug satisfied § 503B); *Markoff v. Athena Cosmetics, Inc*., 764 F. Supp. 3d 733, 742 (N.D. Ill. 2025) (holding claims were not preempted where they were based on alleged concealment of known risks, even though the same conduct might also violate the FDCA).[18]

*Second,* Defendants' insistence that they are "lawfully compounding" (D.I. 18 at 5-8) is irrelevant to these claims and the consumer-protection analysis.[19] *See In re Valsartan*, 2025 LX

---

[18] *See also Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 814 (1986) ("the presence of a claimed violation of the [FDCA] as an element of a state cause of action" does not make a state-law claim an FDCA claim for purposes of federal-question jurisdiction).

[19] 21 U.S.C. § 353b ("503B") regulates "outsourcing facilities," which are a distinct category of pharmacies that manufacture compounded drugs in bulk, without patient-specific prescriptions, and are required to register with the FDA and comply with reporting and inspection requirements. § 353b(a)-(b). Triad is not alleged to be an outsourcing facility.

12

180844, at *18-19 (D.N.J. Apr. 7, 2025) (recognizing that a product shown to do nothing, such as "a sugar pill or placebo," has no value and supports a full-refund theory); *Rikos v. P&G*, 2014 U.S. Dist. LEXIS 109302, at *45 (S.D. Ohio June 19, 2014) ("Align … is a capsule filled with bacteria and inert ingredients. If, as alleged, the bacteria does nothing, then the capsule is worthless and plaintiffs and the class members are entitled to a return of the purchase price paid[.]"). Defendants' argument also erroneously strips 503A of any limiting principle and bears little resemblance to the compounding activity the statute was designed to accommodate,[20] as contrasted to Defendants' mass-producing of Oral Tirzepatide. ¶¶17-18, 96-97, 103-111. Also, 503A requires, among other things, that the compounded formulation be "necessary" for the patient (21 U.S.C. § 353a(a)), ***not "appropriate"*** (D.I. 18 at 8); a drug product incapable of delivering the very therapeutic effect it was advertised and purchased for cannot, as a factual matter, be "necessary" for ***any*** patient. That conclusion does not depend on regulatory formalities; it follows from common sense.

*Third,* equally unpersuasive (irrelevant, in the first instance) is Defendants' reliance on the FDA's "route of administration" guidance. D.I. 18 at 8-9. The guidance they invoke addresses comparatively modest alterations to, not the wholesale reformulation of, a drug into a form incapable of delivering its active ingredient. *See id*. at 8 n.8. In Defendants' view of the world, the "FDCA allows" them to alter a drug in any manner and then market and sell it as equally effective (and equally safe). *Id*. at 8. That is a dangerous (and wrong) proposition. Under that theory, they could change an EpiPen's route of administration to a topical (versus an injectable), sell it to the masses for less, represent it is equally effective, and then be shielded from liability to those consumers from selling them a product that, of course, fails to reverse an allergic reaction.

---

[20] *See, e.g*., *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360 (2002) ("Compounding is typically used to prepare medications that are not commercially available, such as medication for a patient who is allergic to an ingredient in a mass-produced product.").

13

*Fourth,* Plaintiff's claims, including the state statutory and common law claims, do not depend on establishing a violation of a state's prohibition on the distribution of "new drugs." Legal claims brought by purchasers of an ineffective drug product sold as a legitimate therapy allege independent unfair or deceptive claims that are simply not swept away on Defendants' cries of preclusion and preemption. *See, e.g., Rikos v. P&G*, 799 F.3d 497, 517-18 (6th Cir. 2015); *In re Neurontin Mktg. & Sales Practices Litig.*, 2011 U.S. Dist. LEXIS 99593, at *138-139 (D. Mass. Aug. 31, 2011) ("Pfizer's failure to disclose lack of efficacy is particularly outrageous … where there was not a scrap of evidence supporting efficacy … Accordingly, the intentional material misrepresentations and omissions … constitute fraudulent business acts or practices[.]").

*Fifth,* Defendants' reliance on *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) (D.I. 18 at 10, 13, 14) supports Plaintiff's position, not Defendants. In *Buckman*, the plaintiffs alleged injuries from medical devices that ***had been*** cleared for sale by the FDA. 531 U.S. at 343. And, the preempted claim was a "fraud-on-the-FDA" claim premised entirely on allegations that a medical-device manufacturer's consultant *lied to the FDA to obtain premarket* approval; it was, thus, preempted because "policing fraud against federal agencies is hardly a field which the States have traditionally occupied." *Id*. at 347-48 (cleaned up). No remotely analogous fact or claim is alleged here.[21] *See also Painters & Allied Trades Dist. Council 82 Health Care Fund v. Forest Pharms., Inc.*, 915 F.3d 1, 10 n.5 (1st Cir. 2019) ("Plaintiffs question the efficacy of Celexa and Lexapro only for off-label uses; their claims, accordingly, are not predicated on a fraud-on-the-FDA theory of liability."). As the Supreme Court held in *Wyeth v. Levine*, 555 U.S. 555, 575 (2009), *Buckman* does not extend to broadly preempt all "state regulation of health and

_____

[21] *See Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 848 (9th Cir. 2024) ("It is therefore important to understand what *Buckman* was and was not about. *Buckman* did not involve any violation of duties owed under a state consumer protection statute.").

14

safety." 555 U.S. at 565 n.3.[22] "Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness." *Id.* at 575.[23]

*Sixth,* Defendants' description of *Scanlon v. Medtronic Sofamor Danek USA Inc.*, 61 F. Supp. 3d 403 (D. Del. 2014), as "instructive," is similarly deeply misplaced. *See* D.I. 18 at 13. The claims in *Scanlon* involved an FDA-approved medical device, turned on the manufacturer's alleged failure to comply with FDA adverse event reporting obligations, and invoked an express preemption provision in Medical Device Amendments, 21 U.S.C. § 360k(a). *Scanlon*, 61 F. Supp. 3d at 412. None of that pertains to Plaintiff's claims.

The *three* other cases Defendants rely on fare no better. *In re Orthopedic Bone Screws Prods. Liab. Litig.*, 193 F.3d 781 (3d Cir. 1999), predates *Buckman*, arose from the same underlying MDL litigation, and therefore adds nothing beyond the Supreme Court's later analysis; to the extent it survives *Buckman* at all, it is redundant of it. *Frompovicz v. Niagara Bottling, LLC*, 337 F. Supp. 3d 498, 513 (E.D. Pa. 2018), was a competitor suit analyzing express preemption under the food-labeling provision of the FDCA, 21 U.S.C. § 343-1(a)(1), and thus has no bearing here. And *Bennett v. Teva Pharms. USA, Inc.*, 2021 U.S. Dist. LEXIS 38565 (D. Del. Mar. 2, 2021), involved a meritless competitor challenge to a generic manufacturer whose drug had received FDA approval through the ANDA process; in any event, the decision's preemption discussion is dicta, as the Third Circuit affirmed dismissal on Rule 8 grounds. *Bennett v. Teva*

---

[22] In *Wyeth,* the Supreme Court, finding no conflict, upheld a Vermont state-law failure-to-warn verdict against a drug manufacturer for its labeling of "Phenergan," even though the "warnings on Phenergan's label had been deemed sufficient by the [FDA]." *Id.* at 558. Thus, no conflict or preemption even though state and federal law regulated the same conduct *in different ways*.

[23] Defendants' contention that because (purportedly) no state has "incorporated parallel versions of § 503A" Plaintiff "cannot escape § 337(a) preemption" (D.I. 18 at 12) is without merit. Despite efforts to make is sound different, Defendants are effectively asserting that the FDA occupies the field of prescription-drugs, which is an argument *Wyeth* unequivocally rejected. 555 U.S. at 576.

*Pharms. USA, Inc.*, 2022 U.S. App. LEXIS 25168 (3d Cir. Sept. 7, 2022).

**2. RICO Claims Based on Deceptive Marketing and Telehealth Prescribing Are Not Precluded**

Defendants' argument (D.I. 18 at 13-14) that Plaintiff's RICO claims are "preempted" is not merely incorrect, it is doctrinally incoherent and rests on fictitious quotations from the Complaint. Preemption is a doctrine governing conflicts between federal law and state law. *See POM*, 573 U.S. at 111. RICO is a federal statute.[24] The relevant inquiry, if any, would be preclusion, not preemption. *Id*. Defendants cite no authority holding that civil RICO claims may be "preempted" by the FDCA, nor could they: RICO and the FDCA are both federal statutes enacted by Congress, and § 337(a) speaks only to the exclusivity of FDCA enforcement, "[i]t does not address, or refer to, other federal statutes or the preclusion thereof." *POM*, 573 U.S. at 109. Defendants' casual conflation of preemption and preclusion is itself a red flag.

More troubling is Defendants' persistence in attempting to manufacture FDCA enforcement claims by rewriting the Complaint. They assert, for example, that paragraph 157(d) of the Complaint is "premised on Defendants' supposed noncompliance with the FDCA." D.I. 18 at 14. It is not. That allegation concerns deception about the nature and legitimacy of the product sold, not a violation of federal approval requirements. Defendants similarly claim that paragraph 148(a) alleges advertising "is false because claims of safety, efficacy, and equivalence are invalid without FDA approval" *Id*. That quotation is fabricated, and is not otherwise Plaintiff's claim. Paragraph 148(a) alleges that Defendants made "claims of safety, efficacy, and equivalence to FDA-approved drugs" with respect to Oral Tirzepatide despite knowing such claims "were (literally) false and misleading." Nowhere does it state, nor could ever be even implied (which

---

[24] 18 U.S.C. § 1962(c) and (d), and Plaintiff's claims are predicated on violations of the federal mail and wire fraud statutes. 18 U.S.C. §§ 1341, 1343. *See* Complaint, Counts I-II, ¶¶127-173.

would be improper), that Plaintiff alleges the scheme and representations are because of or based on the lack of FDA approval of Oral Tirzepatide. The same mischaracterization recurs elsewhere, with Defendants suggesting that Plaintiff predicates fraud on the sale of an "unapproved" "new drug." No RICO count alleges a "new drug" violation. No RICO count relies on the absence of FDA approval of Oral Tirzepatide as the basis for fraud.

