# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CYNTHIA FREELAND, individually and on behalf of all others similarly situated,

Plaintiff,

v.

FOOTHILLS PROFESSIONAL PHARMACY, LTD., AVOCADO HEALTH TECHNOLOGY, INC., SAJAD ZALZALA, M.D., TELERX PROVIDERS, P.C., and DOES 1-5,

Defendants.

No. 4:26-CV-00263

(Chief Judge Brann)

## MEMORANDUM OPINION

**NOVEMBER 18, 2026**

Plaintiff Cynthia Freeland ("Freeland") calls oral tirzepatide "modern-day snake oil."[1] Millions use tirzepatide to assist with weight loss and other health goals. Freeland alleges that the drug works as an injection, but not as a pill. Still, companies market and sell the pill to customers nationwide, including Freeland. She now sues the pharmacy that filled her orders and the technology company, clinician network, and physician that she alleges made the sales possible. These Defendants move to dismiss, responding that the Court lacks jurisdiction, federal law bars her claims, the complaint is too thin, and Freeland agreed to arbitrate anyway. The Court disagrees,

[1] Doc. 1, at 3.

with two exceptions: Freeland may not represent a subclass that excludes her, nor may she rest her Pennsylvania consumer-protection claims on the bare fact that the pill lacks FDA approval. Otherwise, her claims proceed, and they proceed in this Court.

## I. BACKGROUND

On February 3, 2026, Freeland filed a Class Action Complaint ("Complaint") against Defendants.[2] The complaint concerns the sale and distribution of oral tirzepatide, which is advertised as a weight-loss pill.[3] Freeland alleges that these pills lack any pharmacological efficacy[4] and support a fraudulent scheme in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),[5] the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"),[6] and other state statutory and common law grounds.[7]

On March 27, 2026, Defendant Foothills Professional Pharmacy, Ltd. ("Foothills") filed a motion to dismiss for lack of personal jurisdiction and failure to state a claim.[8] On April 27, 2026, Defendants Avocado Health Technology Inc., TeleRx Providers, P.C., and Sajad Zalzala, M.D. (collectively, the "TeleRx

---

2 Doc. 1.
3 *Id.* at 2.
4 *Id.* at 3.
5 *Id.* at 2, 93-107.
6 *Id.* at 108-114.
7 *Id.* at 114-131.
8 Doc. 24.

Defendants") filed a motion to compel arbitration.[9] On the same day, the TeleRx Defendants filed a motion to dismiss for lack of subject-matter jurisdiction, lack of personal jurisdiction, and failure to state a claim.[10] Lastly, on September 21, 2026, Foothills filed a motion to compel arbitration.[11] These four motions are now ripe for disposition. For the following reasons, they are denied with two exceptions: Freeland's claims asserted on behalf of the Multistate Subclass are dismissed without prejudice, and her UTPCPL claim may not rely on any alleged violation of the FDCA.

## II. FACTUAL ALLEGATIONS

The facts alleged in the Complaint are as follows. The Court accepts these as true for the purposes of the Defendants' motions to dismiss.

### A. Oral Tirzepatide

Freeland brings this class action challenging Defendants' distribution and sale of oral tirzepatide. In brief, tirzepatide is a patented drug that helps with weight loss and glucose control.[12] Tirzepatide is a glucagon-like peptide-1 receptor agonist ("GLP-1RAs"), which have in recent years become popular with those struggling with weight loss.[13] GLP-1RAs are traditionally administered by subcutaneous

---

9 Doc. 39.
10 Doc. 41.
11 Doc. 76.
12 Doc. 1, at 31-32.
13 *Id.*

injection,[14] and there exists a large market for less invasive GLP-1RA delivery methods.[15] Oral tirzepatide is marketed as such an alternative. Consumable as a pill, oral tirzepatide is represented as a more accessible way to deliver GLP-1RAs while preserving the active ingredients of the drug.

But Freeland says oral tirzepatide does not work. She points to medical research concluding that tirzepatide is ineffective if administered orally.[16] Specifically, Freeland cites research suggesting that digestive enzymes—such as those present in saliva—break down the operative peptides in oral tirzepatide long before they reach the bloodstream.[17] Further, the low permeability of the gastrointestinal wall limits the absorption of tirzepatide, thereby neutralizing any effect.[18]

These difficulties have led to declarations cautioning that oral tirzepatide does not currently exist in a safe and effective form.[19] For instance, the FDA has not

---

[14] *Id.* at 32.

[15] *Id.* at 33.

[16] *Id.* at 33-40.

[17] *Id.* at 34-35.

[18] Freeland also notes the distinction between oral tirzepatide and oral semaglutide, which is an FDA-approved orally administered GLP-1RA. *Id.* at 36. In contrast to oral tirzepatide, oral semaglutide includes absorption enhancers to promote increased absorption through the gastric membrane, which in turn prevents degradation of the active drug during the digestive process. *Id.* Even then, Freeland highlights that semaglutide's efficacy is still constrained by its pill form, requiring "administration under tightly controlled condition[s]." *Id.* at 37. The complaint concludes that the development of oral semaglutide "underscores the exceptional difficulty of formulating effective oral" delivery systems—particularly so for tirzepatide, which has a larger molecular weight than semaglutide and possesses different formulation properties which make effective absorption even more difficult. *Id.* at 37-40.

[19] *Id.* at 40, 43-44.

approved an oral form of tirzepatide,[20] nor does Eli Lilly—the patent holder of tirzepatide—sell the drug as a pill.[21] Freeland quotes Eli Lilly to underscore the point, including from pleadings in other cases declaring that "[n]o clinical study suggests tirzepatide taken orally is safe and effective,"[22] and "Lilly's tirzepatide medicines are tested and approved for under-the-skin injections only—not in any oral form."[23] Nevertheless, oral tirzepatide is currently available from businesses across the United States.

**B. Defendants**

SkinnyRx is one of those businesses. Like others, SkinnyRx runs a GLP-1RA marketing website that advertises oral tirzepatide among other products.[24] On the website, customers see numerous claims that oral tirzepatide "works with your body to naturally control hunger," "improve[s] blood sugar levels, which may reduce the risk of type 2 diabetes," and "helps to improve your heart health, lower cholesterol, and boost your overall metabolism—benefits that go beyond just weight loss."[25] SkinnyRx makes identical statements about injectable tirzepatide. According to Freeland, that overlap shows that SkinnyRx "markets the two products as

---

20 *Id*. at 39.
21 *Id*.
22 *Id*.
23 *Id*. at 44.
24 *Id*. at 19.
25 *Id*. at 50.

functionally equivalent."[26] Customers then complete an online screening questionnaire about their weight, health goals, and medical history to determine their eligibility for oral tirzepatide.[27] Freeland does not pursue claims against any of these front-end telehealth websites; instead, she pursues them against their back-end facilitator: Avocado Health Technology, Inc. ("Avocado Health"), one of four named defendants.[28] Avocado Health develops and services the technological infrastructure for consumer-facing entities—such as SkinnyRx—and helps to structure workflows and order routing.[29]

After a customer is determined to be eligible for oral tirzepatide, a clinician issues a prescription. Defendant TeleRx Providers, P.C. ("TeleRx"), a professional corporation registered to do business in Pennsylvania,[30] operates the network that matches prospective telehealth customers with clinicians.[31] Once matched, the clinician provides the customer with prescriptions for oral tirzepatide.[32] Defendant Sajad Zalzala, M.D. ("Dr. Zalzala"), a Michigan resident, is the owner of TeleRx[33] and the Medical Director of Avocado Health and SkinnyRx.[34] In his role, Dr. Zalzala

26 *Id.*

27 *Id.* at 63-66.

28 *Id.* at 6-7.

29 *Id.*

30 *Id.* at 9.

31 *Id.* at 9-10.

32 *Id.*

33 *Id.* at 9.

34 *Id.* at 10-13.

staffs the TeleRx clinician network that prescribes oral tirzepatide.[35] Customers are also greeted by his name and headshot, displayed prominently on SkinnyRx's website.[36] Customers also see his endorsement: "[p]rescription medications can help *turn the tide*, making weight loss achievable and lowering your risk for serious health conditions like diabetes, heart disease, and sleep apnea."[37]

Once a customer secures a prescription, Foothills fills and ships the order.[38] Foothills holds a pharmacy license with the Pennsylvania State Board of Pharmacy and advertises itself as a compounding pharmacy, filling prescriptions for patients solicited through sites like SkinnyRx.[39] Yet, Freeland alleges Foothills is more than a mere prescription filler. She points to Foothills' numerous advertised partnerships with telehealth brands like SkinnyRx, together with its own claims that it "bridge[s] the gap between telemedicine and pharmacy care" across all fifty states.[40] She also points to overlapping leadership between Foothills and Avocado Health, namely the fact that Foothills' Chief Executive Officer and President also serves as the Chief of Medical Operations for Avocado Health.[41]

---

35 *Id*.
36 *Id*. at 53.
37 *Id*.
38 *Id*. at 5.
39 *Id*. at 5-6. "Compounding" is the act of customizing or altering medicine to the needs of individual patients.
40 *Id*.
41 *Id*. at 6.

### C. Freeland's Experience

Freeland purchased a three-month supply of oral tirzepatide on October 1, 2025,[42] after completing an online screening and questionnaire on SkinnyRx.[43] Freeland never spoke with any licensed medical professional, including the prescribing physician identified on the label of the Foothills-branded pill bottle that she received.[44]

Freeland took the oral tirzepatide as directed for over two months.[45] During these initial months, no healthcare provider checked in with Freeland.[46] Freeland eventually concluded that the medication was ineffective and sought to cancel her subscription before it renewed on January 4, 2026.[47] Before she could do so, Freeland was charged again for a new three-month supply issued by a different prescribing physician.[48] Freeland contacted customer service and requested an immediate cancellation on the same day.[49] But SkinnyRx would only offer a ten-percent discount on injectable tirzepatide.[50] After Freeland declined, SkinnyRx advised that because the renewal charge had already been processed, she was no

---

42 *Id*. at 72.
43 *Id*.
44 *Id*. at 75.
45 *Id*. at 76.
46 *Id*.
47 *Id*.
48 *Id*.
49 *Id*. at 77.
50 *Id*. at 78.

longer eligible for a refund.[51] SkinnyRx offered again to provide tirzepatide injections for the next renewal period.[52] She declined again.[53] Freeland continued to escalate her concerns, but to no avail: Freeland received her second three-month supply of oral tirzepatide on December 30, 2025.[54] Foothills was listed as the dispensing pharmacy.[55] Freeland attempted to return the shipment; SkinnyRx refused.[56]

Freeland contends that her experience is not unique. Freeland points to numerous reviews by oral tirzepatide purchasers to suggest a concerted "bait-and-switch" operation:[57] first, prospective customers are drawn to oral tirzepatide as a convenient entry point into popular GLP-1 therapies.[58] Then, when customers realize the pills do not work, telehealth brands like SkinnyRx pressure those same consumers towards injectable options.[59] Like Freeland, numerous consumers report unauthorized renewals, refused refunds, and minimal—if any—interaction with actual healthcare professionals.[60]

---

51 *Id*. at 79.
52 *Id*.
53 *Id*.
54 *Id*. at 80.
55 *Id*.
56 *Id*. at 81.
57 *Id*. at 83.
58 *Id*.
59 *Id*.
60 *Id*. at 81-84.