This is not a disagreement about interpretation. Plaintiff's RICO claims do not seek to enforce the FDCA, do not require adjudication of FDCA compliance, and do not "exist solely by virtue of" federal drug-approval requirements. *See Azurity*, 45 F.4th at 500. Plaintiff alleges a scheme to obtain money through materially false representations about the product Defendants made and sold. Section 337(a) is inapplicable. Defendants' contrary argument is built on a series of demonstrable misstatements and should be rejected accordingly. *See also* Section IV.D., *infra.*

**D.    PLAINTIFF PLEADS RICO STANDING, INCLUDING BOTH INJURY AND PROXIMATE CAUSE**

### 1.  RICO Has Long Applied to Fraudulent Pharmaceutical and "Snake Oil" Schemes

Despite Defendants' arguments in their rather pithy challenge to Plaintiff's RICO allegations (D.I. 18 at 14-17), there is nothing novel about RICO claims challenging the fraudulent marketing and sale of prescription drugs. Indeed, as the decisions Plaintiff cite to herein demonstrate, Courts have routinely permitted civil RICO claims where pharmaceutical manufacturers or affiliated healthcare actors used coordinated enterprises and interstate communications to increase sales through deception, causing purchasers to pay for prescriptions they otherwise would not have bought. *See, e.g. In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 38-39, 49 (1st Cir. 2013) (the First Circuit upheld a RICO verdict where Pfizer promoted its drug Neurontin[25] for uses no more effective than placebo, causing payment for

---

[25] "Dubbed 'snake oil' by Pfizer's own sales team." 2011 U.S. Dist. LEXIS 99593, at *2.

prescriptions that would not otherwise have been covered); *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms Co.*, 943 F.3d 1243 (9th Cir. 2019), *cert. denied*, 590 U.S. 978 (2020), *class certification granted*, 674 F. Supp. 3d 799 (C.D. Cal. 2023), *aff'd*, No. 23-55742, 2025 LX 185001 (9th Cir. June 16, 2025), *cert. denied*, No. 25-625, 2026 LX 188463 (Mar. 23, 2026); *In re Avandia Mktg.*, 804 F.3d 633 (3d Cir. 2015), *cert. denied*, 578 U.S. 1022 (2016), *class certification granted*, No. 1871, 2025 LX 83813 (E.D. Pa. May 22, 2025).

RICO has likewise been applied in the compounding context, where pharmacies and affiliated actors operated together to generate revenue through medically unnecessary or misrepresented prescriptions. *See Gov't Employees Ins. Co. v. Wellmart RX, Inc.*, 435 F. Supp. 3d 443, 454–58 (E.D.N.Y. 2020). Criminal RICO cases underscore the same principle. Executives at Insys Therapeutics were convicted of racketeering for bribing physicians to prescribe drugs without a legitimate medical purpose. *United States v. Simon*, 12 F.4th 1, 69 (1st Cir. 2021) ("Subsys prescriptions, like snake oil on the frontier, became above all else a means of generating revenue."). Industrial-scale compounding misconduct has likewise resulted in RICO convictions. *See United States v. Cadden*, 965 F.3d 1 (1st Cir. 2020).

Contrary to Defendants' arguments, RICO's reach does not contract simply because the alleged enterprise operates under the veneer of medical practice.

### 2. <u>Plaintiff Alleges a Concrete Economic Injury</u>

A plaintiff states a civil RICO claim by alleging "a violation of section 1962," and an injury "in his business or property by reason of" that violation. 18 U.S.C. § 1964(c). "A plaintiff has been 'injured in his business or property' if his business or property has been harmed or damaged. Section 1964(c) requires nothing more." *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025). "'A showing of injury requires proof of a concrete financial loss…' This requirement 'can be

satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss.'" *Avandia*, 804 F.3d at 638 (quoting *Maio v. Aetna*, 221 F.3d 472, 483 (3d Cir. 2000) (cleaned up). Plaintiff alleges precisely that: he paid for Defendants' worthless weight-loss drug.

Plaintiff alleges that Oral Tirzepatide lacks medical efficacy because, as a matter of established scientific understanding, Tirzepatide cannot function when administered orally. *See* Section III.B, *supra*. The allegation rests on well-known scientific constraints governing peptide drugs, not on the absence of clinical studies. Yet, Defendants attempt to recast those allegations and facts as allegations about "lack of substantiation." D.I. 18 at 15. That attempt fails.

"Lack of substantiation is [a] theory of liability premised upon the lack of scientific support for an advertised benefit of a product," **but is distinct from** claims, as are Plaintiff's claims, "premised upon allegations that competent scientific evidence demonstrates that claims made by a defendant are objectively false." *Diebler v. SanMedica Int'l, LLC*, 488 F. Supp. 3d 169, 180 (D.N.J. 2020) (citations omitted); *see also Cohen v. Quten Rsch. Inst., LLC*, 2024 U.S. Dist. LEXIS 123854, at *5-6 (D.N.J. Jan. 29, 2024).

Defendants' reliance on *Eli Lilly & Co. v. Adonis Health, Inc.* ("*Henry*"), 2025 LX 465179 (N.D. Cal. Sep. 24, 2025) does not alter that analysis. D.I. 18 at 25-26. Eli Lilly's claims under the Lanham Act alleged unfair competition based on the sale of compounded versions of Eli Lilly's weight loss drugs by Henry. In *Henry*, in contrast to the Complaint, the full extent of Lilly's theory was the *absence* of clinical studies. *Henry*, 2025 LX 465179, at *18-19; *see also* ¶57. Here, in addition to the many other allegations and different legal claims, Plaintiff alleges why Defendants' Oral Tirzepatide is not a pharmacologically effective weight-loss drug. ¶¶39, 42, 46-47, 55, 90.

Defendants' Memo often uses general, vague references to GLP-1 drugs, when arguing that Plaintiff has pled a "lack of substantiation" claim, or that Plaintiff's claim rests on gaps in

19

studies or data about efficacy and safety. D.I. 18 at 24-28. But those arguments and references actually pertain to a wholly separate, distinct drug and active ingredient, Semaglutide. Tirzepatide is not the same as Semaglutide, it is a completely different molecule/peptide. ¶¶43 n.87, 46, 48. The technological pathway that enabled oral semaglutide does not work for Tirzepatide. ¶¶45-48. Defendants cannot piggyback off the fact that there is an FDA-approved oral version of Semaglutide. At bottom, Plaintiff does not allege that Defendants failed to substantiate an uncertain claim about Oral Tirzepatide. Plaintiff alleges economic injury because Defendants sold a product that scientific evidence demonstrates is ineffective. *See* Section III. B, *supra*.

Even the court in *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, a case Defendants cite, described the allegations here as an example of a properly pled RICO injury:

> "By way of a hypothetical, consider a case in which a pharmaceutical manufacturer markets **snake oil pills**, labeled as 'Drug X,' **for certain conditions when the manufacturer knows it is merely hocking snake oil**. Under this example, a **purchaser of Drug X could plead RICO injury because the pills have no efficacy whatsoever for the uses for which they are marketed**."

2009 LX 58900, at *47-48 (D.N.J. July 10, 2009) (emphasis added). Paying money for a product that cannot deliver the benefit for which it was sold is a paradigmatic economic injury. *See, e.g., Rikos*, 799 F.3d at 506 ("If Align does not provide any such benefits, then every class member was injured in the sense that he or she spent money on a product that does not work as advertised."); *United States v. Gonzalez-Alvarez*, 277 F.3d 73, 80 (1st Cir. 2002) ("[C]onsumers here who reasonably believed they were purchasing milk compliant with all government health regulations, but in fact received a different product of unknown safety, were denied the benefit of their bargain and suffered an actual loss."). Plaintiff alleges he paid for a drug product that Defendants knew had no medical efficacy whatsoever. That is a concrete out-of-pocket loss. *See Avandia*, 2025 LX 83813, at *25 ("[T]he Third Circuit has—in no uncertain terms—explained that here, direct

20

economic harm occurred at the time of [drug] purchase.").

### 3.    Plaintiff's Injury Was the Proximately Caused by Defendants' Scheme

To be liable under RICO, a defendant must conduct or participate, directly or indirectly, in the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c); *Reves v. Ernst & Young,* 507 U.S. 170, 179 (1993). RICO proximate cause, in turn, requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). The inquiry is whether the alleged scheme directly produced the injury, not whether a plaintiff relied on a particular statement. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647-50 (2008) (rejecting first-party reliance as a prerequisite to civil RICO liability); *United States v. Abrams*, 165 F.4th 784, 803 (3d Cir. 2026) ("'justifiable reliance . . . plainly ha[s] no place in the federal fraud statutes.'").

Defendants collapse those distinct concepts. They suggest Plaintiff was required to plead reliance on a particular misrepresentation from a particular "brand." D.I. 18 at 17. That is not the law. Reliance is not the measure of RICO proximate cause. As the Court held in *Bridge*, "[u]sing the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation. And one can conduct the affairs of a qualifying enterprise through a pattern of such acts without anyone relying on a fraudulent misrepresentation." 553 U.S. at 648-49 (citation omitted).