### D. The Complaint and Subsequent History

On February 3, 2026, Freeland filed the complaint with this Court, asserting a coordinated scheme perpetrated by Defendants to defraud class members.[61] Freeland seeks certification of a nationwide class ("Nationwide Class") encompassing "all consumers domiciled in the United States who purchased oral tirzepatide that was marketed, manufactured, distributed, fulfilled or delivered to them by Defendants, or any affiliated entity."[62] In the alternative or in addition, Freeland seeks certification of a subclass of consumers domiciled in Pennsylvania ("Pennsylvania Subclass"),[63] and a multistate subclass of consumers domiciled in fourteen states ("Multistate Subclass").[64]

The Court briefly describes each claim as relevant to the instant motions. First, Freeland pursues two RICO claims under 18 U.S.C. § 1964(c) for violations of §§ 1962(c) and (d) on behalf of the Nationwide Class.[65] In support, Freeland alleges a coordinated scheme to defraud class members through false online representations regarding oral tirzepatide's efficacy and safety.[66] Freeland specifically claims that the TeleRx Defendants coordinated to maintain the consumer-facing telehealth

---

[61] Doc. 1.
[62] *Id.* at 85.
[63] *Id.*
[64] *Id.* at 85-86. Specifically, Multistate Subclass encompasses purchasers domiciled in California, Colorado, Connecticut, Florida, Illinois, Michigan, Missouri, New Jersey, New Mexico, New York, North Carolina, South Carolina, Tennessee, and Washington.
[65] *Id.* at 93-107.
[66] *Id.*

network that marketed oral tirzepatide, while Foothills manufactured, filled, and shipped the product.[67] Freeland's next claim, made on behalf of the Pennsylvania Subclass, charges Defendants with violating the UTPCPL by unfairly and deceptively selling oral tirzepatide.[68] Freeland also asserts claims for common law fraud and unjust enrichment, both on behalf of the Pennsylvania Subclass.[69]

Lastly, on behalf of the Multistate Subclass, Freeland alleges that Defendants have violated the consumer-protection statutes of fourteen states.[70] In general, these state statutes prohibit unfair or deceptive acts or practices in trade or commerce.[71] They also prohibit the sale of drugs that have not received premarket approval from the FDA or from the state's regulatory body.[72] Freeland accordingly reasons that Defendants' conduct would constitute a *per se* violation of each state statute.[73] The Court has received several motions by Defendants, including motions to dismiss from all Defendants and two motions to compel arbitration.

## III. MOTIONS TO COMPEL ARBITRATION

First, Foothills and the TeleRx Defendants ask this Court to compel arbitration.[74] They advance substantially similar arguments in support. In essence,

---

67 *Id*. at 106.
68 *Id*. at 108-114.
69 *Id*. at 114-118.
70 *Id*. at 119-131.
71 *See Id*.
72 *Id*. at 129.
73 *Id*.
74 *See* Docs. 39, 76. The Court is bound to first consider Defendants' motions to compel arbitration. *Silfee v. Auto. Data Processing*, 696 F.App'x 576, 577-78 (3d Cir. 2017) ("[A]fter

Defendants argue that an arbitration provision contained within SkinnyRx's Terms of Service is enforceable, and that Freeland's claims fall within the scope of that provision. The Court disagrees.

### A. Standard

"To compel arbitration, a court must determine (1) the validity of the arbitration agreement and (2) whether the dispute falls within the scope of that agreement."[75] While adjudicating arbitration questions, courts are mindful of a "strong federal policy in favor of . . . arbitration."[76] But any presumption of arbitrability goes to the scope of arbitration, not the formation of an arbitration agreement.[77] Whether an arbitration clause is enforceable hinges on whether the parties consented to arbitration in the first place.[78] Although courts ordinarily resolve

---

a motion to compel arbitration has been filed, the court must 'refrain from further action' until it determines arbitrability. District courts may not alter this sequencing . . . .") (quoting *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004)) (citation omitted). *See also Rose v. Equitrans Midstream Corp.*, Civ. No. 19-01343, 2020 WL 13547735, at *2 (W.D. Pa. May 22, 2020) ("When courts are faced with both a motion to dismiss for failure to state a claim and a motion to compel arbitration, it is required that the court first address the motion to compel arbitration.").

75 *Swartz v. ESPN*, 1:22-CV-01523, 2026 WL 1507403, at *2 (M.D. Pa. May 29, 2026) (citing *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005)).

76 *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003)); *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 525 (3d Cir. 2009).

77 *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 301-02 (2010).

78 *Id.* at 299 ("[T]he first principle that underscores all of our arbitration decisions" is that "[a]rbitration is strictly a matter of consent."); *see Silfee*, 696 F.App'x at 577 ("Because 'arbitration is a matter of contract . . . [and is] predicated upon the parties' consent,' a court ruling on a motion to compel under § 4 must first determine if the parties intended to arbitrate the dispute.") (citing *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013)); *see also Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019) (collecting cases).

that question "by relying on state contract principles, state law is preempted to the extent it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of the [Federal Arbitration Act]."[79]

The United States Court of Appeals for the Third Circuit "has established a two-tiered framework for assessing motions to compel arbitration."[80] First, if asserted claims would be clearly subject to an enforceable arbitration clause based on the face of the complaint and supporting documents, the motion is considered under a Rule 12(b)(6) standard.[81] Alternatively, if it is unclear whether the parties have agreed to arbitrate, or if the plaintiff has provided additional facts sufficient to question the arbitration agreement, then "the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question."[82]

### B. Choice of Law

At issue is the Terms of Service agreement posted on SkinnyRx's website. Section 11 of the SkinnyRx Terms of Service includes a "Governing Law" provision that states "these terms . . . shall be governed by the laws of California, without giving effect to the principles of conflict of laws."[83] Both Freeland and Defendants

---

79 *Lamps Plus*, 587 U.S. at 183-84 (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011)).

80 *Lloyd v. Retail Equation, Inc.*, No. CV 21-17057, 2022 WL 18024204, at *4 (D.N.J. Dec. 29, 2022) (citing *Guidotti*, 716 F.3d at 764).

81 *Guidotti*, 716 F.3d at 776.

82 *Id.*

83 Doc. 40-1, at 19-21.

cite to Pennsylvania and California law in their briefings and agree that no conflict of law exists: Freeland notes that the "basic principles of contract formation are uniform across states,"[84] while Defendants cite to cases finding "no conflict between California and Pennsylvania law on contract formation."[85] Because there does not appear to be a relevant conflict of law, the Court "may refer interchangeably to the laws of the states whose laws potentially apply."[86]

### C. Validity of the Arbitration Agreement

SkinnyRx's Terms of Service agreement includes an arbitration provision requiring resolution of "all disputes between [SkinnyRx] through binding individual arbitration . . . ."[87] Defendants argue that Freeland assented to a valid and enforceable arbitration agreement by creating a SkinnyRx account and using its services. Courts describe these agreements as "browsewrap."[88] Browsewrap agreements do not require users to scroll through the terms of service before clicking to accept; rather, the "user supposedly manifests assent to those terms simply by continuing to use the

---

84 Doc. 80, at 8 n.2 (citing *Atacs Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 665 (3d Cir. 1998)).

85 Doc. 40, at 16 (citing *Azer Scientific Inc. v. Quidel Corp.*, 5:21-cv-2972, 2021 WL 5918655, at *4 n.2 (E.D. Pa. Dec. 15, 2021)); *see* Doc. 77, at 29 n.6.

86 *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006).

87 Doc. 40-1, at 19.

88 *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F.Supp.3d 308, 331 (W.D. Pa. 2020) (citing *James v. Glob. TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017)). Defendants do not contest that the disputed provision at issue qualifies as "browsewrap."

website."[89] The Third Circuit has clarified that the "evolving body of caselaw" on the validity of browsewrap agreements turns on "whether the terms or a hyperlink to the terms are reasonably conspicuous on the webpage."[90] Because users subject to browsewrap agreements have not explicitly assented, "[c]ourts are more hesitant to enforce browsewrap agreements."[91]

As with any contract, formation requires mutual assent. Mutual assent turns on "reasonable notice of the merchant's terms of service agreement."[92] Reasonable notice of an online, hyperlinked agreement can be inferred if the hyperlink is presented "in a way that a 'reasonably prudent internet user' would notice them."[93] Some factors indicating reasonable notice include (1) a uniquely colored and underlined hyperlink;[94] (2) proximity of the hyperlink to the assent button;[95] and (3) a non-distracting website design.[96] Courts perform this analysis to determine whether an agreement "explicitly notif[ies] a user of the legal significance of the action she must take to enter into a contractual agreement," and whether the

---

89 *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). When users are directly presented with the terms and conditions, these agreements are known as "clickwrap." *James*, 852 F.3d at 267.

90 *James*, 852 F.3d at 267.

91 *Swartz*, 2026 WL 1507403, at *7 (quoting *Berman*, 30 F.4th at 856).

92 *Pricharda v. Checkr, Inc.*, 5:22-cv-3180, 2022 WL 16749033, at *3 (E.D. Pa. Nov. 7, 2022) (citing *Dobbs v. Health IQ Ins. Servs., Inc.*, No. 21-5276, 2022 WL 2974713, at *3 (E.D. Pa. July 27, 2022)).

93 *Checcia v. SoLo Funds, Inc.*, 771 F.Supp.3d 594, 611 (E.D. Pa. 2025).

94 *Id.* at 609.

95 *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 292 (2d Cir. 2019); *see Berman*, 30 F.4th at 857.

96 *Starke*, 913 F.3d at 292; *Berman*, 30 F.4th at 857; *see Wiggins v. Lab'y Corp. of Am. Holdings*, No. 24-0648, 2024 WL 4476646, at *7 (E.D. Pa. Oct. 11, 2024).

accompanying text gives the user reasonable notice that a single click will manifest their assent to an agreement.[97]

Put differently, the question is whether a "reasonably prudent user would understand" that a single click would accept an agreement.[98] Look to what courts find sufficient. A webpage can include language stating that by clicking a certain button, "[the user] accept[s] and agree[s] to [the website's] Terms of Use Agreement."[99] Or a webpage can warn "directly below the buttons for registration" that "by creating an . . . account, you agree to the terms of service & privacy policy."[100] Perhaps even more simply, a webpage's button to proceed can read "Agree & Continue," with one accompanying statement that "by clicking . . . you . . . acknowledge that you have read our Privacy Policy."[101] These cases do not present a high bar.

---

[97] *Berman,* 30 F.4th at 858.

[98] *Checcia*, 771 F.Supp.3d at 611.

[99] *Coulter v. Experian Info. Sols., Inc.*, No. 20-1814, 2021 WL 735726, at *5 (E.D. Pa. Feb. 25, 2021) (finding hyperlinked agreement enforceable with accompanying language tying a single click to acceptance and agreement of terms); *see Lloyd*, 2022 WL 18024204, at *5 (finding hyperlinked agreement enforceable with accompanying language indicating that "[b]y placing your order, you agree to the . . . terms of use."); *see also Mucciariello v. Viator Inc.*, 18-cv-14444, 2019 WL 4727896, at *6 (D.N.J. Sept. 27, 2019) ("hyperlinked terms, such as the one in this case, amount to an enforceable agreement when 'reasonable notice' is provided and a button is designated to manifest assent, near a statement informing the user that, by clicking, he or she is agreeing to be bound by the hyperlinked terms").

[100] *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017).

[101] *Swartz*, 2026 WL 1507403, at *8.