Under RICO, predicate acts form the foundation of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 488-89 (1985). Mail and wire fraud serve as predicate acts where defendants use interstate communications or mailings to execute a scheme to defraud. 18 U.S.C. §§ 1341, 1343; *Lum v. Bank of Am.*, 361 F.3d at 223. The focus is the fraudulent scheme itself, not

21

the content of any particular transmission.[26]

To prove wire/mail fraud in the Third Circuit, a party needs to show "(1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme." *Abrams*, 165 F.4th at 802. A mailing or wire transmission satisfies the statute if it "further[s] the scheme to defraud or [is] incident to an essential part of that scheme." *Irish v. Ferguson*, 970 F. Supp. 2d 317, 357 (M.D. Pa. 2013). It is sufficient if the defendant knew or should have reasonably anticipated that such use would follow in the ordinary course of business. *Pereira v. United States*, 347 U.S. 1, 8-9 (1954). [27]

RICO's "in furtherance" requirement does not demand that the defendant personally commit the predicate acts of racketeering but instead focuses on the *nexus* between the defendant's participation and the pattern of racketeering activity. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 371-72. Against that framework, courts have repeatedly held that purchasers adequately plead RICO proximate cause where they allege that they paid for drugs they would not have purchased absent the defendant's fraudulent scheme. *Neurontin*, 712 F.3d at 49; *Painters*, 943 F.3d at 1243 (the Ninth Circuit held that insurers and consumers plausibly alleged RICO proximate cause where a manufacturer concealed known cancer risks to drive sales); *Avandia*, 804 F.3d at 645 (the Third Circuit rejected the argument that intermediaries defeat RICO causation, explaining that a fraudulent pharmaceutical scheme directly injures those who ultimately pay for the drug because

---

[26] *Bridge*, 553 U.S. at 647; *Kolar v. Preferred Real Estate Invs., Inc.*, 361 F. App'x 354, 362 (3d Cir. 2010) ("To establish predicate offenses under §§ 1341 or 1343, it is the scheme that must be fraudulent, not necessarily the particular mail or wire transmissions that constitute the offenses.").

[27] *United States v. Bentz*, 21 F.3d 37, 40-41 (3d Cir. 1994); *Philadelphia Reserve Supply Co. v. Norwalk & Assocs.*, 864 F.Supp. 1456 (E.D. Pa. 1994); *Altisource S.A.R.L. v. Szumanski*, 2022 WL 909872, at *7 (D.N.J. Mar. 29, 2022).

the scheme "could have been successful only if" they bore the cost).

The authorities Defendants invoke (which include cases involving unrelated fact patterns or "off-label" FDA-approved drug/device cases that present materially facts than alleged here) do not alter that settled rule. D.I. 18 at 16-17, 33. Nothing in *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508 (D.N.J. 2011) (cited at D.I. at 16, 34), undermines causation in this case, particularly in light of *Avandia*, which rejected the argument that physician intermediaries break proximate cause. 804 F.3d at 645. *Dist. 1199P* involved third-party payors several steps removed from the alleged misconduct and an FDA-approved drug that was concededly efficacious in some contexts. 784 F. Supp. 2d at 520-22. *Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594 (D.N.J. 2000), arose in a materially different setting (employment), was dismissed on Rule 9(b) grounds, and, decided years before *Bridge*, treated first-party reliance as essential to civil RICO. *Id*. at 600. And *Dockery v. Heretick*, 2021 LX 60343 (E.D. Pa. Sep. 1, 2021), which involved allegations of conflicts of interest and misrepresentations with independent professional advice in a structured settlement, does not support Defendants' sweeping proposition that "proximate cause cannot logically be established without reliance." D.I. 18 at 17.

Thus, the Complaint's allegations belie Defendants' contentions (D.I. 18 at 5, 16-17, 30-31) it contains just one ("but-for") causation allegation (*id.* at 17) or otherwise fails to allege proximate causation or a sufficient nexus between his injury and their misconduct. The Complaint alleges that Defendants: designed and operated a unified scheme to market, collect payment, prescribe, manufacture, and dispense Oral Tirzepatide, a product they knew was snake oil. *See* Section III.A., *supra;* and, marketed and sold a fraudulent weight-loss pill directly to consumers (¶¶66-67), billed directly to OpenLoop (¶88; *see also* Altland Decl. at ¶¶10-11), routed through

23

clinicians operating pursuant to Defendants' prescribing protocols (¶¶17-18),[28] and filled by and distributed from Defendants' very own pharmacy. ¶89. The Complaint alleges no meaningful prescriber oversight, and no individualized medical determination. ¶¶85, 98. It alleges the consumer chooses Oral Tirzepatide. ¶77. Thus, in addition to the weight of authority cited above that rejects Defendants' physician-intermediary argument, there is no physician intermediary involved here that requires dismissal of Plaintiff's RICO claim. *See Neurontin*, 712 F.3d at 38-39 ("[T]he causal chain in this case is anything but attenuated."); *Painters*, 943 F.3d at 1257 ("[A]lthough prescribing physicians serve as *intermediaries* between Defendants' fraudulent omission of Actos's risk of causing bladder cancer and Plaintiffs' payments for Actos, prescribing physicians do not constitute an *intervening cause* to cut off the chain of proximate cause.").

Proximate causation fails only where the alleged injuries "'could have resulted from factors other than [the defendants'] alleged acts of fraud.'" *In re Insulin Pricing Litig.*, 2025 U.S. Dist. LEXIS 267766, at *119 (D.N.J. Dec. 30, 2025) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006)). Here, Plaintiff's injury flowed from the very enterprise Defendants created. To suggest that Plaintiff's financial injury, of paying for a worthless drug product marketed through the network of shell websites they solicited and assembled, is not directly attributable to Defendants' own misconduct is to suggest that Clark Stanley could have peddled his Snake Oil Liniment with impunity so long as he hired others to hawk it from the wagon.[29]

---

[28] Defendants assert that the Complaint does not allege "that OpenLoop … dictated treatment protocols[] or controlled prescribing decisions." D.I. 18 at 5. That is incorrect, *see* ¶17.

[29] Smithsonian Magazine, *How Snake Oil Became a Symbol of Fraud and Deception* (October 21, 2024), https://www.smithsonianmag.com/innovation/how-snake-oil-became-a-symbol-of-fraud-and-deception-180985300/.

**E.    PLAINTIFF ADEQUATELY ALLEGES A RICO ENTERPRISE, PATTERN, AND CONSPIRACY**

Defendants challenge the RICO elements only under Rule 9(b) (D.I. 18 at 32-34), which Plaintiff addresses in Section IV.F., *infra.* Also, as identified in Section IV.B., *supra,* Defendants fail to meaningfully address the RICO elements and any such arguments are waived. Plaintiff does address here for the Court the sufficiency of his allegations in establishing the RICO elements.

### 1.    <u>Defendants Functioned as a Single Coordinated Enterprise</u>

RICO "protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed.'" *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164-65 (2001). Defendants characterize the Complaint as alleging nothing more than "commercial relationships among a telehealth platform, a pharmacy, and related service providers" and purportedly "arm's-length business arrangements." D.I. 18 at 33-34. That framing ignores key allegations to which Defendants do not respond or dispute, namely that OpenLoop Health Inc. owns, controls, and operationally integrates OpenLoop Healthcare Partners P.C., Triad Rx, and Triad Buyer. ¶¶11-13, 16-18, 58-65.

An association-in-fact enterprise requires only three elements: a common purpose, relationships among the associates, and longevity sufficient to permit the enterprise's purpose to be pursued. *Boyle v. United States*, 556 U.S. 938, 946 (2009). The Complaint alleges all three. In assessing common purpose, courts "'look to the underlying purpose of the alleged criminal activity' in a fairly broad sense." *United States v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019). "Importantly, a common goal may exist even when 'conspirators individually or in groups perform different tasks in pursuing the common goal,' and a single conspiracy may 'attract[] different members at different times' or 'involve[] different sub-groups committing acts in furtherance of the overall plan.'" *Id*. (citing *United States v. Boyd*, 595 F.2d 120, 123 (3d Cir. 1978)). Here, the

25

Complaint alleges defined and continuing relationships among Defendants and the nominal "brands" based on common ownership, shared management, and operational control (*see* Section III.A., *supra*), and that they operated that structure on an ongoing basis to process prescriptions, manufacture the product, and collect payments nationwide. *Id*. Those allegations plausibly establish the relational and longevity elements of an association-in-fact enterprise.

The Complaint also alleges a shared purpose: monetizing the sale of Oral Tirzepatide. Allegations of coordinated conduct undertaken to increase profits through deceptive practices are sufficient to plead a common purpose under RICO. *See, e.g., Ins. Brokerage Antitrust Litig*., 618 F.3d at 376 ("Plaintiffs adequately allege a 'common interest' or 'purpose,' namely to increase profits by deceiving insurance purchasers about the circumstances surrounding their purchase.").[30]

Defendants' attempt to recast these allegations as innocuous arm's-length dealings does not negate at this stage the enterprise plausibly alleged. *See Smith v. Berg*, 247 F.3d 532, 537 n.11 (3d Cir. 2001) ("If [Defendants'] repeated characterization of themselves as innocent service providers is not belied by the evidence, they will incur no liability under [RICO]."). The Complaint describes a vertically integrated operation in which each Defendant played a complementary role in furtherance of a single fraudulent scheme. *See* Section III.A., *supra*. That is sufficient to plead an association-in-fact enterprise under RICO.

### 2. <u>The Complaint Alleges a Pattern of Racketeering Activity</u>

For there to be a "pattern of racketeering activity" there must be "at least two acts of

---

[30] *See also, In re Insulin Pricing Litig.*, 2025 LX 267766, at *122 ("Defendants engaged in a scheme to corrupt the supply chain by artificially inflating list prices in exchange for preferred formulary placement, shifting the cost of the bribes and kickbacks to purchasers of the Insulin Drugs.") (cleaned up); *In re JUUL Labs, Inc.*, 533 F. Supp. 3d 858, 861 (N.D. Cal. 2021) ("The schemes to defraud had the goals of growing the market of nicotine-addicts, most specifically youth addicts, to ensure a new pipeline for Altria and to enrich the … Defendants.").

racketeering activity." 18 U.S.C. § 1961(5). Those predicate acts must be related and must "amount to or pose a threat of continued criminal activity." *H.J.*, 492 U.S. at 239. Defendants simply say that Plaintiff has failed to allege a pattern because he either did not plead predicate acts with specificity or because Defendants' conduct is supposedly lawful. *See* D.I. 18 at 9, 32. But no business is immune from RICO by virtue of licensure or participation in otherwise legitimate commerce. Racketeering enterprises include those in which "the predicate acts or offenses are … a regular way of conducting defendant's ongoing legitimate business." *H.J.*, 492 U.S. at 242-43; *see, e.g., State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 2010 U.S. Dist. LEXIS 147405, at *43-45 (M.D. Fla. May 24, 2010) (finding fraud where patients were subjected to an identical treatment protocol which was "not based on any scientific evidence."); *Gov't Emps. Ins. Co. v. J Flexible Corp.*, 2026 LX 192857, at *14 (E.D.N.Y. Mar. 17, 2026) ("This case … concerns 'referral agreements' for *fraudulent* prescriptions, which is not a 'referral agreement' at all; it is simple fraud…"); *Gov't Emps. Ins. Co. v. Bhargav Patel*, 166 F.4th 280 (2d Cir. 2026).