What is not sufficient, however, is to infer assent merely from having a hyperlink at the bottom of the webpage.[102] Nor is a single "Continue" button—even if closely accompanied by hyperlinks to the terms and conditions.[103] Consider *Hoover v. Cleo AI, Inc.*, a decision from this Court.[104] There, a large blue "Continue" button was located next to the statement: "[b]y agreeing to . . . [Terms of Service] and Privacy Policy, you also agree to . . . [other] terms and policies below."[105] Large, highlighted blue hyperlinks to the terms of service and privacy policy were presented directly for the user to see.[106] However, because the page failed to state that "by clicking continue you agree . . ." or "by continuing you agree," the Court held the agreement unenforceable.[107] Generally, then, these cases instruct that if a user's assent is to be inferred from a single click, the notice of the legal consequences that attach must be clear, explicit, and unambiguous.

Here, Freeland argues that she never manifested her assent to SkinnyRx's Terms of Service.[108] Defendants respond that Freeland was on reasonable notice at

---

[102] *Childs v. Fitness Int'l LLC*, 2:22-cv-05196, 2023 WL 3594180 (E.D. Pa. May 22, 2023) (finding hyperlinked agreement unenforceable when nested among "one of many small hyperlinks at the bottom of the . . . website.").

[103] *Berman*, 30 F.4th at 857-58 ("[M]erely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything. A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement").

[104] *Hoover v. Cleo AI, Inc.*, 3:23-CV-01067, 2026 WL 1507408 (M.D. Pa. May 29, 2026).

[105] *Id.* at *7.

[106] *Id.*

[107] *Id.*

[108] Doc. 80, at 16-21.

the "Shipping Information" stage of the SkinnyRx account registration process. On that screen, users are presented with a hyperlink to the Terms of Service located below a button labeled "Continue."[109] The argument continues that Freeland assented when she clicked "Continue" to proceed.[110] The Court relies on the Defendants' declaration of Guenna Lin ("Lin Declaration"), which Freeland does not substantively contest,[111] to understand how SkinnyRx's Terms of Service are presented.[112] The "Shipping Information" screen of the SkinnyRx account registration process is as follows:[113]

---

[109] Doc. 40-1, at 5.

[110] Doc. 40, at 22; Doc. 77, at 32-33.

[111] In response to these motions to compel, Freeland offers a separate declaration of Dylan D. Altland ("Altland Declaration"). Docs. 49-2, 80-2. The Altland Declaration provides images of several additional stages of the SkinnyRx questionnaire. However, the main "Shipping Information" screen remains substantively identical to the Lin Declaration. *Compare* Doc. 49-2, at 43, 44 *with* Doc. 40-1, at 5.

[112] *See* Doc. 40-1. As to *Guidotti*, 716 F.3d 764, the Court finds that arbitrability is not apparent on the face of the Complaint. A Rule 56 standard therefore applies. However, because the relevant facts are undisputed, no further discovery is needed. *Simonovich v. United Rentals, Inc.*, No. 25-15142, 2026 WL 1864188, at *4-5 (D.N.J. June 29, 2026).

[113] Doc. 40-1, at 5.




On this screen, users enter their name and mailing address. Users then click "Continue," with an additional option to receive texts when their prescription is approved and shipped. Underneath the text notification option, users are advised in light gray text that:

> By checking the options "Text me when my prescription is approved & shipped!" I agree to receive automatically-generated marketing text messages from SkinnyRx at my number I provided above. Consent is not a condition of purchase. Msg & Data rates may apply. Reply HELP or STOP to opt out. See our Text Msg, Privacy Policy & Terms of Service.

Each underlined term is presented as a hyperlink and redirects the user to the relevant policy when clicked. Defendants argue that clicking this "Continue" button while seeing the nearby hyperlink to the Terms of Service shows reasonable notice and manifests assent. But even assuming the notice is conspicuous enough, what "explicitly notif[ies] a user of the legal significance of the action she must take to enter into a contractual agreement" is a different question.[114] As courts have repeatedly held, a button labeled "Continue" does not provide a user with reasonable notice without something more.[115] Nor would a reasonable internet user—or for that matter, a reasonable reader of English—understand "continue" to mean "agree." Moreover, the hyperlink sits in a disclosure about an optional text message checkbox, nested within language stating consent "is not a condition of purchase." If anything, a reasonable reader would comprehend the linked Terms as relating to the optional texts. The underlying text therefore fails to explain both how the user accepts the hyperlinked terms, and what the legal significance of clicking "Continue" is. As previously discussed, courts refuse to enforce precisely this form of browsewrap. This Court is no exception.

The Court need not consider derivative arguments on whether non-signatory Defendants may properly seek to enforce the agreement, or whether Defendants

[114] *Berman,* 30 F.4th at 858.

[115] *Id.* at 857-58; *see Hines v. Overstock.com, Inc.*, 668 F.Supp.2d 362, 367 (E.D.N.Y. 2009) (declining to enforce agreement where hyperlinked terms were located at the bottom of a webpage and defendant provided no statement advising assent); *Hoover*, 2026 WL 1507408.

waived arbitration. In sum, this Court denies the Defendants' motions to compel arbitration.

## IV. MOTIONS TO DISMISS

### A. Subject-Matter Jurisdiction – Fed. R. Civ. P. 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), "a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim."[116] The first step in evaluating a 12(b)(1) motion is to address whether it presents a "facial" or "factual" attack on the plaintiff's claims.[117] The "distinction is significant because, among other things, it determines whether we accept as true the non-moving party's facts as alleged in its pleadings."[118]

A facial challenge contests the court's subject-matter jurisdiction "without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.'"[119] A factual challenge, by contrast, asserts that the underlying facts of the case do not support jurisdiction.[120] When considering a factual challenge, a court may consider evidence outside the pleadings.[121] Further,

---

[116] *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

[117] *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357-58 (3d Cir. 2014) (citation omitted).

[118] *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017) (citation omitted).

[119] *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)).

[120] *Aichele*, 757 F.3d at 358.

[121] *Id.*

the plaintiff bears the burden of contesting a factual challenge and proving that jurisdiction exists.[122]

### 1. Standing

"For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing."[123] "A motion to dismiss for want of standing is also properly brought pursuant to 12(b)(1), because standing is a jurisdictional matter."[124] To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[125] "The requirements for standing do not change in the class action context."[126] The "class's standing turns on the named plaintiffs' standing,"[127] and "so long as a named class representative has standing, a class action presents a valid case or controversy under Article III."[128] Accordingly, the class representative "must establish standing individually with respect to each claim asserted."[129] So too for subclasses. "It is

---

[122] *Davis*, 824 F.3d at 346.
[123] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).
[124] *Ballentine v. U.S.*, 486 F.3d 806, 810 (3d Cir. 2007); *see St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232, 240 (3d Cir. 2000); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 733 (3d Cir. 1970).
[125] *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016).
[126] *Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d at 634.
[127] *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 459 (3d Cir. 2024) (citing *Neale v. Volvo Cars of America*, 794 F.3d 353, 369 (3d Cir. 2015)).
[128] *Neale*, 794 F.3d at 369 (internal quotations omitted).
[129] *Id*. at 359 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

axiomatic that the lead plaintiff must fit the class definition,"[130] and Rule 23(c)(5) instructs that subclasses are "each treated as a class."[131] Therefore, a named plaintiff seeking to represent a subclass must herself be a member of the subclass,[132] and each defined subclass must have its own representative.[133] That representative must have the personal stake Article III requires.[134]

The TeleRx Defendants bring a facial challenge, arguing that Freeland lacks standing to pursue claims on behalf of the Multistate Subclass.[135] The Court agrees. The Multistate Subclass invokes the consumer-protection laws of fourteen states, yet excludes Pennsylvania's consumer-protection law. Allegations pertaining to Pennsylvania's UTPCPL are encompassed in the separate Pennsylvania Subclass.[136]

---

[130] *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 359-60 (3d Cir. 2013) (citing *Bailey v. Patterson*, 369 U.S. 31, 32-33 (1962) ("[Plaintiffs] cannot represent a class of whom they are not a part.")); *see Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 156 (1982) ("We have repeatedly held that a class representative must be a part of the class."); *see also Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974) ("To have standing to sue as a class representative it is essential that a plaintiff must be a part of that class."); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) ("[A] class representative *must be part of the class . . . .*") (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)) (emphasis added).

[131] Fed. R. Civ. P. 23(c)(5).

[132] *Contawe v. Crescent Heights of America, Inc.*, Civ. A. 04-2304, 2004 WL 2966931, at *7 (E.D. Pa. Dec. 21, 2004) ("A plaintiff cannot represent a subclass of which he is not a member.") (citing *First Eastern Corp. by Friedman v. Mainwaring*, No. 92-1176, 1993 WL 223607, at *2 (E.D. Pa. Jun. 22, 1993)).

[133] *Boone v. City of Philadelphia*, 668 F.Supp.2d 693, 706 (E.D. Pa. 2009) ("Each subclass is then to be treated as a class within the rule, and each must have its own representative."); *see Salter v. Phila. Hous. Auth.*, No. Civ.A. 99-1681, 2000 WL 1052115, at *7 (E.D. Pa. Jul. 19, 2000) ("[A]ny and each subclass created will require a named plaintiff to prosecute the action on its behalf.").

[134] *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

[135] *See* Doc. 40, at 18-25.

[136] Doc. 1, at 108-114.

Freeland, as a citizen of Pennsylvania, is not a citizen of any state within the Multistate Subclass—she is then not a subclass member and cannot represent it. As Freeland is the only named plaintiff in this action, the Multistate Subclass has no named representative and must be dismissed.

Freeland's counterargument does not change the result. Freeland relies on the proposition that "courts routinely recognize that in a putative class action, questions concerning a named plaintiff's ability to pursue claims under the laws of additional states are addressed at the class certification stage."[137] Which is to say, Freeland argues that this question of standing is premature. But that is a different question from the much simpler one presented here: whether Freeland represent a subclass that she is excluded from. She cannot. Freeland's argument is more relevant when class representatives—who are concededly members of the proposed class—seek to represent absent class members whose claims arise from the laws of other states. None of Freeland's cited cases allowed a *non*-class or *non*-subclass plaintiff to represent a group defined to exclude them.[138] And perhaps more importantly, none

---

[137] Doc. 50, at 28 (citing *Gress v. Freedom Mortg. Corp.*, 386 F.Supp.3d 455, 462 (M.D. Pa. 2019)).

[138] For instance, take Freeland's reliance on *Gress*, 386 F.Supp.3d 455. There, the named Pennsylvania plaintiff sought to represent a multistate class that encompassed eleven states *including* Pennsylvania. *Gress*, 386 F.Supp.3d at 459. Or *Pineda v. Lake Consumer Prods., Inc.*, where the Pennsylvania plaintiff sought to represent a multistate subclass encompassing nearly every state *including* Pennsylvania. 812 F.Supp.3d 493 (E.D. Pa. 2025). The Court need not go on. Freeland relies entirely on cases where a subclass member seeks to represent a multistate subclass. But Freeland is a *non*-subclass member seeking to represent a multistate subclass. These facts are materially different, and Freeland's citations are inapposite.

of those cases undermine the principle that a named representative must belong to the class she seeks to represent.