Courts find viable RICO claims in the compounding context. In *Gov't Employees Ins. Co. v. Wellmart RX, Inc.*, GEICO alleged that a compounding pharmacy and its owners: worked in concert with providers to generate reimbursement claims through prescriptions for the defendants' fraudulent compounded drugs (435 F. Supp. 3d at 443); and, colluded with prescribing providers to issue medically unnecessary prescriptions pursuant to "predetermined fraudulent protocols..." *Id*. at 454. The court concluded that those allegations, as well as allegations that the pharmacy dispensed products "in pre-set formulations" that were "neither FDA-approved nor tailored to the individual needs of patients," and submitted reimbursement claims representing those products as medically necessary (*id*. at 447-48), raised serious questions going to the merits of GEICO's RICO

27

claims for the purposes of a preliminary injunction. *Id*. at 455.[31] The same structure the First Circuit in *Cadden* found sufficient to support the jury's finding of a pattern of racketeering activity is alleged here. *Cadden*, 965 F.3d at 15-16. The alleged predicate acts share the same purpose (profit), the same structure (OpenLoop-Triad prescription pipeline), the same victims (consumers), and the same method (fraudulent marketing and standardized prescription processing). Like in *Cadden*, these were not isolated events but Defendants' "regular way of doing business." *Cadden*, 965 F.3d at 17 (quoting *H.J.*, 492 U.S. at 242). Plaintiff amply pleads a pattern of racketeering activity.

3.      **Plaintiff Adequately Pleads RICO Conspiracy Under § 1962(d)**

Plaintiff also states a conspiracy claim under § 1962(d) (Count II ¶¶166-173) based on Defendants' agreement to violate § 1962(c). Defendants devote only a few lines to this Count and fail to address this governing legal standard. D.I. 18 at 34. A claim under 1962(d) is sufficiently pled based on allegations that a defendant knew of the enterprise's racketeering activity and agreed to facilitate it. *Berg*, 247 F.3d at 535. The conspirator must intend to further acts that, if completed, would satisfy the elements of a substantive RICO offense. *Id*. at 537 n.9; *Salinas v. United States*, 522 U.S. 52, 65 (1997). Moreover, a § 1962(d) "agreement" need not be express; its existence can be inferred from Defendants' words, actions, or the interdependence of the activities and persons involved, or circumstantial evidence. *United States v. Boria*, 592 F.3d 476, 481 (3d. Cir. 2010).[32]

---

[31] *See also United States v. Quinones*, 635 F.3d 590 (2d Cir. 2011) (affirming money laundering conspiracy conviction arising from an internet-based prescription scheme in which medications were approved through cursory questionnaires with no doctor-patient interaction and filled by pharmacies controlled by the defendant); *United States v. Lane Labs-USA, Inc.*, 427 F.3d 219 (3d Cir. 2005) (affirming restitution where defendant leveraged a purportedly independent research consultant to promote its shark-cartilage products as cancer cures).

[32] Plaintiff alleges direct contact between Defendants and the consumer-facing brands. But a RICO conspiracy does not require proof that each conspirator had contact with every other participant or knew all the details of the scheme in order to be found to have agreed to participate

The Complaint alleges that each Defendant knowingly participated in and agreed to facilitate the enterprise's racketeering activity by carrying out the operational core of the scheme: collecting payment, issuing prescriptions, manufacturing, and dispensing the fraudulent weight-loss drug. *Supra*, Section III.A. Those functions were indispensable and performed in coordination; the scheme could not operate without that shared agreement. Given the nature of the product at issue and each Defendants' role, the Complaint plausibly alleges knowing participation in and agreement to further the racketeering conduct. That is sufficient at the pleading stage.

**F.**    **PLAINTIFF ADEQUATELY PLEADS FRAUD AND RICO UNDER RULE 9(b)**

**1.**    **The Complaint Pleads a Unified Course of Fraudulent Conduct, Not Isolated Statements**

Defendants try to recast the Complaint as asserting a "false advertising" theory from which Defendants are divorced. D.I. 18 at 20. They quote ¶169 to argue that Plaintiff "concedes that a third party (not Defendants) advertised," and therefore fails Rule 9(b)'s "who-said-what-and-when" requirement. D.I. 18 at 20-21. But ¶169 does not allege advertising by a nonparty; it alleges that "OpenLoop, Triad Buyer and Triad Rx jointly orchestrated and supplied the infrastructure," while "consumer-facing GLP-1 marketing fronts, including MEDVi, executed the deception." That allegation does not disclaim Defendants' role, it pleads it. *See* Section III.A., *supra*.

Defendants' characterization that Plaintiff "nowhere ties any of those [false advertising] statements to any identified speaker at OpenLoop, Triad Rx, or Triad Buyer" (D.I. 18 at 20) bears no resemblance to the pleading. Plaintiff does not allege stray misstatements floating in isolation. He alleges a coordinated, backend-controlled enterprise in which consumer-facing "brands" served as portals into a unified telehealth–pharmacy operation that deceptively sold customers Oral

---

in it. *United States v. Riccobene,* 709 F.2d 214, 225 (3d Cir. 1983)); *United States v. Bergrin*, 650 F.3d 257, 271 (3d Cir. 2011) (Knowledge of one's co-conspirators is not required).

29

Tirzepatide. *See* ¶¶65, 102, 103-111. Those allegations do not distance Defendants from the representations, they place them at the center of the scheme that generated them.

Defendants falsely insist that "the only allegations of any purported fraudulent or racketeering conduct are misrepresentation based," that Plaintiff alleges no scheme independent of statements, and that "Plaintiffs' wire fraud allegations fail to attribute any conduct to any specific Defendant". D.I. 18 at 20, 32 & n.16. The Complaint does identify specific "'mail' or 'wire fraud'" incidents, *i.e.,* it alleges that on October 18, 2025, OpenLoop Health Inc. processed and received Plaintiff's payment through the MEDVi platform and issued Invoice No. GJAH3F4U-0003. ¶¶82-88. The receipt falsely identified MEDVi as the billing entity. ¶88. That transaction caused a wire transmission to Triad, which filled Plaintiff's prescription on October 20, 2025, from "Lot: LG183421," and issued it as Rx No. 91131559. ¶89. He also alleges that the product received bore Triad labeling; meaning the "Medication" (*see* ¶71) MEDVi was selling was plainly Defendants' "Medication." ¶89. That fact alone constitutes, at minimum, aiding and abetting fraud. *See* 21 CFR § 201.1(h)(2) (A name appearing on a drug label represents that the person is the manufacturer; it is false and misleading if they are not).

Nor does the Complaint rely on generalized "exposure" allegations to demonstrate causation. D.I. 18 at 29-30. It details the MEDVi website and intake process that Plaintiff navigated (and every customer must navigate) to obtain Oral Tirzepatide. *Compare* ¶¶ 70-78 *with* Altland Decl. Ex. C. Those allegations foreclose Defendants' suggestion that Plaintiff did not encounter the representations at issue and instead amply demonstrate "when and how [he] was exposed", in contrast to *Gray v. Bayer Corp.*, 2009 U.S. Dist. LEXIS 48181, at *8 (D.N.J. June 8, 2009), relied on by Defendants, D.I. 18 at 30.[33]

---

[33] The other cases on which Defendants rely are likewise factually distinguishable. In *Carson v.*

The Complaint pleads OpenLoop's own statements describing its role in supplying and operating the essential elements of the scheme. *See* Section III.A., *supra*; *see* Altland Decl. Ex A. Those representations are not peripheral advertising slogans; they are an invitation to join the conspiracy. *See Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939) (An invitation proposing collective action followed by a course of conduct showing acceptance suffices to show concerted action). Thus, attributing the representations to Defendants is not impermissible group pleading; they were communications used by Defendants' partner "brands" to induce purchases within an enterprise Defendants supplied and controlled. Any argument (D.I. 18 at 33 n.26) that Plaintiff failed to differentiate among the named Defendants is meritless as it ignores that OpenLoop owns Triad (*see* ¶¶11-12, demonstrating OpenLoop's ownership of Triad through corporate filings) and otherwise specifies their roles in the scheme (*see* Section IV.E., *supra*).

Further, Rule 9(b) does not require Plaintiff to identify a specific OpenLoop employee who authored particular website language. *Caldiero v. Mo. Higher Educ. Loan Auth.*, 2025 LX 279453, at *12 (M.D. Pa. Mar. 31, 2025) (Rejecting argument that 9(b) required plaintiff to "allege the name or job title of the employee…who allegedly made the representations, or the manner in which the representations were made, or the date when they occurred…").[34] Nor does it require a plaintiff to pretend that a scheme executed through nominal intermediaries consisted of isolated, arm's-

---

*HP Inc.*, 750 F. Supp. 3d 376, 392 (D. Del. 2024), the allegations were insufficient because there was "no attempt … to identify any *specific* alleged misrepresentation[.]" In *Snowdy v. Mercedes-Benz USA, LLC*, 2024 U.S. Dist. LEXIS 59302, at *60 (D.N.J. Apr. 1, 2024), the allegations were insufficient because plaintiffs failed to identify "what [the] statements were, or at what point Plaintiffs were exposed to those statements."