To highlight the difference, consider the following example: a subclass representative from State A seeks to represent a subclass defined as "all individuals from States A, B, and C." The subclass representative is undeniably a subclass member, so any challenge to "standing" effectively attacks the State A subclass representative's ability to represent her fellow subclass members from States B and C. These are class certification questions on typicality, commonality, and adequacy—not ones of standing.[139] Now change the hypothetical: this time, the subclass extends only to States B and C. The State A class representative is excluded from the subclass, yet still seeks to represent subclass members from States B and C. Whether she can do so is no longer a question of class certification, but one of standing. So, while a subclass representative's ability to represent her fellow subclass members may best be analyzed through Rule 23, a named plaintiff who

---

[139] Several courts that have addressed this question reason that if a named plaintiff can show that success on their own state law claim will dictate success under another state's law, then the fact that relief will be accorded to other jurisdictionally diverse class members "has no relevant bearing on the personal stake of the named plaintiffs in litigating the case." *In re Generic Pharm. Pricing Antitrust Litig.*, 368 F.Supp.3d 814, 830-31 (E.D. Pa. 2019) (citing *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018)). *See Garner v. Global Plasma Solutions Inc.*, 590 F.Supp.3d 738, 742-43 (D. Del. 2022) (citing *Lisowski v. Henry Thayer Co., Inc.*, No. 19-1339, 2021 WL 1185924, at *4 (W.D. Pa. Mar. 30, 2021)) (refusing to dismiss a multistate class claim on standing grounds because "on a motion to dismiss, [ ] courts allow a case to proceed so long as the products, claims, and defendants are 'sufficiently similar.'"); *see also Blasingame v. Malibu Boats, LLC*, 24-cv-00648, 2026 WL 2279977, at *4-5 (D. Del. Aug. 7, 2026) (Bibas, J., sitting by designation).

seeks to represent a subclass from which she is excluded *by definition* presents a much more fundamental defect.

Freeland's case is the latter, not the former. By the complaint's own terms, the Multistate Subclass covers consumers in fourteen states, and Pennsylvania is not among them. Whatever latitude a subclass representative enjoys, Freeland has none of it without first being a subclass member.[140] For those reasons, the Court need not address the broader disagreement among courts concerning whether multistate standing questions should be addressed before or during class certification. Given the absence of a proper subclass representative, the claims asserted on behalf of the Multistate Subclass are dismissed without prejudice.[141]

**B. Personal Jurisdiction – Fed. R. Civ. P. 12(b)(2)**

The Court now turns to Defendants' motions to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2).[142] "When a defendant challenges the

---

140 If anything, Freeland's own argument reinforces the conclusion that dismissal is proper. The argument for postponing standing considerations until class certification relies on the Supreme Court's decision in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999). There, the Court permitted class certification before the district court explicitly confirmed Article III standing because the asserted standing problem would not exist absent certification. In those instances where certification questions are "logically antecedent" to jurisdictional questions, the Supreme Court has allowed lower courts to delay findings on standing. *Ortiz*, 527 U.S. at 831 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612-13 (1997)). But here, Freeland's inability to satisfy the definition of the Multistate Subclass exists independently of certification—if the Multistate Subclass were certified as presently pleaded, it would still have no named representative who belonged to it. Stated differently, certifying the Multistate Subclass would not be logically antecedent to the present concern. Rather, this "[s]tanding issue would exist regardless of whether [Freeland] filed [her] claim alone or as part of a class." *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J. 2003).

141 *See Bass v. Butler*, 116 F.App'x 376, 385 (3d Cir. 2004).

142 Only Foothills and Dr. Zalzala contest personal jurisdiction.

court's personal jurisdiction, the plaintiff bears the burden 'to come forward with sufficient facts to establish that jurisdiction is proper.'"[143] Accordingly, once the defense is raised, a plaintiff must establish "jurisdictional facts through sworn affidavits or other competent evidence."[144] And "at no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion" to dismiss.[145]

The plaintiff's burden to establish personal jurisdiction is reduced, however, where a District Court, when presented with a motion to dismiss under Rule 12(b)(2), does not hold an evidentiary hearing. In such circumstances, the plaintiff "need only establish a prima facie case of personal jurisdiction."[146] Moreover, prior to an evidentiary hearing, "[i]t is well established that in deciding a motion to dismiss for lack of jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff."[147]

### 1. Personal Jurisdiction Rule

Rule 4(k)(1)(A) permits courts to exercise personal jurisdiction to the extent permitted by state law. Because Pennsylvania's long-arm statute authorizes

---

143 *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020) (quoting *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)).

144 *Clarity Sports Int'l LLC v. Redland Sports*, 400 F. Supp. 3d 161, 169 (M.D. Pa. 2019) (internal quotation marks omitted) (quoting *Time Share Vacation Club v. Atl. Resorts*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)).

145 *Patterson by Patterson v. F.B.I.*, 893 F.2d 595, 604 (3d Cir. 1990) (citation omitted).

146 *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).

147 *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (alteration in original) (internal quotation marks and citations omitted).

jurisdiction "to the fullest extent allowed under the Constitution of the United States," the Court asks whether exercising jurisdiction over each Defendant comports with due process.[148]

Personal jurisdiction may be general or specific. General jurisdiction permits adjudication of any claim and ordinarily exists over a corporation only where it is "at home,"[149] or over an individual where he or she is domiciled.[150] A corporation is "at home" in its state of incorporation and principal place of business.[151] When a defendant is not subject to general jurisdiction, the inquiry turns to specific jurisdiction. To exercise specific jurisdiction, the Court must determine (1) that a defendant purposefully directed its activities towards Pennsylvania or otherwise purposefully availed themselves; (2) that a plaintiff's claims "arise out of or relate to" those forum-directed activities; and (3) that exercising jurisdiction would comport with traditional notions of fair play and substantial justice.[152] Purposeful availment requires the defendant to deliberately create a connection with the forum; "random, isolated, or fortuitous contacts" will not suffice.[153] For businesses and people alike, the relevant inquiry is whether that defendant deliberately targeted Pennsylvania, knowingly conducted business with Pennsylvania residents, or

---

[148] 42 Pa. Cons. Stat. § 5322(b).
[149] *Fischer v. Federal Express Corp.*, 42 F.4th 366, 383 (3d Cir. 2022) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)).
[150] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).
[151] *Fischer*, 42 F.4th at 383 (citing *Daimler*, 571 U.S. at 122).
[152] *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007).
[153] *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359-60 (2021).

established other sufficiently related contacts with the Commonwealth. Specific jurisdiction is claim-specific, though such an analysis may not be necessary "for certain factually overlapping claims."[154]

The exercise of jurisdiction must also "comport with fair play and substantial justice."[155] This determination involves factors such as "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies."[156] However, "[t]he existence of minimum contacts makes jurisdiction presumptively constitutional, and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"[157]

### 2. Foothills Professional Pharmacy, Ltd.

First, Foothills is not "at home" in Pennsylvania. Foothills is organized and located in Arizona.[158] Foothills does not have its principal place of business in Pennsylvania, nor is it incorporated there. As Freeland does not argue that Foothills possesses contacts so "continuous and systematic as to render it essentially at home

---

[154] *O'Connor*, 496 F.3d at 317 n.3; *see also Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 413 F. Supp. 2d 410, 417 (E.D. Pa. 2005).

[155] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)).

[156] *Id*. (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

[157] *O'Connor*, 496 F.3d at 324.

[158] Doc. 1, at 5.

in the forum State," Foothills is not subject to general jurisdiction,[159] but is instead subject to specific jurisdiction.

Start with Foothills' contacts. Foothills concedes that it fills and ships prescriptions to Pennsylvania, including the oral tirzepatide shipped to Freeland.[160] As the Third Circuit has noted, "the presence of direct shipments will show the defendant's purposeful availment."[161] Standing alone then, Foothills' shipments are "strong indicia of purposeful availment," though not dispositive.[162] Foothills counters that there are insufficient contacts to support personal jurisdiction. To the extent that Foothills relies on the limited number of transactions or shipments, recall that a personal jurisdiction analysis rests on the nature and quality of the contacts—not the quantity.[163] Consider *Heavy Iron Oilfield Services v. Mountain Equipment of New Mexico*, where a District Court found that a defendant corporation had purposefully availed themselves of Pennsylvania law by shipping two defective sand traps to a Pennsylvania plaintiff.[164] Or *Arch Insurance v. Technological Investments*,

---

[159] *Daimler*, 571 U.S. at 139 (citing *Goodyear*, 564 U.S. at 919) (citation modified).

[160] Doc. 24, at 13.

[161] *Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 282 (3d Cir. 1994). *See Allen v. Foxway Transportation, Inc.*, 4:21-CV-00156, 2022 WL 265945, at *6 (M.D. Pa. Jan. 27, 2022); *see also Avicolli v. BJ's Wholesale Club, Inc.*, CV 21-1119, 2021 WL 3471167, at *3 (E.D. Pa. Aug. 6, 2021).

[162] *Love v. Matt-Bri*, No. 22-3502, 2024 WL 6991333, at *3 n.4 (E.D. Pa. Mar. 29, 2024) (citing *Renner*, 33 F.3d at 282).

[163] *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 298 (3d Cir. 1985) ("It is axiomatic that the issue of minimum contacts turns on the specific facts of each case, and that the existence or absence of personal jurisdiction depends upon an assessment of the quality and nature of a defendant's activity.") (citing *Hanson v. Denckla*, 357 U.S. 235 (1958)).

[164] No. 14-39, 2014 WL 3870006, at *10-11 (W.D. Pa. Aug. 6, 2014).

where four direct shipments were sufficient for purposeful availment.[165] And Foothills does more than ship; Foothills also holds a license from the Pennsylvania State Board of Pharmacy[166] and fills prescriptions for individual patients—here, a Pennsylvania patient.[167] And it advertises partnerships with telehealth brands, like SkinnyRx, that sell to Pennsylvania customers.[168]

Foothills' reliance on *Colur World v. Supmedic* does not help it either.[169] Foothills argues that *Colur World* stands for the proposition that "[i]ntermittent or marginal sales via a virtual storefront intermediary, absent any other contacts, are insufficient to establish personal jurisdiction."[170] But in *Colur World*, the Eastern District of Pennsylvania ultimately exercised specific jurisdiction over the defendant. Despite the defendant's use of a general e-commerce platform, that court cited the defendant's other contacts that indicated "knowing and repeated transmission" of business in the forum.[171] So too here. Foothills' contacts aside from direct shipments are indicative of "knowing and repeated" business in Pennsylvania. Foothills attempts to cast itself as a wholesaler acting blindly to the recipient, but the Court is not persuaded.[172] At bottom, a pharmacy that holds a Pennsylvania license,

---

165 5:15-cv-1223, 2016 WL 1257618, at *6 (E.D. Pa. Mar. 31, 2016).
166 Doc. 1, at 6.
167 Doc. 24, at 14.
168 Doc. 1, at 5.
169 *Colur World, LLC v. Supmedic, Inc.*, 801 F.Supp.3d 524 (E.D. Pa. 2025).
170 Doc. 24, at 11 (quoting *Colur World*, 801 F.Supp.3d at 533-34).
171 *Id*. at 535-36.
172 Foothills' other citations are similarly inapposite. Foothills relies on *Philadelphia Indemnity Insurance v. Dreamershop Trade*, a case from the United States District Court for the Western

fills a prescription for a Pennsylvania patient, and mails it to her Pennsylvania address knows exactly where its product is going.

Neither can Foothills argue that Freeland's claims do not "arise out of or relate to" such contacts.[173] Freeland's claims revolve around a product ordered to Pennsylvania. Her claims would not have arisen but for Foothills' manufacture and shipment of the product into the forum.