[34] *See also Agostino v. Quest Diagnostics*, 2005 U.S. Dist. LEXIS 64071, at *22 (D.N.J. Oct. 6, 2005) ("[I]n applying Rule 9(b), courts should be sensitive to situations in which sophisticated defrauders may successfully conceal the details of their fraud. Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed.") (citation omitted).

31

length statements by unrelated actors.[35] It requires particularity as to the fraudulent scheme and each defendant's role in carrying it out.[36] *See Prudential Ins. Co. of Am. v. Credit Suisse Secs. LLC*, 2013 WL 5467093, at *19 (D.N.J. Sept. 30, 2013) (declining to dismiss fraud claims where the complaint "describe[d] each defendant's respective roles" in the underlying business, alleged which defendants were involved in the purported fraudulent practice, and stated "how their respective roles put them in a position to make and/or know about the [fraud]").

Defendants' cited authority is inapposite. D.I. 18 at 19-22. Those cases arise from bilateral contract disputes or product-liability pleadings in which plaintiffs failed to identify a speaker in a discrete transaction.[37] Here, by contrast, the Complaint pleads that Defendants supplied the infrastructure, content frameworks, and operational backbone for consumer-facing brands/websites, which was fundamental to Defendants' scheme to sell Oral Tirzepatide. ¶¶103-

---

[35] *See Humana, Inc. v. Indivior, Inc.*, 2022 U.S. App. LEXIS 34754, at *8 (3d Cir. Dec. 15, 2022) ("Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' One such alternative measure would have been through satisfaction of the standard set forth by the RICO statute.") (quoting *Rockefeller Ctr. Props. Sec. Litig. v. Rockefeller*, 311 F.3d 198, 216 (3d Cir. 2002).

[36] *Klapper v. Commonwealth Realty Tr.*, 657 F. Supp. 948, 959 (D. Del. 1987) ("In the RICO context, Rule 9(b) only requires that the 'circumstances' of the alleged fraud be pled with sufficient particularity to place the defendants on notice of the conduct of which they are charged and to safeguard against spurious allegations."); *Bernstein v. IDT Corp.,* 582 F. Supp. 1079, 1085 (D. Del. 1984) ("Rule 9(b) 'does not require an exhaustive cataloguing of facts but only sufficient factual specificity to provide assurance that the plaintiff has investigated … the alleged fraud and reasonably believes that a wrong has occurred'") (citations omitted).

[37] *Arnold v. X Corp.*, 2024 LX 58634, at *46 (D. Del. Dec. 5, 2024) (contract dispute dismissing a fraud claim for failure to identify who made specific oral representations); *Chaleplis v. Karloutsos*, 579 F. Supp. 3d 685, 708 (E.D. Pa. 2022) (individual investment dispute requiring identification of specific statements by a single defendant regarding discrete investments), Rule 9(b) satisfied on repleading, 609 F. Supp. 3d 341 (E.D. Pa. 2022); *MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 245 (3d Cir. 2005) (commercial contract dispute dismissing fraud claim where alleged oral promise contradicted written agreement); *Rowe v. Metabolife Int'l, Inc.*, 2004 U.S. Dist. LEXIS 245, at *6-7 (E.D. Pa. Jan. 21, 2004) (wrongful death action dismissing complaint that failed to distinguish between manufacturer and distributor).

111; *see* Altland Decl. Ex. A, at Fig. 5.2 ("We'll set up a high-converting webpage under you brand"); *id.* at Fig. 6.3 ("Every Friday, you'll get paid for the active patients... Simply promote the program and get paid. It's that simple and easy!"). The brands were not independent marketers; they were operating at Defendants' direction. They were designed to serve as the consumer-facing shells so that Defendants could attempt to, as they try to now, distance themselves from the representations used to generate Oral Tirzepatide sales. ¶¶29 n.66, 30 n.70, 111. Trying to relegate the claims to a dispute over "who said what on a website" skirts the pleaded reality: a unified scheme that enabled Defendants to peddle their snake oil while operating "*invisibly* behind the scenes." Altland Decl. Ex. A, at Fig. 7.2; ¶¶61-64.

### 2.    The Complaint Adequately Pleads Falsity

#### (a)    *Safety and Efficacy Claims Are Actionably False and Misleading*

As stated *supra*, in Sections III.B. and IV.D.2., Plaintiff's efficacy claims rest on a scientific reality that Defendants do not credibly dispute. Defendants' argument that Plaintiff's personal physiological experience cannot establish "falsity" misses the point because his claim is not premised on anecdote but on the inherent nonfunctionality of the product as constituted and sold. D.I. 18 at 25-26.

#### (b)    *Defendants Made Utterly False Representations About Their Weight-Loss Product's Therapeutic Equivalence and Efficacy*

The Complaint alleges that Defendants *caused* Oral Tirzepatide to be marketed as the therapeutic equivalent of FDA-approved injectable GLP-1 medications. *See* Section IV.D.3.-IV.E.3., *supra*. The allegations summarized above describe more than enthusiastic marketing. They describe concrete, verifiable representations about therapeutic equivalence, clinical efficacy, and physician oversight—representations Plaintiff alleges induced him to purchase what he believed was a clinically effective weight-loss treatment. ¶87. The marketing did not merely

promote convenience. It juxtaposed Oral Tirzepatide with images of FDA-approved and compounded *injectable* GLP-1s, creating the categorically false impression that the pill form was comparable to clinically established weight-loss treatments. ¶¶66, 72. Oral Tirzepatide was sold as delivering the same dual GLP-1/GIP agonist benefits and promised substantial weight reduction. ¶¶66, 69 n.115, 71. Launch-style language was used, such as "Tirzepatide *Now Available* as a Pill," framing Oral Tirzepatide as a novel medical breakthrough. ¶71. Quantifiable efficacy claims were used, including statements that "people on GLP-1 + GIP Pill medication lose 20% of their weight in a year." ¶66. And consumers saw repeated messaging about prescriptions grounded in individualized medical judgment and as "doctor-approved," "doctor-supervised," and "1:1 physician guidance." ¶¶67, 70(c), 76-77. Plaintiff alleges that no such consultation occurred and consumers were invited to select medications irrespective of a (if any) purported medical "recommendation." ¶¶77, 85, 98.

These are objective claims, that are caused by and dependent upon OpenLoop's prescribed backend infrastructure, and are about pharmacological equivalence, measurable clinical outcomes, and physician involvement, which Plaintiff has alleged to be false. The Complaint pleads those representations with specificity, identifies where they appeared, quotes the language used, and explains why they were materially false and misleading in the context of the alleged scheme. *See Grant v. Turner*, 505 F. App'x 107, 112 (3d Cir. 2012); *Int'l ProcessPlants & Equip. Corp. v. First Standard Asurety, LLLP*, 2025 LX 283562, at *26-28 (E.D. Pa. Mar. 6, 2025); *Jones v. CVS Health Corp.*, 2024 LX 177157, at *24-28 (E.D. Pa. Oct. 31, 2024); *Altisource S.A.R.L. v. Szumanski*, 2024 U.S. Dist. LEXIS 96952, at *34-36 (D.N.J. May 31, 2024); *Roche Diagnostics Corp. v. Smith*, 2022 U.S. Dist. LEXIS 178662, at *45-46 (D.N.J. Sep. 30, 2022).

      **(c)**     ***Statements Concerning Oral Tirzepatide and the Telehealth Prescribing Process***

34

Defendants' challenge to Plaintiff's allegations concerning Oral Tirzepatide and the telehealth prescribing process rests on a mischaracterization of the Complaint. They isolate words and generalized marketing phrases—such as "fast," "easy," and "personalized care"—taken from the broader alleged marketing, and argue that those statements are either accurate or nonactionable puffery (or that the testimonials appearing during the MEDVi intake questionnaire did not reflect "real patients"). D.I. 18 at 23-24. That approach extracts a handful of adjectives from their context and ignores the function those representations served in the alleged scheme (and, in the case of "real patients," raises something completely irrelevant). Plaintiff does not allege that these words are false in the abstract; he alleges that, in context, the alleged representations surrounding Oral Tirzepatide are necessarily false or misleading because, as alleged, Defendants' product is snake oil. Those representations were used to funnel consumers into a purportedly individualized telehealth process that predictably resulted in the sale of that snake oil. The Complaint pleads the role these representations played in the alleged scheme with the specificity Rule 9(b) requires, identifying the websites where the statements appeared, the quoted claims themselves, and the date and circumstances of Plaintiff's purchase. ¶¶66-78, 82-92. Defendants cannot defeat those allegations by isolating selected phrases and relabeling them as free-floating puffery. *See Barrera v. Pharmavite*, 2016 U.S. Dist. LEXIS 204164, at *25-26 (C.D. Cal. June 2, 2016) (rejecting a puffery defense where the plaintiff alleged the product was "no better than sugar pills," because if proven, the product's lack of efficacy would render the representations materially misleading regardless of "the significance of the phrase 'comfort, mobility, and flexibility'").

More fundamentally, this case does not rise or fall on any single phrase. Under *Bridge*, liability does not depend on reliance on a particular misrepresentation, or the truth or falsity thereof, where the scheme itself is fraudulent. *See Avandia*, 804 F.3d at 645; *Abrams*, 165 F.4th at

35

802. Defendants do not dispute that they collect payment for Oral Tirzepatide, prescribe it, mass compound it, and distribute it nationwide through affiliated brands. Nor do they contest the allegation that the Oral Tirzepatide they sell lacks medical efficacy. In that posture, parsing website language for puffery is beside the point because the Complaint alleges **conduct** that, if proven, satisfies the elements of mail and wire fraud and, by extension, RICO.