Because Freeland has made a prima facie showing that minimum contacts exist between Pennsylvania and Foothills, the exercise of personal jurisdiction is "presumptively constitutional."[174] All of her claims against Foothills arise from the same conduct, and Foothills must now demonstrate a compelling reason that would "render jurisdiction unreasonable."[175] Foothills provides the following reasons: (1) as an Arizona-based entity, it would be substantially burdened by litigation in Pennsylvania; and (2) Arizona has the strongest regulatory interest in the outcome of this litigation.[176] On the first point, Foothills knowingly filled the prescription,

---

District of Pennsylvania, to suggest that a single sale to a plaintiff in the forum state is insufficient to assert jurisdiction over an out-of-state defendant. No. 2:24-CV-1569, 2025 WL 2282567 (W.D. Pa. Aug. 8, 2025); *see* Doc. 24, at 11. Foothills also cites *Nifty Home Products v. Ladynana*, a nonprecedential decision from the Third Circuit. Nos. 23-1332, 23-2028, 2024 WL 4987245 (3d Cir. Dec. 5, 2024); *see* Doc. 24, at 5. Both cases stand for the proposition that a single sale standing alone is not sufficient. But those cases are inapposite because Foothills' sales do not stand alone. Foothills therefore has sufficient contacts with Pennsylvania and has purposefully availed itself of its laws.

173 *Ford Motor*, 592 U.S. at 359 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 582 U.S. 255, 262 (2017)).

174 *O'Connor*, 496 F.3d at 324.

175 *Burger King*, 471 U.S. at 477.

176 Doc. 24, at 9.

then affirmatively shipped the medication across state lines to Freeland's Pennsylvania address. Having chosen to engage in interstate business, Foothills cannot complain that the interstate character of the resultant litigation is constitutionally unfair.

As to the second point, the Court recognizes that Arizona has a legitimate regulatory interest here. However, such an interest does not displace Pennsylvania's own interest: (1) a Pennsylvania resident obtained medication from Foothills; (2) Foothills knowingly sent the medication into Pennsylvania; and (3) the resident consumed that medication in Pennsylvania. Considering Foothills' deliberate targeting of the forum, Pennsylvania possesses a direct interest in adjudicating the consequences of that transaction.[177] Nor would civil liability in this matter interfere with Arizona's authority to license and regulate pharmacies operating within its borders. In the absence of any valid showing that litigating in Pennsylvania would place Foothills at a severe disadvantage, the exercise of specific jurisdiction comports with fair play and substantial justice.

In sum, Foothills itself selected, filled, packaged, addressed, and shipped Freeland's prescription medication to Pennsylvania for pecuniary gain. The Third

---

[177] *Burger King*, 471 U.S. at 473 ("'The forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by customers in the forum State' and those products subsequently injure forum customers.") (quoting *World-Wide Volkswagen*, 444 U.S. at 297-98).

Circuit has recognized that "the presence of direct shipments will show the defendant's purposeful availment."[178] Foothills has done that, and more. Because Freeland's claims arise from the exact medication that Foothills shipped to her, the requisite relationship among Foothills, the forum, and the litigation is sufficiently direct to subject Foothills to personal jurisdiction. Consequently, the Court will deny Foothills' motion to dismiss for lack of personal jurisdiction.

### 3. Sajad Zalzala, M.D.

Defendant Dr. Zalzala presents a much closer question. Dr. Zalzala is a doctor licensed in several states, including Pennsylvania.[179] Freeland alleges that Dr. Zalzala exercises control and ownership over Defendant Avocado Health and SkinnyRx, serving as the Medical Director for both.[180] Dr. Zalzala also owns Defendant TeleRx, which supplies the provider network used to prescribe medication.[181] Based on these allegations, Freeland argues that jurisdiction is proper. In the alternative, Freeland argues that the Court may exercise RICO jurisdiction under 18 U.S.C. § 1965(b).

Under the traditional test, Dr. Zalzala is not subject to general jurisdiction and Freeland concedes as much.[182] The Court must now assess whether Dr. Zalzala is

---

178 *Renner*, 33 F.3d at 282; *see* 42 Pa. Cons. Stat. § 5322(a)(1)(iii) ("The shipping of merchandise directly or indirectly into" the Commonwealth constitutes the transaction of business within it).

179 Doc. 1, at 10.

180 *Id.* at 10-11.

181 *Id.* at 96.

182 Doc. 50, at 16. Dr. Zalzala is a citizen of Michigan, not Pennsylvania.

subject to specific jurisdiction. He is not. The record does not suggest that Dr. Zalzala purposefully availed himself of the laws of Pennsylvania. Freeland argues that because she provided Defendant TeleRx with her personal information required for prescriptions, and because Dr. Zalzala owns TeleRx, he acted with "full knowledge of [Freeland's] identity and location" sufficient to constitute minimum contacts.[183] Such an argument relies merely on Dr. Zalzala's ownership role to attribute corporate Pennsylvania contacts to him, which cannot sustain specific jurisdiction without more.[184]

Freeland's additional arguments fare no better. True, Dr. Zalzala's likeness is prominently featured on SkinnyRx's website,[185] and his headshot and endorsement of products may have helped to induce purchases. But such conduct does not constitute a "deliberate targeting of the forum."[186] As for Dr. Zalzala's Pennsylvania medical license, Defendants note that no court has used licensure as a sole basis to exercise jurisdiction over an out-of-state doctor.[187] This Court is similarly unaware of any such rulings and declines to be the first court to do so. And even if Dr. Zalzala's license were a contact, Freeland's claim would not arise from it. Dr. Zalzala never prescribed Freeland oral tirzepatide, so Freeland's claims in no way

---

[183] Doc. 50, at 18.

[184] *Lautman v. Loewen Group, Inc.*, No. 99-75, 2000 WL 772818, at *5 (E.D. Pa. June 15, 2000) ("the contacts of the defendant as an agent of a corporation are [generally] not attributable to him to establish personal jurisdiction").

[185] Doc. 1, at 53.

[186] *O'Connor*, 496 F.3d at 317.

[187] Doc. 58, at 8.

depend on his Pennsylvania license. Nor does Freeland argue that Dr. Zalzala's role as Medical Director of Avocado Health or as an owner of TeleRx turned on his Pennsylvania license. Under the traditional test, the Court cannot exercise personal jurisdiction over Dr. Zalzala.

But that does not end the analysis. As the Court addresses later, Freeland adequately pleads her RICO claim. RICO provides an independent statutory basis for exercising personal jurisdiction over defendants who otherwise lack sufficient contacts with the forum state.[188] Section 1965(b) permits the exercise of personal jurisdiction when three requirements are satisfied: (1) at least one defendant satisfies the traditional minimum contacts analysis sufficient for the court to exercise personal jurisdiction; (2) the "ends of justice" require bringing the additional defendant before the court; and (3) the exercise of jurisdiction comports with federal due process.[189]

The first and third requirements are simple enough: for the first, at least one defendant must satisfy the traditional minimum contacts test before a court may proceed with its analysis. The third is similarly clear, but with one caveat: when considering federal due process requirements, the defendant's relevant contacts are

---

[188] *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 122-23 (3d Cir. 2020) (finding that the national policy interest in enforcing RICO militates in favor of exercising personal jurisdiction over defendants who lack minimum contacts with the forum state under the traditional test).

[189] *Id.* at 120-22. The Third Circuit has also acknowledged that "there is a circuit split regarding which subsection of the RICO provision governs the exercise of personal jurisdiction," but ultimately favored the majority approach which views § 1965(b) as the statutory basis for personal jurisdiction. *Id.* at 116-17.

not those "with the forum state," but rather contacts "with the nation as a whole."[190] The second element is more nuanced, and circuit courts are split on the issue of when precisely the "ends of justice" require that a defendant be brought before a particular court.[191] One side, led by the United States Court of Appeals for the Ninth Circuit, requires a plaintiff to "establish that there is no other district that would have traditional personal jurisdiction over all the defendants."[192] The other, led by the United States Court of Appeals for the Tenth Circuit, rejects this view in favor of a more "flexible concept uniquely tailored to the facts of each case."[193] This "flexible" view, however, has a limit: the "ends of justice" are not satisfied merely because a plaintiff suffered damages in the forum state.[194] The Third Circuit has not picked a side,[195] but cautions that courts should resist exercising jurisdiction under § 1965(b) when it would "hal[e] defendants into far flung fora."[196]

As to Dr. Zalzala, the first and third requirements pose no barrier to RICO jurisdiction. The first is satisfied because jurisdiction over Foothills is proper through the traditional test. The third is as well, as Dr. Zalzala both resides and conducts business in the United States. So Dr. Zalzala has contacts "with the nation

---

[190] *Id*. at 122.

[191] *Id*. at 121.

[192] *Butcher's Union Loc. No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).

[193] *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006).

[194] *Id*.

[195] *Laurel Gardens*, 948 F.3d at 121 ("We need not—and do not—decide whether the Ninth or the Tenth Circuit is correct . . . .").

[196] *Id*. at 122 (quoting *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 72 (2d Cir. 1998)).

as a whole"[197] such that an exercise of jurisdiction would further the federal policy of "enabling a single district court to exercise personal jurisdiction over all defendants."[198] The only question, then, is whether such an exercise of jurisdiction over Dr. Zalzala serves "the ends of justice."

It does, regardless of whether one relies on the Ninth Circuit's or Tenth Circuit's approach. Start with the Ninth Circuit's more mechanical approach. Here, there is no other district that would have traditional personal jurisdiction over all the Defendants: Dr. Zalzala is a citizen of Michigan,[199] Foothills was organized in Arizona,[200] Avocado Health was incorporated in New York,[201] and TeleRx was organized in California.[202] The record is also devoid of any evidence to suggest that a single forum would have specific jurisdiction over all four Defendants, and the Court can only conclude as much. The Tenth Circuit's more "flexible" approach presents a closer question but yields the same answer.

Defendants principally rely on the Tenth Circuit's decision in *Cory v. Aztec Steel Building*.[203] In *Cory*, the plaintiff argued that the "ends of justice" favored RICO jurisdiction because he had sustained damages in the forum.[204] The Tenth

---

[197] *Id*.
[198] *Id*. at 123.
[199] Doc. 1, at 10.
[200] *Id*. at 5.
[201] *Id*. at 6-7.
[202] *Id*. at 9.
[203] *Cory*, 468 F.3d 1226.
[204] *Id*. at 1232-33.

Circuit held that "such facts, standing alone," were insufficient.[205] Defendants argue that Freeland alleges the same, but Freeland alleges more. The complaint charges Dr. Zalzala with overseeing and managing integral parts of the very enterprise that allegedly marketed, sold, and shipped the product to the forum. Under the Tenth Circuit's test then, the "facts of [this] case" militate towards exercising RICO jurisdiction.[206] And, mindful of the Third Circuit's warning against haling defendants into distant jurisdictions, Pennsylvania is hardly a "far flung" forum that would unduly burden a Michigan resident.[207] Therefore, the Court concludes that jurisdiction may properly be exercised over Dr. Zalzala under § 1965(b).

With RICO jurisdiction addressed, the Court now considers whether the doctrine of pendent personal jurisdiction applies to Freeland's state law claims. The TeleRx Defendants do not address whether pendent jurisdiction may be exercised pursuant to proper RICO jurisdiction. Indeed, they do not dispute that the state law claims "are so related to" the claims under RICO "that they form part of the same case or controversy under Article III of the United States Constitution."[208] Because "the [C]ourt has personal jurisdiction over the defendant[ ] under service of process authorized by . . . the RICO statute, we can find no constitutional bar to requiring the defendant[ ] to defend the entire . . . case, which includes both federal and state

---

205 *Id.*
206 *Cory*, 468 F.3d at 1232.
207 *Laurel Gardens*, 948 F.3d at 122 (quoting *PT United*, 138 F.3d at 72).
208 *Id.* at 124.

claims arising from the same nucleus of facts."[209] The Court therefore declines to dismiss Dr. Zalzala for lack of personal jurisdiction.