### (d)   *Customer Satisfaction Is Not An Element of Plaintiff's RICO or Consumer Protection Theory*

Defendants attack on Plaintiff's references to customer reviews is misplaced; it distorts their role in the Complaint and misstates (again) the nature of Plaintiff's theory. D.I. 18 at 24-28. Plaintiff is not required to show that no consumer perceived any benefit from Oral Tirzepatide. Placebo responses are well documented, including in GLP-1 trials.[38] That some consumers believed the product worked does not mean it did or that the alleged fraud evaporates. *See* ¶¶93-102. Courts repeatedly reject that notion. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1090 (9th Cir. 1994) (holding it unlawful "for a seller to represent a product as 'effective' when its efficacy results solely from a 'placebo effect.'"); *FTC v. QT, Inc.*, 512 F.3d 858, 863 (7th Cir. 2008) ("[S]elling a placebo as if it had therapeutic effect directly injures the consumer.").

## G.   PLAINTIFF'S STATE LAW CLAIMS ARE ADEQUATELY PLEADED

Defendants' challenges to Plaintiff's state-law claims largely replicate their RICO and Rule 9(b) arguments. D.I. 18 at 34-37. For the reasons already discussed, those arguments fail.

### 1.   North Carolina Class

### (a)   *Plaintiff Has Adequately Alleged Unfair or Deceptive Conduct*

---

[38]   *See, e.g.,* FDA, *Prescribing Information for ZEPBOUND* (2022) at 8, https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/217806s003lbl.pdf (reporting adverse gastrointestinal reactions in **30% of placebo patients**); *id*. at 15 (reporting that **34.5% of placebo patients** lost more than 5% of body weight).

To state a claim under N.C. Gen. Stat. § 75-1.1, a plaintiff must allege (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) proximate injury. *Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (2000). A practice is "unfair" if it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers; it is "deceptive" if it has the capacity or tendency to deceive. *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 228 (N.C. 2013). Whether conduct violates § 75-1.1 is a question of law. *Gray*, 529 S.E.2d at 681. Defendants again fixate on isolated misrepresentations, but § 75-1.1 reaches broader unfair conduct in commerce. *See, e.g., Creekside Apartments v. Poteat*, 446 S.E.2d 826, 833-34 (N.C. Ct. App. 1994) (failure to maintain dwellings in a habitable condition while demanding rent is an unfair and deceptive trade practice). Nor is reliance invariably required. *See In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 911 (E.D. Pa. 2012).

North Carolina courts also recognize that conduct violating statutes designed to protect the consuming public may constitute an unfair or deceptive practice *as a matter of law* where the conduct is inherently unfair or injurious to consumers. *Gray*, 529 S.E.2d at 683; *Stanley v. Moore*, 454 S.E.2d 225, 228 (N.C. 1995); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 48 (4th Cir. 1983). As alleged, Defendants' Oral Tirzepatide constitutes what N.C. Gen. Stat. § 106-135 terms a "new drug." ¶¶186-188. That provision exists to protect the public from ineffective or unsafe drugs.[39] Marketing, selling, and distributing such a product while representing it as legitimate GLP-1 weight-loss therapy falls squarely within conduct that is "inherently unfair, unscrupulous,

---

[39] Adjudicating whether conduct falls within § 503A's exemption is not problematic; such determinations are routinely made in state pharmacy board disciplinary proceedings. *See, e.g., In re Triad Rx, Inc.*, No. 19-L-0137 (Ala. State Bd. Pharmacy July 19, 2022) (Altland Decl. Ex. E) (Finding Triad violated Code of Alabama § 34-23-33(2) by distributing adulterated, misbranded, and "new drug" products). *See also Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 318 (2005) ("'The violation of federal statutes and regulations is commonly given negligence *per se* effect in state tort proceedings.'") (citing Restatement 3d of Torts § 14).

37

immoral, and injurious to consumers." *Gray*, 529 S.E.2d at 683.

Finally, common law fraud is itself a *per se* violation of § 75-1.1. *See Bhatti v. Buckland*, 400 S.E.2d 440, 442 (N.C. 1991). For the reasons set forth above, the Complaint more than adequately pleads unfair and deceptive conduct, commerce, and proximate injury.[40]

### (b)    *Plaintiff's Common Law Fraud Claim Is Properly Pleaded*

To plead a claim for fraud, a plaintiff must plead: "'(1) representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" *Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 891 S.E.2d 100, 112 (N.C. 2023) (quoting *Ragsdale v. Kennedy*, 209 S.E.2d 494, 500 (N.C. 1974)). Fraudulent concealment arises where a party with a duty to disclose material information fails to do so. *Merrell v. Smith*, 2020 NCBC 93, 47 (N.C. Super. Ct. Dec. 20, 2020). A duty to disclose arises, *inter alia*, when "there is a fiduciary relationship between the parties to the transaction." *Id*. "A fiduciary relationship exists between a doctor and a patient." *Fennell v. E. Carolina Health*, 828 S.E.2d 674 (N.C. Ct. App. 2019) (citation omitted).

Plaintiff alleges that Defendants held out Oral Tirzepatide as an effective, legitimate weight-loss therapy comparable to FDA-approved GLP-1 injectable Tirzepatide while concealing the fact that the product could not deliver any therapeutic effect. ¶¶192-196. Those representations concern the product's core attribute, its efficacy, and are therefore material. The Complaint further alleges that Defendants knew the representations were false and disseminated or concealed them to induce purchase. Plaintiff alleges that he purchased the product in reliance on those

---

[40] Defendants' reference to a purported "independent clinical determination" to negate causation fails. D.I. 18 at 30-31. That argument omits that the "prescriber" they invoke operates under Defendants' management and control. *See* ¶¶17-18. A "determination" rendered through that enterprise cannot be characterized as independent medical judgment.

representations and omissions and suffered economic loss as a result. *Id*. For the reasons already discussed in connection with Rule 9(b), those allegations are pleaded with particularity and more than suffice to state a claim for common law fraud.

### (c) *Plaintiff's Unjust Enrichment Claim Is Properly Pleaded*

To state a claim for unjust enrichment, a plaintiff must allege that he conferred a measurable, non-gratuitous benefit on the defendant under circumstances making it inequitable for the defendant to retain that benefit. *Booe v. Shadrick*, 369 S.E.2d 554, 555-56 (N.C. 1988). Plaintiff alleges precisely that. He paid money for Oral Tirzepatide, and OpenLoop accepted, processed, and retained that payment. The benefit, Plaintiff's payment, was neither officious nor gratuitous; it was conferred in exchange for what was represented to be legitimate weight-loss therapy. The Complaint alleges that the product Triad dispensed was worthless snake oil, making Defendants' retention of that payment inequitable. That is sufficient to plead unjust enrichment.

### 2. Multistate Consumer Protection Subclass

### (a) *Every State Prohibits Defendants' Alleged Conduct*

Each state included in the Multistate Consumer Protection Subclass prohibits the use of unconscionable or otherwise deceptive or fraudulent commercial practices. ¶212. *See In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 575 (S.D.N.Y. 2021) (rejecting the argument that "unfair" materially differs from "unconscionable" or "deceptive" for purposes of consumer protection statutes). Each state likewise prohibits the unlawful sale of "new drugs," reflecting a legislative determination that marketing and distributing unsafe or ineffective drug products is contrary to public policy and injurious to consumers. *See Wyeth*, 555 U.S. at 567 (The drug approval requirement "protect[s] the public health" by "assur[ing] the safety, effectiveness, and reliability of drugs."). As discussed *supra*, conduct that violates a statute designed to protect the consuming public from ineffective or unsafe drugs amounts to an unconscionable or deceptive

39

business practice. The sale and distribution of an ineffective weight-loss drug while representing it as legitimate GLP-1 weight-loss therapy falls squarely within that prohibition.

### (b) *Rule 23 Supersedes The South Carolina and Tennessee Statutes*

Defendants contend that the consumer protection statutes of South Carolina and Tennessee prohibit class actions. D.I. 18 at 36. That position is foreclosed by the Supreme Court's decision in *Berk v. Choy*, 223 L.Ed.2d 463 (U.S. 2026), which adopted the *Shady Grove* plurality framework for analyzing conflicts between the Federal Rules and contrary state-law procedural limitations. *Id*. at 475. Rule 23 answers the question whether a class action may proceed in federal court, and its application does not turn on the "substantive purpose" of a contrary state-law limitation. *See also Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1335 (11th Cir. 2015).

### (c) *Defendants' Attacks on Specific State Statutes Are Premature or Meritless*

Defendants do not move under Rule 12(b)(1), and they do not dispute that Plaintiff has suffered an injury in fact that is fairly traceable to Defendants' conduct and redressable by this Court. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Although "[t]he requirements for standing do not change in the class action context," *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017), courts routinely recognize that in a putative class action, questions concerning a named plaintiff's ability to pursue claims under the laws of additional states are addressed at the class certification stage. *See Garner v. Glob. Plasma Sols.*, 590 F. Supp. 3d 738, 743 (D. Del. 2022) ("A plaintiff has standing if he can show a judicially redressable injury. And a plaintiff's injury is not pegged to the laws of different states: an injury is an injury even if no law allows recovery."). Thus, whether Plaintiff may assert claims under the statutes governing the Multistate Consumer Protection Subclass is a Rule 23 question, not an Article III defect. The standing challenge is therefore premature at this juncture. *See Pineda v. Lake Consumer Prods.,*

40

*Inc.*, 2025 U.S. Dist. LEXIS 185142, at *9-11 (E.D. Pa. Sep. 22, 2025) (collecting cases).

### 3.     <u>Plaintiff Has Standing to Seek Injunctive Relief</u>

Defendants' challenge to Plaintiff's request for injunctive relief must be rejected. D.I. 18 at 35-36. This Court has jurisdiction "to prevent and restrain violations of section 1962" through appropriate equitable orders. 18 U.S.C. § 1964(a). Though courts are divided on whether a private plaintiff may independently obtain such relief under § 1964(c),[41] that question concerns the scope of remedies available if Plaintiff prevails, not this Court's authority to grant them. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 140 (2d Cir. 2016).