### C. Failure to State a Claim – Fed. R. Civ. P. 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[210] and *Ashcroft v. Iqbal*,[211] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[212] The Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[213]

Defendants raise three arguments under 12(b)(6). First, both the TeleRx Defendants and Foothills argue that Freeland's claims are preempted by the Federal

---

209 *Id.* (quoting *ESAB Grp. Inc. v. Centricut, Inc.*, 126 F.3d 617, 628-29 (4th Cir. 1997)).
210 550 U.S. 544 (2007).
211 556 U.S. 662 (2009).
212 *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
213 *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

Food, Drug, and Cosmetic Act (FDCA).[214] Second, they attack Freeland's RICO claims: Foothills argues that Freeland fails to sufficiently allege predicate acts under RICO, while the TeleRx Defendants raise the intra-corporate conspiracy doctrine.[215] Finally, the TeleRx Defendants argue that Freeland fails to plead anything beyond conclusory allegations.[216] The Court considers each objection in turn.

**1. The Federal Food, Drug, and Cosmetic Act (FDCA)**

First, the Court considers whether the FDCA mandates dismissal of Freeland's claims. Because the FDCA both regulates drug labeling and marketing, and reserves judgment of a drug's efficacy to the FDA, Defendants argue the FDCA preempts Freeland's state law claims and precludes her RICO claims. Freeland responds that she alleges fraud and not a regulatory violation. The Court agrees with Freeland with one minor exception—her "alternative and independent" basis for UTPCPL liability.[217]

Preemption is rooted in the Supremacy Clause.[218] There are three types of preemption: express, conflict, and field preemption.[219] All three "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal

---

214 Doc. 24, at 12-17; Doc. 42, at 26-30.
215 Doc. 24, at 17-21; Doc. 42, at 31-33.
216 Doc. 42, at 24.
217 Doc. 50, at 15; *see* Doc. 1, at 111-13.
218 *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).
219 *Id.*

law; and therefore the federal law takes precedence and the state law is preempted."[220] But preemption "is an extraordinary power;"[221] courts must "start[ ] with the basic assumption that Congress did not intend to displace state law,"[222] also described as the "presumption against pre-emption."[223] The presumption applies to "fields within the police power of the state,"[224] and "courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress."[225]

Turning to the FDCA, § 337(a) provides that "all such proceedings for the enforcement, or to restrain violations," of the FDCA must be brought "by and in the name of the United States."[226] Private litigants may not sue for relief on a cause of action that relies on an alleged FDCA violation or evade that bar by relabeling an FDCA claim as a state law claim.[227] Such claims are preempted if they "exist solely by virtue of" federal requirements, where "the existence of these federal enactments

---

[220] *Id*.
[221] *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).
[222] *Farina v. Nokia Inc.*, 625 F.3d 97, 116 (3d Cir. 2010) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)) (internal quotation marks omitted).
[223] *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009).
[224] *Farina*, 625 F.3d at 116.
[225] *United States v. Locke*, 529 U.S. 89, 108 (2000).
[226] 21 U.S.C. § 337(a).
[227] *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 352-53 (2001); *see also In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 788-89 (3d Cir. 1999) ("It is well settled . . . that the FDCA creates no private right of action."); *Redmond v. Fresh Grocers Store*, 402 F.App'x 685, 685-86 (3d Cir. 2010) (affirming dismissal and holding that plaintiffs "[cannot] maintain a suit for damages under the FDCA").

is a critical element" of the case.[228] As the Third Circuit has reiterated, allowing plaintiffs to recover for FDCA violations through *per se* state law theories "would undermine section 337(a) by establishing a private, state-law cause of action for violations of the FDCA."[229]

However, § 337(a) does not preempt or preclude everything the FDA regulates. For one, the FDCA's bar on private enforcement does not necessarily preclude other federal statutes and courts effectuate both statutes when possible.[230] Furthermore, FDA oversight is not the "exclusive means of ensuring drug safety and effectiveness;"[231] claims may proceed if grounded in "traditional state tort law which had predated the federal enactments in question."[232] In other words, a claim survives if it rests on a duty that would exist but for the FDCA. No matter if the product itself is regulated by the FDA, or if the questioned conduct may concurrently violate the

---

228 *Buckman*, 531 U.S. at 352-53; *see Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (holding that an explicit preemption clause of the FDCA did not prohibit a state from providing traditional damages remedies for violations of common law duties when the state law duties parallel federal requirements); *see also Phelps v. Wyeth, Inc.*, 938 F.Supp.2d. 1055, 1063-65 (D. Or. 2013) (comparing *Medtronic* and *Buckman* to suggest that "the Supreme Court has distinguished between a private cause of action that seeks only to enforce a violation of the FDCA, and a private cause of action based on a traditional category of state law that parallels the requirements of the FDCA.").

229 *Orthopedic Bone Screw*, 193 F.3d at 791.

230 *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014). In brief, the Supreme Court in *POM Wonderful* found that the FDCA did not preclude a claim under Lanham Act because (1) neither expressly precluded the other; (2) both had complementary remedies; and (3) both "ha[d] its own scope and purpose." *Id.* at 115. *See also J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 144 (2001) ("[W]e can plainly regard each statute as effective because of its different requirements and protections").

231 *Wyeth*, 555 U.S. at 574-75.

232 *Buckman*, 531 U.S. at 352-53.

FDCA. The proper inquiry is whether the plaintiff can establish liability without proving an FDCA violation.[233] If so, § 337(a) poses no barrier.

Freeland's core allegations rest on misrepresentations about oral tirzepatide. Those allegations support her RICO claims, her fraud and unjust-enrichment claims, and most of her UTPCPL claim. None of those allegations require her to prove an FDCA violation. While the Court does not need to exhaustively detail each claim, a brief explanation of Freeland's RICO, fraud, and unjust enrichment claims should suffice. As for the RICO claims, Freeland articulates a fraudulent scheme implemented through (1) false representations about the efficacy of oral tirzepatide; (2) fraudulent prescriptions through the Defendants' telehealth platforms; and (3) shipments of the product across state lines.[234] None of those components rely on a finding of FDCA noncompliance, and RICO and the FDCA exist as distinct regimes. For example, whether oral tirzepatide has the properties that Defendants claimed is a factual question independent from any FDCA imposed duty. Freeland's RICO claims are not precluded.

The same is true for her fraud and unjust enrichment claims. For fraud, Pennsylvania prohibits knowingly or recklessly making a material misrepresentation

---

[233] *See Id.*; *see also Vapor Tech. Ass'n v. Wooten*, 184 F.4th 329 (4th Cir. 2026) ("*Buckman* instructs that a state law claim is preempted if, but only if, the plaintiff needs to *establish an FDCA violation* to prevail on the claim.").

[234] Doc. 1, at 93-107.

with the intent to induce another's justifiable reliance, thereby causing injury.[235] Freeland alleges false representations, induced reliance, and economic loss.[236] Those allegations long predate the FDCA and remain actionable *even if* Defendants fully complied with every applicable regulation.[237] And Freeland's unjust enrichment claim does not depend on an FDCA violation either.[238] Of course, this analysis would be different if Freeland alleged the retention of revenues was unjust because oral tirzepatide violated the FDCA. But she does not, so her claim is not preempted by the FDCA.

As for these claims, Defendants' arguments are generally unavailing. For one, Defendants' argue that the FDA decides questions of whether "substantial evidence" validates claims made about certain drugs.[239] Fair enough, but Freeland asks a different question of whether Defendants' statements about oral tirzepatide were

---

[235] *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) (quoting *Overall v. Univ. of Pa.*, 412 F.3d 492, 498 (3d Cir. 2005)).

[236] *See* Doc. 1, at 114-16.

[237] *See generally Thomas v. Winchester*, 6 N.Y. 397 (N.Y. 1852); *Blood Balm Co. v. Cooper*, 10 S.E. 118 (Ga. 1889); *Seven Cases v. U.S.*, 239 U.S. 510, 517-18 (1916) ("That false and fraudulent representations may be made with respect to the curative effect of substances is obvious . . . . persons who make or deal in substances or compositions alleged to be curative are in a position to have superior knowledge, and may be held to good faith in their statements. It cannot be said . . . that one who should put inert matter or a worthless composition in the channels of trade, labeled or described in an accompanying circular as a cure for disease, when he knows it is not, is beyond the reach of the lawmaking power.") (citations omitted). Though *Seven Cases* dealt with the Federal Food and Drugs Act, it nevertheless remains true that misrepresentations about the efficacy of pharmacological products have historically remained actionable. And as the Supreme Court has clarified, the Federal Food and Drugs Act "supplemented"—not replaced—the protection for consumers already provided by state regulation and common-law liability. *Wyeth*, 555 U.S. at 566.

[238] Doc. 1, at 116-118.

[239] Doc. 24, at 24-25 (quoting 21 U.S.C. § 355).

true. Courts and juries answer similar questions routinely in fraud cases about prescription drugs.[240] Nor can Defendants argue that because the FDCA prohibits misleading drug labeling, any claim about misleading drug marketing is preempted. Aside from the fact that Freeland disclaims any theory of misbranding under federal law, Defendants' argument reverses the rule: the question is *not* whether federal law also prohibits the conduct, but rather whether the claim exists only because of federal law.[241] And here, a promise that a product works, made about a product that does not, is fraud with or without the FDCA.

However, Freeland's UTPCPL claim is different in one important respect. To be sure, much of Freeland's claim does not rest on the FDCA. The complaint invokes sections of the UTPCPL that prohibit "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding,"[242] and representations "that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ."[243] Pennsylvania courts recognize the breadth

---

[240] *See In re Neurontin Mktg. and Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013) (affirming judgment against drug manufacturer for fraudulent marketing practices); *see also Capaci v. Sports Research Corporation*, 445 F.Supp.3d. 607, at 623 (C.D. Cal. 2020) (rejecting argument that the FDA had primary jurisdiction because "plaintiffs' claims present a 'typical false advertising case well within the province of the courts because allegations of deceptive labeling do not require the expertise of the FDA to be resolved in the courts, as every day courts decide whether conduct is misleading.'") (citing *Nathan v. Vitamin Shoppe, Inc.*, 3:17-cv-01590, 2019 WL 1200554, at *6 (S.D. Cal. Mar. 14, 2019)).

[241] *Buckman*, 531 U.S. at 352-53.

[242] Doc. 1, at 108; 73 P.S. § 201-2(4)(xxi).