Injunctive relief is also available under Plaintiff's North Carolina consumer protection claim. *Window Gang Ventures, Corp. v. Salinas*, 2018 NCBC 18, *31 (N.C. Super. Ct. Feb. 21, 2018). A permanent injunction requires success on the merits, the absence of an adequate remedy at law, and equitable grounds favoring relief. *Subacz v. Sellars*, 1998 WL 720822, at *2 (E.D. Pa. Sept. 21, 1998). Defendants' reliance on *McNair v. Synapse Grp. Inc.*, 672 F.3d 213 (3d Cir. 2012), and *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig.*, 903 F.3d 278 (3d Cir. 2018), is misplaced. Those cases involved plaintiffs who failed to establish ***any*** concrete injury. Here, the Complaint alleges a continuing scheme targeting consumers. Plaintiff does not seek an injunction to prevent himself from making the same purchase again; he seeks to halt the continued distribution of Defendants' fraudulent weight-loss pill. ¶189.

If Plaintiff prevails on his North Carolina claim, no remedy at law will prevent Defendants from continuing their misconduct. Even this lawsuit has not deterred them. *See* Altland Decl. Ex. A & B. Defendants' partner brand MEDVi continues advertising, in no uncertain terms, that oral

---

[41] *See Steamfitters Local Union No. 420 v. Philip Morris*, 171 F.3d 912, 935 n.20 (3d Cir. 1999); *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 354 n.13 (2016).

tirzepatide produces the same "proven weight-loss" results as injectable GLP-1 (Ex. B, at Fig. 9.1-12)—even after receiving an FDA warning letter (*id*. at Fig. 7.1-9.6)—and has escalated its claims stating that the product is "FDA-Approved" and works "2x FASTER." *Id*. at Fig. 1-2. At the same time, OpenLoop continues recruiting and launching new GLP-1 weight-loss "brands," offering to build and operate their programs end-to-end while the "brand" promotes the product and collects revenue. *See* Ex. A, at Fig. 6.1-7.3. And Triad is still filling MEDVi orders. *See* Altland Decl. at ₧₧10-11. Such ongoing conduct supports the availability of injunctive relief.

## H.    PLAINTIFF'S CLAIMS ARE NOT SUBJECT TO ARBITRATION OR CLASS WAIVER PROVISIONS

In the last four pages of their forty-page memorandum, Defendants ask the Court to compel individual arbitration only "[i]f the Court does not dismiss Plaintiff's Complaint on other grounds." Memo at 40. That is not how this works. Although unsupported legally and factually, and not coming close to meeting their burden, Defendants' Motion sought to compel arbitration. That gateway issue must be resolved first, and is only resolvable in Plaintiff's favor. *See Silfee v. Auto. Data Processing, Inc.*, 696 F. App'x 576, 577 (3d Cir. 2017) (describing arbitrability as a "gateway issue" that should be addressed at the outset of litigation); *Hause v. City of Sunbury*, 2022 U.S. App. LEXIS 6330, at \*4 (3d Cir. Mar. 11, 2022) ("[C]ourts should rule on a motion to compel arbitration before resolving the case on alternative, nonjurisdictional grounds.").

### 1.    Defendants Fail to Establish that Plaintiff is Subject to an Enforceable Arbitration Agreement or Class Waiver Provision.

Defendants' burden on a motion to compel arbitration is to show that Plaintiff is "subject to an enforceable arbitration clause." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013). Defendants' motion because it fails to meet this burden.

The Court must apply "ordinary state-law principles that govern the formation of contracts" to determine whether there is a valid agreement to individually arbitrate Plaintiff's claims. *Kirleis*

42

*v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009).[42] For a contract to form, there must be "mutual assent of both parties to the terms of the agreement." *Schwarz v. St. Jude Med., Inc.*, 802 S.E.2d 783, 789 (N.C. Ct. App. 2017). Mutual assent "is operative only to the extent that it is manifested," *id.* (quoting Restatement (Second) of Contracts § 18 cmt. a.), ordinarily through "outward expressions," i.e., "words or acts." *Id.* (citing *Howell v. Smith*, 128 S.E.2d 144, 146 (N.C. 1962)). *Lynch v. Gonzalez*, 2020 Del. Ch. LEXIS 254, at *63 (Ch. July 31, 2020) ("Mutual assent 'means the external expression of intention as distinguished from undisclosed intention.'") (quoting Restatement (Second) of Contracts § 18 cmt. b.).

Defendants cite no allegations in the Complaint and attach no evidence to support that Plaintiff manifested assent to MEDVi's Terms of Use ("Terms") or the arbitration and class action waiver provisions contained therein. Instead, Defendants rely on a blatant lie: that MEDVi requires users to "affirmatively check a box" to accept its Terms during the intake process. D.I. 18 at 37. On the contrary, MEDVi's sole offer to accept its "terms" appears next to a ***pre-checked*** box, buried on a page in the intake questionnaire that invites users to share their contact information. Altland Decl. ¶7 & Ex. C, at 33.[43] Because the intake process is not as Defendants represented,

---

[42] The basic principles of contract formation are uniform across states. *See Atacs Corp. v. Trans World Communs.*, 155 F.3d 659, 665 (3d Cir. 1998) (referring to the elements of contract formation as "hornbook law" and citing the Restatement). The facts here demonstrate a lack of assent that would fail to form a contract under any state's law. *See, e.g.*, *Banaszak v. Progressive Direct Ins. Co.*, 3 A.3d 1089, 1094 (Del. 2010); *Marshall v. Georgetown Mem'l Hosp.*, 112 F.4th 211, 215-17 (4th Cir. 2024); *Kseniya Godun v. JustAnswer LLC*, 135 F.4th 699, 706-07 (9th Cir. 2025); *Quamina v. JustAnswer LLC*, 721 F. Supp. 3d 1026, 1033 (N.D. Cal. 2024); *Ramirez v. Trusper, Inc.*, LX 272675, at *13 (N.D. Cal. Oct. 11, 2024); *Presson*, 2025 LX 290154, at *13; *Rojas v. Gosmith, Inc.*, 2020 U.S. Dist. LEXIS 28922, at *8 (N.D. Ind. Feb. 20, 2020); *Optimum Constr., Inc. v. Harbor Bus. Compliance Corp.*, 2022 U.S. Dist. LEXIS 179629, at *23 (D. Md. Sep. 30, 2022).

[43] The Court can consider Plaintiff's declaration because the non-moving party may respond to a motion to compel arbitration with "additional facts sufficient to place the agreement to arbitrate in issue." *Guidotti*, 716 F.3d at 776.

43

and they offer no other evidence that Plaintiff assented to MEDVi's Terms, Defendants fail to show that a contract formed between Plaintiff and MEDVi.[44]

Defendants also fail to establish that an arbitration agreement and class waiver provision between Plaintiff and MEDVi, if validly assented to, would apply to Plaintiff's claims against Defendants. Defendants admit that they were not parties to the purported agreement. D.I. 18 at 38. To the extent Defendants hope to be recognized as third-party beneficiaries, they have waived that argument by failing to raise it in their motion. *Laborers' Int'l Union*, 26 F.3d at 398 (3d Cir. 1994). Nevertheless, third-party beneficiary doctrine only applies if both parties intended to enter into a contract for a third party's "direct, and not incidental, benefit." *Davis & Taft Architecture, P.A. v. DDR-Shadowline, LLC*, 835 S.E.2d 473 (N.C. 2019). Defendants cannot be third-party beneficiaries to a contract that never formed. But even if MEDVi and Plaintiff entered into a valid contract, neither party intended for that contract to benefit Defendants. MEDVi's Terms never reference Defendants by name. Further, the Terms state that they apply to MEDVi's "affiliated brands and products", which, aside from being vague, does not indicate an intent to encompass, include, refer to, or benefit Defendants directly. *See* D.I. 19-1 at 35. In fact, Defendants' involvement is intentionally concealed from consumers when making the purchase of Oral Tirzepatide. ¶¶105-11. Thus, Plaintiff could not have intended to enter into a contract for Defendants' benefit when he did not know Defendants existed, until after the contract purportedly formed. *See* ¶¶88-89 (showing that Plaintiff only became aware of Defendants after receiving his invoice and pills). Thus, Defendants fail to meet their burden to establish that Plaintiff's claims

---

[44] By failing to analyze contract formation under any state's laws in their motion, Defendants have also waived the argument that a contract formed between Plaintiff and MEDVi. *See Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (concluding that arguments not raised in an opening brief are waived).

against them are subject to an enforceable arbitration agreement or class waiver provision.

### 2. **The Record is Conclusive that No Valid Arbitration Agreement Applies to Plaintiff's Claims.**

If the Court does not deny Defendants' motion for failing to meet the requisite burden, the Court should deny the motion based on Plaintiff's additional evidence that no valid arbitration agreement applies. When a plaintiff responds with "additional facts sufficient to place the agreement to arbitrate in issue," a court must consider a motion to compel arbitration under a Rule 56 summary judgment standard. *Guidotti*, 716 F.3d at 776. Under that standard, it is the "non-movant" who may request limited discovery. *Id.* at 774. But "[i]n the absence of a factual dispute, there is nothing to discover and thus no need to delay a decision on the motion to compel." *See Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 319-20 (3d Cir. 2024). Defendants' time to offer evidence in support of their motion and their purported entitlement to arbitrate these claims has passed. Despite what Defendants may have hoped, Plaintiff having to correct the false statements in Defendants' motion with a declaration does not open the door for Defendants to delay resolution of their motion through futile discovery. No further factual development is required; Defendants have not met their burden (*see Guidotti*, 716 F.3d at 776), and the Court can conclude based on the existing record that no valid arbitration agreement applies to Plaintiff's claims.

Indisputable evidence proves that MEDVi's intake process fails to bind Plaintiff, or any user, to its Terms, and, consequently, to the Terms' arbitration and class action waiver provisions, because (i) there was no actual or constructive notice of the Terms, and (ii) even if there was notice, there was no affirmative assent. Plaintiff addresses each of these reasons in turn.