[243] *Id*. at 109; 73 P.S. § 201-2(4)(v).

of the UTPCPL, and even a cursory reading of the statute shows that the duties implicated by the statute do not depend on the FDCA.[244]

But Freeland also advances an "alternative and independent" theory of liability for her UTPCPL claim.[245] That theory rests on oral tirzepatide's classification as a "new drug" under both the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act (CSDDCA) and the FDCA.[246] Because Pennsylvania law forbids selling a new drug without approval, and because Defendants "cannot invoke the Section 503A compounding exemption of the federal FDCA,"[247] Freeland concludes that selling oral tirzepatide constitutes "fraudulent or deceptive conduct" under the UTPCPL's catchall provision.[248] This separate theory,

---

[244] *See Ash v. Continental Ins. Co.*, 932 A.2d 877, 881-82 (Pa. 2007) (finding that the UTPCPL "is broad enough to encompass all claims of unfair and deceptive acts or practices in the conduct of any trade or commerce.") (citing *Commonwealth v. Peoples Benefit Servs.*, 895 A.2d 683, 696 (Pa. Cmwlth. 2006)); *see also Commonwealth v. Monumental Props., Inc.*, 329 A.2d 812, 817 (Pa. 1974) (finding the UTPCPL's "expansive provisions reflect the legislative judgment that unfairness and deception in all consumer transactions must be halted. These sections . . . are to be liberally construed to effectuate that intent."); *Hope v. Fair Acres Geriatric Ctr.*, 174 F.Supp.3d 880, 893 (E.D. Pa. 2016) (describing the UTPCPL as a "broad statute that prohibits a variety of misleading or fraudulent corporate acts.").

[245] Doc. 50, at 15; *see* Doc. 1, at 111-13.

[246] Doc. 1, at 111-13.

[247] *Id.* at 113. Section 780-102(b) of the CSDDCA defines "new drug" as "(i) any drug the composition of which is such that such drug is not generally recognized among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof; or (ii) any drug the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions." *Id.* Notwithstanding certain exceptions not relevant here, the FDCA defines new drug almost identically. 21 U.S.C. § 321(p).

[248] Doc. 1, at 113; 73 P.S. § 201-2(4)(xxi).

unlike the other claims, cannot be adjudicated without deciding whether Defendants violated the FDCA. Indeed, no party disputes that oral tirzepatide is not FDA approved. So, the dispute turns on whether the pill qualifies for the § 503A exemption. As Freeland's own case citation clarifies, § 503A serves as an exemption "from the adulteration, misbranding, and new drug provisions."[249] A compounded drug that fails to qualify for the § 503A exemption is an unapproved new drug, and introducing it into interstate commerce violates the FDCA.[250]

But whether a compounded drug satisfies § 503A is a question reserved for federal enforcement. Further, the Supreme Court has warned against private litigation that would upset the FDA's "somewhat delicate balance of statutory objectives,"[251] and the Third Circuit has instructed against "preemptively [determining] how a federal administrative agency will interpret and enforce its own regulation."[252] For similar reasons, the Ninth Circuit has preempted similar state law

---

[249] Doc. 48, at 13 (citing *Med. Ctr. Pharm. v. Mukasey*, 536 F.3d 383, 405 (5th Cir. 2008)).

[250] 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug,"). A drug is exempted from § 355(a) if "compounded for an identified individual patient based on the receipt of a valid prescription order or a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is necessary for the identified patient, if the drug product meets the requirements of this section, and if the compounding" satisfies other conditions pursuant to § 503A. The § 503A exemption is codified at 21 U.S.C. § 353a.

[251] *Buckman*, 531 U.S. at 348.

[252] *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir. 1990).

claims that would have required a court to decide whether a compounded drug qualified for an FDCA exemption.[253]

In response, Freeland cites to *Zyla Life Sciences v. Wells Pharma of Houston*.[254] There, the Fifth Circuit permitted state law claims against a compounder to proceed, despite the inevitable question of whether a federal exemption applied.[255] The Fifth Circuit first reasoned that states may enforce laws that mirror federal laws without running into preemption[256] and, second, confined the Supreme Court's decision in *Buckman Co. v. Plaintiffs' Legal Committee* to claims of fraud on the FDA.[257] The Court respectfully disagrees. As to the first point, this Court does not doubt that Pennsylvania may enact and enforce its own drug laws. That said, a proxy state law claim seeking to litigate a federal regulatory determination extends far beyond mere stateside enforcement. And as to the second point, the Court views *Buckman* as resting more heavily on § 337(a)'s "clear evidence that Congress intended that the [statute] be enforced exclusively by the Federal Government."[258]

---

[253] *Nexus Pharms., Inc.* v. *Central Admixture Pharmacy Servs., Inc.*, 48 F.4th 1040, 1048-49 (9th Cir. 2022) (barring plaintiffs claim because proceeding "with a claim that Defendants violated this law when the FDA did not so determine would, in effect, permit [plaintiff] to assume enforcement power which the statute does not allow and require the finder of fact to make a decision that the FDA itself did not make.").

[254] *Zyla Life Scis., LLC v. Wells Pharma of Houston, LLC*, 134 F.4th 326 (5th Cir. 2025).

[255] *Id.* at 331.

[256] *Id.* at 332 (reasoning that when state law mirrors federal law, "it recognizes the supremacy of the national law by conforming to it" and therefore "it would be anomalous to conclude the Supremacy Clause some-how preempts them.") (quoting *Asbell v. Kansas*, 209 U.S. 251, 258 (1908)) (internal quotation marks omitted).

[257] *Id.* at 337.

[258] *Buckman*, 531 U.S. at 352.

More persuasively, the Third Circuit also relied on § 337(a) *before Buckman* to bar claims that alleged no fraud on the agency at all.[259] The Court accordingly declines to extend *Zyla* to the instant case.

As a final point, take Freeland's own hypothetical: "[e]xtended to its logical application, Defendants would argue that because the FDA has not approved a wooden chair, a claim for fraud in the sale of that wooden chair is an FDCA enforcement action and preempted."[260] But Freeland's alternative theory does not just allege that Defendants lied about the chair; instead, it alleges the chair *needed* FDA approval or a qualifying exemption. That makes a violation of the FDCA a "critical element" of her claim, which the Supreme Court has cautioned against.[261] Freeland therefore may not pursue her UTPCPL claim on the theory that Defendants sold an unapproved new drug outside § 503A's compounding exemption. Her UTPCPL claim otherwise proceeds, including on any theory that Defendants misrepresented oral tirzepatide.

### 2. The Racketeer Influenced and Corrupt Organizations Act (RICO)

Next, Defendants challenge Freeland's RICO claims brought under 18 U.S.C. §§ 1962(c) and (d). Section 1964(c) provides a cause of action for "any person

259 *Orthopedic Bone Screw*, 193 F.3d at 791-92 (relying on 337(a) to affirm dismissal of conspiracy claims).

260 Doc. 50, at 28.

261 *See Buckman*, 531 U.S. at 353.

injured in his business or property by reason of a violation of section 1962."[262] Pursuant to that statute, Freeland pleads two RICO claims against "All Defendants" for violations of 18 U.S.C. §§ 1962(c) and 1962(d).[263] To state a claim under § 1964(c), plaintiffs must plead "(1) a section 1962 violation and (2) an injury to business or property by reason of such violation."[264] Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[265] To state a claim under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.[266] Section 1962(d) acts derivatively, making it unlawful "for any person to conspire to violate" § 1962(c).[267] "Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient."[268]

---

262 18 U.S.C. § 1964(c).

263 Doc. 1, at 93-107.

264 *Lightning Lube, Inc., v. Witco Corp.*, 4 F.3d 1153, 1187 (3d Cir. 1993).

265 18 U.S.C. § 1962(c).

266 *Tapp v. Proto*, 718 F.Supp.2d 598, 625 (E.D. Pa. 2010) *aff'd,* 404 F.App'x 563 (3d Cir. 2010) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

267 18 U.S.C. § 1962(d).

268 *Lightning Lube*, 4 F.3d at 1191; *see Verify Smart Corp. v. Bank of America, N.A.*, No. 17-4248, 2021 WL 2549335, at *6 (D.N.J. June 17, 2021) ("Because Plaintiff has failed to establish a substantive RICO claim, its RICO conspiracy also fails.") (citing *Lightning Lube*, 4 F.3d at 1191); *see also Kramer v. Gruntal & Co., Inc.*, Civ. A. No. 91-0781, 1992 WL 70593, at *3 (E.D. Pa. Apr. 3, 1992) ("Plaintiffs' 1962(c) claim has successfully withstood the motion to dismiss. Therefore, plaintiffs may go forward with their section 1962(d) claim as well."); *Turi v. Main Street Adoption Servs., LLP*, 2012 WL 4510585, at *13 (E.D. Pa. Oct. 1, 2012)

**a. Foothills Professional Pharmacy, Ltd.**

Freeland alleges that Foothills engaged in the predicate acts of mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343.[269] The complaint identifies Foothills as manufacturing, packaging, and shipping oral tirzepatide across state lines in service to a common purpose of marketing and selling an ineffective pharmacological product.[270] The complaint also quotes Foothills' shared leadership with Avocado Health and its own claim that it "bridge[s] the gap between" telemedicine providers and pharmacy care to allege its complicity in the fraudulent representations that induced consumer purchases.[271] Foothills responds both that Freeland's RICO claims are precluded by the FDCA, and that Freeland fails to sufficiently allege that Foothills (1) participated in a RICO enterprise; and (2) engaged in any predicate acts.[272] Because Freeland's RICO claims are not precluded by the FDCA for the reasons discussed above, the Court begins by assessing whether the Complaint adequately pleads Foothills' participation in a RICO "enterprise."

**i. RICO "Enterprise"**

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated

("Because the Court finds the Plaintiffs have stated a claim under § 1962(c), it likewise finds that the Plaintiffs have stated a claim under § 1962(d).").

[269] Doc. 1, at 89, 99-101.

[270] *Id.*

[271] *Id.* at 103 n.153.

[272] Doc. 24, at 24-27.

in fact although not a legal entity."[273] A RICO enterprise may consequently take the form of either a formal legal entity or an informal association-in-fact.[274] If an enterprise is alleged to be an association-in-fact, it must have (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.[275] The Third Circuit has made clear that a plaintiff must explicitly plead these three features to allege an association-in-fact enterprise.[276] That enterprise does not require "[a] formal hierarchy or means for decision-making, [nor a] purpose or economic significance beyond or independent of the group's pattern of racketeering activity."[277]

Here, Freeland has sufficiently alleged an association-in-fact. Take all three features in order: first, Freeland alleges that all Defendants participate in a broad scheme with a common purpose "to market, distribute, and profit from the nationwide sale of 'oral tirzepatide' products."[278] Next, each Defendant had a role in the enterprise: Avocado Health provided the back-end technological framework to the telehealth websites that induced purchases;[279] TeleRx "supplie[d] and operate[d]

---

[273] 18 U.S.C. § 1961(4).
[274] *United States v. Bergin*, 650 F.3d 257, 265-66 (3d Cir. 2011).
[275] *Boyle v. U.S.*, 556 U.S. 938, 946 (2009).
[276] *Chey v. LaBruno*, 608 F.Supp.3d 161, 184-85 (D.N.J. 2022) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 364-70 (3d Cir. 2010)).
[277] *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 368 (citing *United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009)).
[278] Doc. 1, at 96.
[279] *Id*. at 95.

the clinician network responsible for issuing . . . oral tirzepatide prescription[s]";[280] Dr. Zalzala managed TeleRx and provides credibility to the telehealth websites in question;[281] and Foothills manufactured the very product central to the entire enterprise.[282] The Complaint goes on to allege that Defendants coordinated to perpetrate this scheme.[283] Third and lastly, the instant transactions occurred through October and December 2025, with ongoing nationwide marketing and sales campaigns. Freeland has accordingly alleged longevity "sufficient to permit these associates to pursue the enterprise's purpose"[284]

In alleging as much, Freeland has properly pleaded "(1) a purpose; (2) relationships among those alleged to be associated with the enterprise; and (3) longevity . . . ."[285] She has sufficiently alleged an association-in-fact enterprise, and the Court will not dismiss her RICO claim on this ground.