The "critical issue" in determining if an arbitration agreement formed through an online purchase is whether the purchaser had "actual or constructive notice of the terms of use which included an agreement to arbitrate." *Bergenstock v. Legalzoom.com, Inc.*, 2015 NCBC 66, at *12-

45

13 (N.C. Super. Ct. June 23, 2015). The notice inquiry "focuses on the design and content of the relevant interface and asks whether it would put a reasonably prudent user on notice of a contract on offer and its terms." *Austin v. Experian Info. Sols., Inc.*, 148 F.4th 194, 206 (4th Cir. 2025).

MEDVi's intake questionnaire does not provide users with sufficient notice of its Terms for an agreement to form. The Terms appear only once in the questionnaire, hyperlinked to the word "terms" in the middle of a notice about HIPAA and text message communication consent:

> ✓ I understand that my information is never shared, is protected by HIPAA and I agree to receive communications by text message regarding appointments and product related messages from MEDVi and its medical partners, and agree to the <u>terms</u> and <u>privacy policies</u> and can opt-out at anytime by replying STOP or ask for more information by replying HELP. Message frequency varies. Message and data rates may apply.
>
> **Check Eligibility**

Altland Decl. Ex. C, at Fig. 33. A user can easily miss this visually inconspicuous reference to the Terms, as it is printed in small text, in the same font, size, and color as the unrelated surrounding text, and is only differentiated by an underline. *See id.*; *Kseniya*, 135 F.4th 699 at 709 (finding that terms should be "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it"). The questionnaire also never prompts users to open and acknowledge the Terms, and they can proceed past the sole link to the webpage containing the Terms without ever visiting the webpage or knowing that the webpage exists. *See* Altland Decl. Ex. C, at Fig. 36 (demonstrating MEDVi's complete intake process through screen recording). Such a process is insufficient to put a user on notice of MEDVi's Terms. *See* *Bergenstock*, 2015 NCBC LEXIS 66, at *13-14 (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014)) (explaining that a purchaser who "might proceed without visiting the webpage containing the specific terms" lacks notice of the terms).

Even with adequate notice, a user could not manifest assent to MEDVi's Terms through

46

the intake questionnaire. To accept a website's terms of service, a user must take some action that the website explicitly advises will constitute assent to contractual terms. *See Kseniya*, 135 F.4th at 710-11 ("Even strongly implicit advisement isn't enough—a webpage must *explain* that certain actions will be understood by the offeror to signal assent to contractual terms.").

Courts consistently hold that a pre-checked box like the one in the intake questionnaire does not manifest assent because a user is not required to take any specific action. *See, e.g.*, *Rojas*, 2020 U.S. Dist. LEXIS 28922, at *6-7; *In re Presson*, 2025 LX 290154, at *12-13. The only affirmative action a user must take to proceed past the link to MEDVi's Terms is to click a button labeled "Check Eligibility." Altland Decl. Ex. C, at Fig. 33. Nowhere in the intake questionnaire does MEDVi warn users that clicking "Check Eligibility" constitutes assent to the Terms, *id.*, and without an accompanying explanation of the legal significance of that action, no reasonable user would expect such a result. *Cf. Austin*, 148 F.4th at 199, 208 (holding that enrolling in services constituted assent where enrollment page included "conspicuous terms of use and language indicating that creating an account constituted agreement with those terms").

As MEDVi presents no legally sufficient method to assent to the Terms, no contract binds Plaintiff and other MEDVi users to individually arbitrate their claims or to waive class claims, and Defendants cannot enforce the Terms' arbitration and class action waiver provisions against them. The Court should deny Defendants' motion on that basis.

### 3. Defendants Cannot Rely on Equitable Estoppel

The Court does not need to address the issue of equitable estoppel, as Plaintiff demonstrated that there is no valid agreement between Plaintiff and MEDVi. Equitable estoppel does not apply because neither Plaintiff nor Defendants are signatories to an enforceable arbitration or class action waiver provision. *See Reorganized Hon Hai Precision Indus. Co., Ltd. v. NU Ride*

47

*Inc.*, 2025 LX 309921, at *24-28 (D. Del. Sep. 12, 2025) (finding no theory of estoppel that would permit a non-signatory to an arbitration agreement to compel another non-signatory to arbitrate). The same equitable estoppel analysis applies to the class action waiver. *See Naranjo v. Nick's Mgmt.*, 652 F. Supp. 3d 737, 753 (N.D. Tex. 2023) (explaining "the logic underlying equitable estoppel applies with no less force in the context of collective action waivers," collecting cases).

Even if there was a valid agreement, Defendants would not be entitled to equitable estoppel. Equitable estoppel is "a narrow doctrine that is sparingly invoked." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 2012 Del. Ch. LEXIS 171, at *92-93 (Del. Ch. Aug. 7, 2012). Before applying equitable estoppel, a court must "proceed with a good deal of caution . . . lest nuanced concepts of equity be allowed to override established legal principles of contract formation." *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 433 n.35 (Del. Ch. 2007). Thus, Delaware law[45] "imposes the burden of producing clear and convincing proof on the party asserting estoppel." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 221 (3d Cir. 2014) (citing *Emp'rs' Liab. Assurance Corp. v. Madric*, 183 A.2d 182, 188 (Del. 1962)).

Defendants have not produced "clear and convincing proof" that equitable estoppel applies here. They contend that Plaintiff must individually arbitrate his claims because the Complaint ostensibly alleges "substantially interdependent and concerted misconduct" between Defendants and MEDVi.[46] But as the court from which the Delaware Chancery Court adopted this theory of equitable estoppel explained, "[t]he linchpin for equitable estoppel is equity—fairness." *Grigson*

---

[45] Plaintiff cites Delaware law to respond to Defendants' cited law, but notably, under North Carolina law, Defendants' argument fails as a matter of law because North Carolina does not recognize the "substantially interdependent and concerted misconduct" theory of equitable estoppel. *Epes Logistics Servs. v. Marcuslund*, 861 S.E.2d 924 (N.C. Ct. App. 2021).

[46] Plaintiff does not concede Defendants' characterization of the Complaint, which alleges that Defendants are the main perpetrators of the scheme and MEDVi is one of the many shell-websites that Defendants use to sell Oral Tirzepatide to consumers. ¶¶58-81.

48

*v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000), *cited in Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, 2006 LX 155 (Del. Ch. Aug. 22, 2006). In *Wilcox* and the few other Delaware cases to apply equitable estoppel based on concerted misconduct, the signatory plaintiffs were sophisticated entities or individuals who had equal bargaining power with both the other signatories and the non-signatory defendants. *See Wilcox*, 2006 LX 155, at *19-20 (sending trademark dispute between two competing court reporting companies to arbitration); *see also, e.g.*, *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1153 (Del. Ch. 2006) (compelling arbitration between minority members of software LLC and two of its affiliates). Equity thus dictated that those plaintiffs should arbitrate their claims against the non-signatory defendants because it would be unfair to allow them to strategically pick and choose defendants based on their knowledge of the details of the arbitration agreement. *See Douzinas*, 88 A.2d at 1153 (criticizing sophisticated plaintiffs for attempting to litigate in two separate forums "simply by sweeping into their complaint" the non-signatory defendants).[47]

The courts' rationale and holdings cannot be applied with equal force here. Plaintiff, an individual consumer who simply purchased a product, ¶¶82-92, was not on equal bargaining terms with MEDVi, the business that held complete control over the terms of the purported agreement, and never directly interacted with Defendants, the corporate entities that seek to enforce the purported agreement against him. ¶¶10-13, 20. And he could not have strategically chosen Defendants based on the details of the arbitration clause, as MEDVi conceals and fails to name the "affiliated brands and products" that the Terms purportedly cover. ¶¶105-11; D.I. 19-1. It would

---

[47] *Cf. West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 985 A.2d 391 (Del. 2009).

49

be unfair to allow non-signatory corporate entities, whose identities MEDVi never disclosed in the Terms and with whom Plaintiff had no direct dealings, to enforce an arbitration clause and class action waiver against an individual consumer. Equity weighs against extending the narrow doctrine of equitable estoppel to this new, imbalanced context. If the Court reaches this issue, it should decline to apply equitable estoppel and deny Defendants' motion to compel arbitration.

## I.    LEAVE TO AMEND

The law is well settled that, "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 245. Likewise, F.R.C.P 15 embodies a liberal approach to amendment and directs that "leave shall be freely given when justice so requires…" *Dole v. Arco Chem. Co.*, 921 F.2d 484, 486-87 (3d Cir. 1990). To the extent the Court determines that the Complaint has not yet plausibly pled one of the asserted claims, Plaintiff respectfully requests that such claim be dismissed without prejudice and with leave to amend the Complaint. No prior amendments have been previously requested or allowed. Under these circumstances, granting leave to file an amended Complaint is warranted. *See In re PMTS Liquidating Corp.*, 490 B.R. 174 (D. Del. 2013) (granting leave to file **third** amended complaint); *Clarity Sports Int'l LLC v. Redland Sports*, 400 F. Supp. 3d 161 (M.D. Pa. 2019) (granting leave to "file a second amended complaint that clarifies" the claims and "includes additional factual allegations[.]")

## V.    CONCLUSION

Based on the foregoing and the allegations detailed in the Complaint, Plaintiff respectfully requests that the Court deny Defendants' Motion in full.

Dated: March 26, 2026                                    **CHIMICLES SCHWARTZ KRINER &**
                                                          **DONALDSON-SMITH LLP**

                                                          */s/ Scott M. Tucker*

50

Robert J. Kriner, Jr. (Del. Bar No. 2546)
Scott M. Tucker (Del. Bar No. 4925)
2711 Centerville Rd., Suite 201
Wilmington, DE 19808
Phone: 302-656-2500
Fax: 302-656-9053
smt@chimicles.com

Nicholas E. Chimicles *(pro hac vice)*
Kimberly M. Donaldson-Smith *(pro hac vice)*
Dylan Altland *(pro hac vice)*
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, PA 19041
Phone: 610-642-8500
Fax: 610-649-3633
*nec@chimicles.com*
*kds@chimicles.com*
*dda@chimicles.com*

*Attorneys for Plaintiff and Proposed Class*

51