**ii. Conduct and Predicate Acts**

Foothills' final argument may be properly distilled to a single line: "mere association with the enterprise" will not suffice.[286] The "conduct" requirement of § 1962(c) demands participation "in the operation or management of the enterprise

---

280 *Id*. at 96.
281 *Id*. at 95.
282 *Id*. at 94-95.
283 *Id*. at 96-97.
284 *Boyle*, 556 U.S. at 946.
285 *Id*.
286 *Macauley v. Estate of Nicholas*, 7 F.Supp.3d 468, 483 (E.D. Pa. 2014) (citing *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 370).

itself."[287] Liability turns on a "showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."[288] Furthermore, the defendants must individually conduct or participate in the enterprise's affairs "through—that is, by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of—a pattern of racketeering activity."[289] "It is the 'person' charged with the racketeering offense—not the entire enterprise—who must engage in the 'pattern of racketeering activity.'"[290] A person engages in a pattern of racketeering activity by engaging in "at least two acts of racketeering activity" within a span of ten years.[291] Racketeering activity forms a pattern where the predicate acts are "related, and . . . amount to . . . a threat of continued . . . activity;"[292] and relatedness requires the predicate acts to "have the same or similar purposes, results, participants, victims or methods of commission . . . ."[293]

Freeland has alleged more than just mere association; Foothills is not a vendor who happened to sell supplies to those alleged to have perpetrated a fraud. On Freeland's allegations, it instead made the *very* product that was the object of the enterprise. Foothills then shipped that product directly to customers who purchased

---

[287] *Id*. (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993)).
[288] *Id*. (quoting *Reves*, 507 U.S. at 185).
[289] *Id*. (quoting *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 372).
[290] *Bergin*, 650 F.3d at 267.
[291] *Macauley*, 7 F.Supp.3d at 483; 18 U.S.C. § 1961(5).
[292] *Macauley*, 7 F.Supp.3d at 483 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).
[293] *Id*. (quoting *Mega Concrete, Inc. v. Smith*, CIV.A. 09-4234, 2013 WL 3716515, at *10 (E.D. Pa. July 15, 2013)).

it through the telehealth brands that Foothills claimed to work with.[294] Together with the overlapping leadership structure between Foothills and Avocado Health,[295] Foothills is alleged to be a manufacturer that knowingly produced an instrument of fraud.[296] Freeland also alleges that Foothills used the mails to ship oral tirzepatide.[297] A mailing need only be "incident to an essential part of the scheme," and delivering the product to the customer is arguably the most essential part of this scheme.[298] Foothills' shipments to Freeland are consequently qualifying predicate acts for RICO purposes, and it cannot be said that they are merely ancillary to the fraud. And, the alleged conduct sounds in fraud, perpetrated through sales, advertising, and distribution.[299] By their nature then, these "open-ended" acts "project[ ] into the

---

294 Doc. 1, at 5.
295 *Id*. at 6.
296 *See Munderloh v. Biegler GmbH*, 2022 WL 901408, at *10 (D. Ariz. Mar. 28, 2022) (refusing to dismiss RICO claim against product manufacturer because "the alleged scope of the scheme specifically contemplated the misrepresentation of the [product], and because [manufacturer] is alleged to have specifically participated in the marketing and sale of the device.").
297 Doc. 1, at 31.
298 *United States v. Tiller*, 302 F.3d 98, 101 (3d Cir. 2002) (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1954)). *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1413 (3d Cir. 1991) ("[E]ach mailing that is incident to an essential part of the scheme constitutes a new violation."). Insofar as Freeland alleges that Foothills mailed oral tirzepatide in furtherance of the scheme, the Complaint raises such a plausible and actionable inference. *AR Network, LLC v. Wireless Guardian*, No. 25-1447, 2026 WL 973498, at *32 n.34 (E.D. Pa. Apr. 10, 2026).
299 Doc. 1, at 97.

future"[300] and "pose a threat of continued . . . activity."[301] Freeland's pleadings are therefore sufficient and satisfy even Rule 9(b)'s heightened standard.[302]

Foothills argues that it merely "fills prescriptions from a variety of telehealth entities" and consequently "only provide[s] lawful services to the other Defendants."[303] Foothills relies on two cases in support: *Reves v. Ernst & Young*[304] and *Grant v. Turner*.[305] A brief review of the facts shows how these cases cut the other way. In *Reves*, an accounting firm audited a farmers' cooperative; the Supreme Court held that reviewing completed transactions and certifying records was not participation in its "operation or management."[306] And in *Grant*, the plaintiff never

300 *Tabas v. Tabas*, 47 F.3d 1280, 1292-93 (3d Cir. 1995) (quoting *H.J. Inc*, 492 U.S. at 241). As clarified by the Supreme Court, open-ended continuity can be satisfied "by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242.

301 *H.J. Inc.*, 492 U.S. at 239.

302 Rule 9(b)'s heightened pleading standard requires a plaintiff to allege "the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation" by stating "the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise conduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). In other words, Rule 9(b) "essentially requires Plaintiffs to allege the who, what, when, where, and how elements to state a claim arising in fraud." *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 703 (D.N.J. 2013) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997)). But the Third Circuit has also clarified that "courts should be sensitive to the fact that application of the Rule prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." *Burlington Coat Factory*, 114 F.3d, at 1418 (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir. 1992)). Accordingly, this standard "has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *Id.* (citing *Shapiro*, 964 F.2d at 285).

303 Doc. 24, at 27.

304 507 U.S. 170.

305 505 F.App'x 107 (3d Cir. 2012).

306 *Reves*, 507 U.S. at 176-77 (quoting *Arthur Young & Co. v. Reves*, 936 F.2d 1310, 1324 (8th Cir. 1991)) (citation modified). In *Ins. Brokerage Antitrust Litigation*, 618 F.3d at 371-72, the

alleged how the defendants committed or aided in any predicate act.[307] Here, Freeland does not allege an ancillary service like in *Reves*, or only conclusory statements like in *Grant*. She instead alleges specific conduct and overlapping leadership in service to a coordinated enterprise.[308] Therefore, the Court declines to dismiss Freeland's RICO claim at this stage of the litigation.

**b. TeleRx Defendants**

The TeleRx Defendants—also alleged to have engaged in the predicate acts of mail fraud and wire fraud—argue that the intra-corporate conspiracy doctrine bars Freeland's RICO conspiracy claim under 18 U.S.C. § 1962(d).[309] That doctrine holds that a corporate entity generally cannot conspire with its agents.[310] The TeleRx Defendants reason that the doctrine applies because the complaint frames all Defendants as constituting a single economic entity.[311] However, whether the doctrine even applies to § 1962(d) actions is another live issue between circuits.[312]

---

Third Circuit formally adopted the "operation or management" standard to determine qualifying "conduct" for the purpose of § 1962(c).

307 *Grant*, 505 F.App'x at 110-13.

308 Doc. 1, at 17-18 n.35 (describing overlapping leadership between Foothills and Avocado Health); *Id.* at 19 (describing partnerships between Foothills and GLP-1 marketing brands). *See Kehr Packages*, 926 F.2d at 1413.

309 Doc. 42, at 31.

310 *See Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 53 F.3d 1125, 1135-36 (3d Cir. 1995).

311 Doc. 42, at 31-34.

312 *State Farm Mut. Auto. Ins. Co. v. Lincow*, 715 F.Supp.2d 617, 640 (E.D. Pa. 2010), *aff'd*, 444 F.App'x 617 (3d Cir. 2011) (describing the circuit split).

The Third Circuit has not decided whether the intercorporate conspiracy doctrine applies in § 1962(d) cases.[313]

More dispositively though, the Court notes that whether the doctrine applies depends on the existence of an agency relationship between co-conspirators. This is a question of fact.[314] For those reasons, "the intra-corporate conspiracy doctrine [is] inappropriate to determine at the motion to dismiss stage, as it is a defense and requires a factual inquiry."[315] As the TeleRx Defendants advance no other arguments on the merits of the claim, the Court declines to dismiss Freeland's RICO claim. And as to both the TeleRx Defendants and Foothills, because Freeland sufficiently pleads a claim under § 1962(c), the Court likewise finds that she has stated a claim under § 1962(d) through allegations of an agreement to defraud.[316]

---

313 *Id.*

314 *See Great Northern Ins. Co. v. ADT Sec. Servs., Inc.*, 517 F. Supp. 2d 723, 746 (W.D. Pa. 2007) (collecting cases) ("Ordinarily, the nature and extent of an agent's authority presents a question of fact for the jury.").

315 *Logan v. Salem Baptist Church of Jenkintown*, 10-cv-0144, 2010 WL 3364203, at *5 (E.D. Pa. Aug. 17, 2010); *see Page-Jones v. Berfield*, 1:20-CV-1042, 2020 WL 7480649, at *5 n.2 (M.D. Pa. Dec. 18, 2020); *Cole v. Encapera*, No. 15-104, 2015 WL 8528449, at *8 (W.D. Pa. Dec. 11, 2015) (quoting *Logan*, 2010 WL 3364203, at *5)); *Melinda Morgan v. Christina Fow*, 1:25-CV-01992, 2026 WL 3151514, at *10 (M.D. Pa, Oct. 21, 2026) (collecting cases).

316 Doc. 1, at 105-106; *see Kramer*, 1992 WL 70593, at *3 ("Plaintiffs' 1962(c) claim has successfully withstood the motion to dismiss. Therefore, plaintiffs may go forward with their section 1962(d) claim as well."); *Turi*, 2012 WL 4510585, at *13 ("Because the Court finds the Plaintiffs have stated a claim under § 1962(c), it likewise finds that the Plaintiffs have stated a claim under § 1962(d).").

### 3. Allegations Against the TeleRx Defendants

The TeleRx Defendants' last argument is that Freeland's allegations "revolve around the marketing on the SkinnyRx website."[317] However, SkinnyRx is not a named defendant—accordingly, the TeleRx Defendants argue that the complaint, as to them, pleads only "conclusory allegations about ownership and control."[318]

The complaint alleges much more, and the Court need only briefly explain why: (1) Avocado Health is charged with supplying the telehealth infrastructure that allows front-end brands to market oral tirzepatide, thereby inducing purchases;[319] (2) Dr. Zalzala oversaw the prescribing of oral tirzepatide to customers;[320] and (3) TeleRx facilitated the network of clinicians who prescribed the oral tirzepatide.[321] These allegations underlie all of Freeland's claims, and the notion that these are merely "conclusory allegations about ownership and control" does not survive even a cursory reading of the complaint.[322] The complaint rather focuses on the fraudulent "marketing, *producing, and selling*" of oral tirzepatide in a coordinated, multi-step scheme.[323] The complaint alleges that each of the TeleRx Defendants played a distinct and essential role in facilitating this scheme. That is sufficient at this stage. The Court therefore declines to dismiss Freeland's claims on this ground.

---

[317] Doc. 42, at 30.
[318] *Id.*
[319] Doc. 1, at 6-7.
[320] *Id.* at 10-14.
[321] *Id.* at 9-10.
[322] Doc. 42, at 30.
[323] Doc. 1, at 44 (emphasis added).

## V. CONCLUSION

For these reasons, (1) the TeleRx Defendants' motion to dismiss will be granted in part and denied in part; (2) Foothills' motion to dismiss will be granted in part and denied in part; and (3) both motions to compel arbitration will be denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge